OKLAHOMA
STATE
COURTS
NETWORK

The information on this page is NOT an official record. Do not rely on the correctness or completeness of this information. Verify all information with the official record keeper. The information contained in this report is provided in compliance with the Oklahoma Open Records Act, 51 O.S. 24A.1. Use of this information is governed by this act, as well as other applicable state and federal laws.

Track Case

## IN THE DISTRICT COURT IN AND FOR TULSA COUNTY, OKLAHOMA

| | |
|---|---|
| CALEB WALKER,<br>Plaintiff,<br>v.<br>CITY OF TULSA,<br>A MUNICIPAL CORPORATION,<br>Defendant, and<br>RAY GOOLDY, INDIVIDUALLY,<br>Defendant, and<br>ZACHARY MORING, INDIVIDUALLY,<br>Defendant, and<br>JAMES KIDD, INDIVIDUALLY,<br>Defendant, and<br>RYAN THOMPSON, INDIVIDUALLY,<br>Defendant. | **No. CJ-2026-2691**<br>**(Civil relief more than $10,000: NEGLIGENCE (GENERAL))**<br><br>Filed: 06/16/2026<br><br>Judge: Civil Docket A |

## PARTIES

CITY OF TULSA, Defendant
GOOLDY, RAY, Defendant
KIDD, JAMES, Defendant
MORING, ZACHARY, Defendant
THOMPSON, RYAN, Defendant
WALKER, CALEB, Plaintiff

## ATTORNEYS

| Attorney | Represented Parties |
|---|---|
| GARRETT, D MITCHELL JR (Bar #20704)<br>GARRETT LAW CENTER PLLC<br>320 S BOSTON AVE, STE 825<br>TULSA, OK 74103 | WALKER, CALEB |

EXHIBIT A

## EVENTS

Get Text Reminders

None

## ISSUES

For cases filed before 1/1/2000, ancillary issues may not appear except in the docket.

**Issue # 1.** Issue: NEGLIGENCE (GENERAL) (NEGL)
Filed By: WALKER, CALEB
Filed Date: 06/16/2026

| Party Name | Disposition Information |
| --- | --- |
| **Defendant:** CITY OF TULSA | |

**Issue # 2.** Issue: UNREASONABLE SEIZURE AND FALSE ARREST (OTHER)
Filed By: WALKER, CALEB
Filed Date: 08/17/2026

| Party Name | Disposition Information |
| --- | --- |
| **Defendant:** GOOLDY, RAY | |
| **Defendant:** MORING, ZACHARY | |
| **Defendant:** KIDD, JAMES | |
| **Defendant:** THOMPSON, RYAN | |

**Issue # 3.** Issue: EXCESSIVE FORCE (OTHER)
Filed By: WALKER, CALEB
Filed Date: 08/17/2026

| Party Name | Disposition Information |
| --- | --- |
| **Defendant:** GOOLDY, RAY | |
| **Defendant:** MORING, ZACHARY | |
| **Defendant:** KIDD, JAMES | |
| **Defendant:** THOMPSON, RYAN | |

**Issue # 4.** Issue: MALICIOUS PROSECUTION (OTHER)
Filed By: WALKER, CALEB
Filed Date: 08/17/2026

**Party Name** **Disposition Information**

**Defendant:**
GOOLDY, RAY

**Defendant:**
MORING, ZACHARY

**Defendant:**
KIDD, JAMES

**Defendant:**
THOMPSON, RYAN

**Issue # 5.** Issue: DEPRIVATION OF LIBERTY WITHOUT DUE PROCESS (STIGMA-PLUS) (OTHER)
Filed By: WALKER, CALEB
Filed Date: 08/17/2026

**Party Name** **Disposition Information**

**Defendant:**
GOOLDY, RAY

**Defendant:**
MORING, ZACHARY

**Defendant:**
KIDD, JAMES

**Defendant:**
THOMPSON, RYAN

**Issue # 6.** Issue: EQUAL PROTECTION (RACE-BASED SELECTIVE ENFORCEMENT) (OTHER)
Filed By: WALKER, CALEB
Filed Date: 08/17/2026

**Party Name** **Disposition Information**

**Defendant:**
CITY OF TULSA

**Defendant:**
GOOLDY, RAY

**Defendant:**
KIDD, JAMES

**Defendant:**
THOMPSON, RYAN

**Defendant:**
MORING, ZACHARY

**Issue # 7.** Issue: MUNICIPAL LIABILITY (MONELL) (OTHER)
Filed By: WALKER, CALEB
Filed Date: 08/17/2026

**Party Name** **Disposition Information**

**Defendant:**
CITY OF TULSA

**Issue # 8.** Issue: COMPENSATORY & PUNITIVE DAMAGES (DAMAGE)
Filed By: WALKER, CALEB
Filed Date: 08/17/2026

| Party Name | Disposition Information |
|---|---|
| **Defendant:** CITY OF TULSA | |
| **Defendant:** GOOLDY, RAY | |
| **Defendant:** MORING, ZACHARY | |
| **Defendant:** KIDD, JAMES | |
| **Defendant:** THOMPSON, RYAN | |

# DOCKET

| Date | Code | Description | Count | Amount |
|---|---|---|---|---|
| 06-16-2026 | [ TEXT ] | CIVIL RELIEF MORE THAN $10,000 INITIAL FILING. | #1 | |
| 06-16-2026 | [ NEGL ] | NEGLIGENCE (GENERAL) | | |
| 06-16-2026 | [ DMFE ] | DISPUTE MEDIATION FEE | | $ 7.00 |
| 06-16-2026 | [ PFE1 ] | PETITION<br>Document Available (#1065534474) TIFF PDF | | $ 163.00 |
| 06-16-2026 | [ PFE7 ] | LAW LIBRARY FEE | | $ 6.00 |
| 06-16-2026 | [ OCISR ] | OKLAHOMA COURT INFORMATION SYSTEM REVOLVING FUND | | $ 25.00 |
| 06-16-2026 | [ OCJC ] | OKLAHOMA COUNCIL ON JUDICIAL COMPLAINTS REVOLVING FUND | | $ 1.55 |
| 06-16-2026 | [ OCASA ] | OKLAHOMA COURT APPOINTED SPECIAL ADVOCATES | | $ 10.00 |
| 06-16-2026 | [ SSFCHSCPC ] | SHERIFF'S SERVICE FEE FOR COURTHOUSE SECURITY PER BOARD OF COUNTY COMMISSIONER | | $ 10.00 |
| 06-16-2026 | [ CCADMINCSF ] | COURT CLERK ADMINISTRATIVE FEE ON COURTHOUSE SECURITY PER BOARD OF COUNTY COMMISSIONER | | $ 1.00 |
| 06-16-2026 | [ CCADMIN0155 ] | COURT CLERK ADMINISTRATIVE FEE ON $1.55 COLLECTION | | $ 0.16 |

**06-16-2026** [ **SJFIS** ] $ 0.45

STATE JUDICIAL REVOLVING FUND - INTERPRETER AND TRANSLATOR SERVICES

**06-16-2026** [ **DCADMIN155** ] $ 0.23

DISTRICT COURT ADMINISTRATIVE FEE ON $1.55 COLLECTIONS

**06-16-2026** [ **DCADMINCSF** ] $ 1.50

DISTRICT COURT ADMINISTRATIVE FEE ON COURTHOUSE SECURITY PER BOARD OF COUNTY COMMISSIONER

**06-16-2026** [ **CCRMPF** ] $ 10.00

COURT CLERK'S RECORDS MANAGEMENT AND PRESERVATION FEE

**06-16-2026** [ **DCADMIN10** ] $ 1.50

DISTRICT COURT ADMIN FEE FOR $10 COLLECTION

**06-16-2026** [ **CCADMIN10** ] $ 1.00

COURT CLERK ADMIN FEE FOR $10 COLLECTION

**06-16-2026** [ **LTF** ] $ 10.00

LENGTHY TRIAL FUND

**06-16-2026** [ **TEXT** ]

OCIS HAS AUTOMATICALLY ASSIGNED JUDGE CIVIL DOCKET A TO THIS CASE.

**06-16-2026** [ **ACCOUNT** ]

RECEIPT # 2026-4928964 ON 06/16/2026.
PAYOR: DMGLO PLLC TOTAL AMOUNT PAID: $ 248.39.
LINE ITEMS:
CJ-2026-2691: $163.00 ON AC01 CLERK FEES.
CJ-2026-2691: $6.00 ON AC23 LAW LIBRARY FEE CIVIL AND CRIMINAL.
CJ-2026-2691: $2.16 ON AC31 COURT CLERK REVOLVING FUND.
CJ-2026-2691: $10.00 ON AC58 OKLAHOMA COURT APPOINTED SPECIAL ADVOCATES.
CJ-2026-2691: $1.55 ON AC59 COUNCIL ON JUDICIAL COMPLAINTS REVOLVING FUND.
CJ-2026-2691: $7.00 ON AC64 DISPUTE MEDIATION FEES CIVIL ONLY.
CJ-2026-2691: $0.45 ON AC65 STATE JUDICIAL REVOLVING FUND, INTERPRETER SVCS.
CJ-2026-2691: $3.23 ON AC67 DISTRICT COURT REVOLVING FUND.
CJ-2026-2691: $25.00 ON AC79 OCIS REVOLVING FUND.
CJ-2026-2691: $10.00 ON AC81 LENGTHY TRIAL FUND.
CJ-2026-2691: $10.00 ON AC88 SHERIFF’S SERVICE FEE FOR COURT HOUSE SECURITY.
CJ-2026-2691: $10.00 ON AC89 COURT CLERK'S RECORDS MANAGEMENT AND PRESERVATION FEE.

**06-30-2026** [ **SMF** ] $ 10.00

SUMMONS FEE (CLERKS FEE)

**06-30-2026** [ **SMIMA** ]

SUMMONS ISSUED - MAILED BY ATTORNEY

**06-30-2026** [ **ACCOUNT** ]

RECEIPT # 2026-4934301 ON 06/30/2026.
PAYOR: DMGLO PLLC TOTAL AMOUNT PAID: $ 10.00.
LINE ITEMS:
CJ-2026-2691: $10.00 ON AC01 CLERK FEES.

**07-09-2026 [ S ]** CITY OF TULSA

PARTY HAS BEEN SUCCESSFULLY SERVED. / CITY OF TULSA / ON 7-6-26
Document Available (#1065802715) TIFF PDF

**07-27-2026 [ MOD ]**

DEFENDANTS MOTION TO DISMISS AND BRIEF IN SUPPORT / CERTIFICATE OF SERVICE / C - J
Document Available (#1065728198) TIFF PDF

**08-17-2026 [ AMP ]**

FIRST AMENDED PETITION
Document Available (#1066498420) TIFF PDF

**08-28-2026 [ CTFREE ]**

NIGHTINGALE, REBECCA;
DEFENDANT'S MOTION TO DISMISS IS GRANTED. PLAINTIFF IS GRANTED 10 DAYS TO FILE A SECOND AMENDED PETITION. THE FIRST AMENDED PETITION IS STRICKEN FOR FAILURE TO GAIN LEAVE OF THE COURT BEFORE FILING
((CLERK FILED ORDER AND MAILED COPIES GARRETT MITCHELL, LAWSON VAGHN, STEVN TERILL))

**08-28-2026 [ O ]**

ORDER ON DEFENDFANTS MOTION TO DISMISS / AFFIDAVIT OF MAILING
Document Available (#1066514707) TIFF PDF

**09-08-2026 [ AMP ]**

SECOND AMMENDED PETITION
Document Available (#1066783639) TIFF PDF

**10-08-2026 [ SMF ]** $ 10.00

SUMMONS
Document Available (#1067089509) TIFF PDF

**10-08-2026 [ SMIMA ]**

SUMMONS ISSUED - MAILED BY ATTORNEY

**10-08-2026 [ SMF ]** $ 10.00

SUMMONS
Document Available (#1067089510) TIFF PDF

**10-08-2026 [ SMIMA ]**

SUMMONS ISSUED - MAILED BY ATTORNEY

**10-08-2026 [ SMF ]** $ 10.00

SUMMONS
Document Available (#1067089511) TIFF PDF

**10-08-2026 [ SMIMA ]**

SUMMONS ISSUED - MAILED BY ATTORNEY

**10-08-2026 [ SMF ]** $ 10.00

SUMMONS
Document Available (#1067089512) TIFF PDF

**10-08-2026 [ SMIMA ]**

SUMMONS ISSUED - MAILED BY ATTORNEY

**10-08-2026 [ ADJUST ]** $ 1.00

ADJUSTING ENTRY: MONIES DUE TO AC09-CARD ALLOCATION

**10-08-2026 [ ACCOUNT ]**

ADJUSTING ENTRY: MONIES DUE TO THE FOLLOWING AGENCIES REDUCED BY THE FOLLOWING AMOUNTS:
CJ-2026-2691: AC01 CLERK FEES -$0.25
CJ-2026-2691: AC01 CLERK FEES -$0.25
CJ-2026-2691: AC01 CLERK FEES -$0.25
CJ-2026-2691: AC01 CLERK FEES -$0.25

---

**10-09-2026 [ ACCOUNT ]**

RECEIPT # 2026-4971472 ON 10/09/2026.
PAYOR: STEVEN TERRILL TOTAL AMOUNT PAID: $ 40.00.
LINE ITEMS:
CJ-2026-2691: $39.00 ON AC01 CLERK FEES.
CJ-2026-2691: $1.00 ON AC09 CARD ALLOCATIONS.

---

**10-12-2026 [ NO ]**

PLAINTIFF'S NOTICE REGARDING SERVICE
Document Available (#1067094930) TIFF PDF

DISTRICT COURT
FILED
JUN 16 2026
DON NEWBERRY, Court Clerk
STATE OF OKLA. TULSA COUNTY

DISTRICT COURT FOR TULSA COUNTY
STATE OF OKLAHOMA

(1) CALEB WALKER,

Plaintiff,

v.

(2) CITY OF TULSA,

Defendant.

Case No.: CJ-2026-02691

JURY TRIAL DEMANDED

ATTORNEY LIEN CLAIMED

Rebecca Brett Nightingale

## PETITION

Caleb Walker, for his cause of action against the above-named Defendant, states as follows:

## I.

## PARTIES, JURISDICTION, AND VENUE

1. Caleb Walker is a resident and citizen of Oklahoma.

2. The City of Tulsa (the "City") is a municipal corporation and a political subdivision of the State of Oklahoma within the meaning of the Oklahoma Governmental Tort Claims Act, 51 O.S. § 151 et seq., located primarily in Tulsa County.

3. The events complained of occurred in Tulsa County, Oklahoma.

4. The officers who engaged Mr. Walker relative to the allegations herein were, at all times as depicted in the body-worn camera ("BWC") footage of the encounter, (a) employed by and working for the City in their capacity as peace officers, (b) acting under color and authority of state law, (c) within the scope of their employment, and (d) consistent with the policies and practices of the City's police department.

FILED
OFFICE OF THE CITY CLERK
CITY OF TULSA, OKLAHOMA
2026 JUL 07 PM03:24

RECEIVED
CITY OF TULSA
LEGAL DEPARTMENT
2026 JUL 07 PM04:13

5. Pursuant to 51 O.S. § 153, the City is liable for the torts of its employees committed within the scope of their employment, and this action is brought against the City as the exclusive remedy provided by the Governmental Tort Claims Act.

6. Plaintiff presented a written notice of tort claim to the City of Tulsa on September 19, 2025, in compliance with 51 O.S. § 156. The City did not approve the claim within ninety (90) days, and the claim was therefore deemed denied by operation of law on December 18, 2025, pursuant to 51 O.S. § 157(A). This Petition is filed within one hundred eighty (180) days of that denial, on or before the resulting deadline of June 16, 2026, and is therefore timely under 51 O.S. § 157(B).

7. This Court has subject matter jurisdiction over this action, and venue is proper in Tulsa County.

## II.

## STATEMENT OF FACTS

8. On September 24, 2024, at approximately 10:55:53 a.m., Tulsa Police officers initiated a stop of Caleb Walker at his apartment complex, immediately addressing him as "Curtis Chaplin," a wanted sex offender.

9. Mr. Walker immediately and repeatedly identified himself as "Caleb Walker" and informed the officers that he lived at the complex.

10. Within seconds of contact, and despite Mr. Walker's verbal cooperation, Officer Ray and other officers physically seized Mr. Walker and grabbed his arms.

11. At approximately 10:58:32 a.m., Mr. Walker informed the officers that he had a chipped tooth that the actual suspect did not have. The officers disregarded this physical evidence.

12. At approximately 11:02:26 a.m., Officer Ray interviewed a sixteen-year-old resident who confirmed that Mr. Walker had identified himself as "Caleb" before the police arrived. Despite this independent corroboration, the officers continued to detain Mr. Walker.

13. On at least two occasions, at approximately 11:02:40 a.m. and 11:10:05 a.m., Officer Ray stated to a private citizen that Mr. Walker was a "registered sex offender," even as Mr. Walker continued to protest his identity.

14. At approximately 11:06:06 a.m., Officer Ray informed Mr. Walker that he was under arrest for failure to register as a sex offender and for obstruction.

15. At approximately 11:07:22 a.m., Officers Gooldy, Thompson, and Kerr forced Mr. Walker to the ground and knelt on him while he was handcuffed.

16. At approximately 11:15:35 a.m., while Mr. Walker was handcuffed on the ground, Officer Ray inspected Mr. Walker's arm and confirmed that he did not have the "blood" tattoo that the actual suspect had. Officer Ray told Mr. Walker, "The guy that we're looking for has 'blood' tattooed on his arm, which you do not have."

17. At approximately 11:16:51 a.m., Officer Ray admitted to Officer Doolin that Mr. Walker "looks like a guy we're looking for but it's not going to be him." The officers nevertheless proceeded with the arrest and transport.

18. After confirming that Mr. Walker was not the suspect, Officer Thompson stated that the officers were "past that point" and would proceed with "obstruction" and "jaywalking" charges.

19. At approximately 11:28:13 a.m., three officers used significant force to shove a handcuffed and seated Mr. Walker into the back of a patrol car. Mr. Walker screamed in pain and repeatedly insisted that he was the wrong person.

20. The City prosecuted Mr. Walker knowing the conduct of these officers.

21. The City continued to prosecute Mr. Walker until the day of trial.

22. Tellingly, when the matter was called for trial, not one of the officers involved in Mr. Walker's arrest appeared to testify or to answer questions about the encounter, and the City dismissed all charges against Mr. Walker that same day.

23. As a direct and proximate result of the officers' conduct, Mr. Walker suffered injuries and damages, including physical injury, pain and suffering, the loss of his liberty, humiliation, injury to his reputation, and emotional distress.

## III.

## CAUSES OF ACTION

### COUNT I

### NEGLIGENCE

24. Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

25. The officers who engaged Mr. Walker were employees of the City acting within the scope of their employment, and owed Mr. Walker a duty to perform their law enforcement functions with reasonable care, including a duty to reasonably investigate and confirm a suspect's identity before effecting an arrest and a duty to refrain from using unreasonable force.

26. The officers breached these duties by, among other things, failing to investigate or credit Mr. Walker's repeated identification of himself, the corroborating statement of a resident, the absence of the suspect's distinctive tattoo, and their own recognition that Mr. Walker was not the suspect; by detaining, arresting, and searching him without justification; and by using unreasonable force against him.

27. Pursuant to the Oklahoma Governmental Tort Claims Act, 51 O.S. § 153, the City is liable for the negligent acts and omissions of its employees committed within the scope of their employment.

28. As a direct and proximate result of this negligence, Mr. Walker suffered the injuries and damages described above.

## COUNT II

### ASSAULT AND BATTERY (EXCESSIVE FORCE)

29. Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

30. The officers intentionally and without justification made harmful and offensive contact with Mr. Walker, including by forcing a cooperative man to the ground, kneeling on him while he was handcuffed, and shoving a handcuffed and seated man into a patrol car with significant force.

31. The force used was objectively unreasonable and excessive under the circumstances, particularly after the officers had confirmed that Mr. Walker was not the suspect they sought.

32. The officers committed these acts within the scope of their employment, and the City is liable under 51 O.S. § 153.

33. As a direct and proximate result, Mr. Walker suffered the injuries and damages described above.

## COUNT III

### FALSE ARREST AND FALSE IMPRISONMENT

34. Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

35. The officers lacked probable cause to believe that Mr. Walker had committed or was about to commit any crime.

36. The officers unlawfully seized, detained, arrested, restrained, and searched Mr. Walker against his will and without legal justification, and continued to do so after they knew he was not the suspect they sought.

37. The officers acted within the scope of their employment, making the City liable under 51 O.S. § 153.

38. As a direct and proximate result, Mr. Walker suffered the injuries and damages described above, including the loss of his liberty.

## COUNT IV

### MALICIOUS PROSECUTION

39. Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

40. The City, through its officers and agents, caused criminal proceedings to be instituted and continued against Mr. Walker without probable cause and with malice, as evidenced by the officers' continuation of the arrest and prosecution after confirming that Mr. Walker was not the suspect.

41. The criminal proceedings terminated in Mr. Walker's favor when the City dismissed all charges against him on the day of trial because Mr. Walker did not violate any law.

42. As a direct and proximate result, Mr. Walker suffered the injuries and damages described above.

## COUNT V

### DEFAMATION (SLANDER PER SE) AND FALSE LIGHT

43. Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

44. Officer Ray published false statements of fact to one or more third parties — namely, that Mr. Walker was a "registered sex offender" — when the officers knew or reasonably should have known that the statements were false.

45. The statements falsely imputed to Mr. Walker the commission of a crime and were defamatory on their face, constituting slander per se, and placed Mr. Walker in a false light that would be highly offensive to a reasonable person.

46. The officers made these statements within the scope of their employment, and the City is liable under 51 O.S. § 153.

47. As a direct and proximate result, Mr. Walker suffered the injuries and damages described above, including injury to his reputation.

**WHEREFORE**, all premises considered, and pursuant to 12 O.S. § 1776, Plaintiff Caleb Walker respectfully requests that the Court enter judgment in his favor and against the City of Tulsa and award:

a. Compensatory damages in an amount in less than Two Hundred and Fifty Thousand dollars ($250,000.00);

b. All costs of this action;

c. Pre and post-judgment interest; and

d. such other and further relief as the Court deems just and equitable.

Respectfully submitted,

BRYAN & TERRILL

By: /s/ Spencer Bryan
Steven J. Terrill, OBA # 20869
J. Spencer Bryan, OBA # 19419
Bryan & Terrill Law, PLLC
2500 S. Broadway, #122
Edmond, OK 74013
Tele/Fax: (918) 935-2777
sjterrill@bryanterrill.com
jsbryan@bryanterrill.com

-and-

GARRETT LAW

By: ______________________
D. Mitchell Garrett Jr., OBA # 20704
320 S. Boston Ave, STE 825
Tulsa, Oklahoma 74103
Telephone: (918) 221-6190
Facsimile: (918) 340-6799
mitchell@garrettlawcenter.com

*Counsel for Plaintiff Caleb Walker*

**IN THE DISTRICT COURT IN AND FOR TULSA COUNTY**
**STATE OF OKLAHOMA**
500 S. Denver Ave., Tulsa, Oklahoma 74103

| | | |
|---|---|---|
| CALEB WALKER, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. CJ-2026-02691 |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| CITY OF TULSA, | ) | **ATTORNEY LIEN CLAIMED** |
| | ) | |
| Defendant. | ) | |

**SUMMONS**

**(Service by Certified Mail, Return Receipt Requested)**

**To the above-named Defendant: CITY OF TULSA**

**VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED**
c/o Office of the City Clerk
City of Tulsa
175 East Second Street
Tulsa, Oklahoma 74103

FILED
OFFICE OF THE CITY CLERK
CITY OF TULSA, OKLAHOMA
2026 JUL 07 PM03:24

You have been sued by the above-named Plaintiff, and you are directed to file a written answer to the attached petition in the court at the above address within twenty (20) days after service of this summons upon you exclusive of the day of service. Within the same time, a copy of your answer must be delivered or mailed to the attorney for the plaintiff. Unless you answer the petition within the time stated judgment will be rendered against you with the costs of the action.

If Interrogatories and Request for Production of Documents are served with this Petition, you are directed to answer the Interrogatories and produce the documents requested within forty-five (45) days after service of these Interrogatories and Request for Production of Documents.

Issued this 30 day of June, 2026.

DON NEWBERRY, Court Clerk
[signature]
Court Clerk

RECEIVED
CITY OF TULSA
LEGAL DEPARTMENT
2026 JUL 07 PM04:13

by ______________________________, Deputy
Court Clerk
(Seal)

**Attorney(s) for Plaintiff(s):**
D. Mitchell Garrett, Jr., OBA #20704
GARRETT LAW
320 S. Boston Ave., Ste. 825
Tulsa, Oklahoma 74103
Telephone: (918) 221-6190
Facsimile: (918) 340-6799
mitchell@garrettlawcenter.com

-and-

Steven J. Terrill, OBA #20869
J. Spencer Bryan, OBA #19419
BRYAN & TERRILL LAW, PLLC
2500 S. Broadway, #122
Edmond, OK 74013
Tele/Fax: (918) 935-2777
sjterrill@bryanterrill.com
jsbryan@bryanterrill.com

**RETURN OF SERVICE BY MAIL**

I certify that on the 30th day of June, 2026, I mailed a copy of this summons and the petition to the above-named Defendant by certified mail, return receipt requested, deliverable to addressee only, at the address stated above, as shown by the attached return receipt.

Certified Mail No.: 9589 0710 5270 2667 2592 62

Date of delivery per return receipt: ______________________

Aleta-June Pettit
Signature of person mailing summons

DISTRICT COURT
FILED
JUL 27 2026
DON NEWBERRY, Court Clerk
STATE OF OKLA. TULSA COUNTY

IN THE DISTRICT COURT OF TULSA COUNTY
STATE OF OKLAHOMA

| | | |
|---|---|---|
| CALEB WALKER, | ) | |
| Plaintiff, | ) | |
| vs. | ) | Case No. CJ-2026-2691 |
| | ) | Judge Rebecca Nightingale |
| CITY OF TULSA, | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION TO DISMISS AND BRIEF IN SUPPORT**

Defendant City of Tulsa ("City") hereby moves the Court, pursuant to 12 O.S. § 2012(B)(6), to dismiss Plaintiff's Petition for failure to state a claim upon which relief can be granted.[1] Specifically, Plaintiff's Petition has failed to assert facts sufficient to allege a claim against the City for Negligence or False Arrest/False Imprisonment. Also, Plaintiff lacks a cognizable legal theory against the City for his claims of Assault and Battery, Malicious Prosecution, and Defamation and False Light because they would require a showing that the City's officers were not acting in good faith. This would place them outside the scope of their employment and would be conduct for which the City cannot be held liable under Oklahoma law. In support, the City would show the Court as follows:

## I. INTRODUCTION AND STATEMENT OF THE CASE

Plaintiff Caleb Walker was arrested on September 24, 2024, after he refused to answer questions, obstructed a police investigation, threw an elbow and kicked at police officers, and resisted arrest. Also, prior to their interaction, the officers had seen him improperly cross a street. Plaintiff was charged with Obstruction – Resisting, Pedestrian – Improper Crossing, and

[1]Defendant reserves all its rights to answer and to assert all affirmative defenses to which it is entitled per 12 O.S. § 2008(C) regarding all of Plaintiff's causes of action alleged in the Petition.

Obstruction – Deny Identifiers. Although there was a basis, he was not charged with Assault Upon a Police Officer. None of his charges related to Curtis Chaplin but were the result of his own conduct.

Plaintiff brings state law tort actions for negligence, assault and battery, false arrest and false imprisonment, malicious prosecution, and defamation. (See Petition, **Exhibit 1**). Plaintiff's claims arise from his interaction with Tulsa Police Department (TPD) officers on September 24, 2024. On that date, Officers Zach Moring, Ray Gooldy, James Kidd, and Ryan Thompson were in the area of 8141 E. 16th St. in Tulsa attempting to locate Curtis Chaplin, a man with a felony warrant for Failure to Register as a Sex Offender. Officers Moring and Gooldy observed Plaintiff walk out from an apartment where they expected the suspect to be and watched him improperly cross 16th Street. They noticed he matched the description of the suspect (Chaplin) as he appeared to have the same height, weight, skin color, hair color, eye shape, and glasses. The officers made contact with Plaintiff, and their encounter was captured on video by the officers' body-worn cameras (BWC). (*See* Officer Moring's BWC, **Exhibit 2**).

Officer Moring reviewed the photo of the suspect (**Exhibit 2** at 10:54:35-10:55:00). Officers Moring and Gooldy advised Plaintiff they were looking for a convicted sex offender, that he looked like the suspect, and asked for Plaintiff's identification. Plaintiff stated he did not have any identification with him. They asked for his name and date of birth. Plaintiff provided his name but refused to spell his first name or give his date of birth. Plaintiff was evasive and appeared as though he was going to flee, so the officers detained him. Officers Thompson and Kidd arrived on the scene and also attempted to obtain Plaintiff's date of birth. The officers further explained he matched the description of the suspect, and they were trying to identify him simply to rule him out as the warranted suspect they were seeking. Plaintiff continued to be uncooperative and refused to

give his birth date. He repeatedly stated, "no, no, no" and "I do not consent to none of this." Plaintiff also stated he had a chipped tooth and could not be the suspect. (*Id.* at 10:55:27-10:57:30).

Officers reviewed more photos and advised Plaintiff they needed his birth date to rule him out. He still refused. (*Id.* at 10:57:50-11:02:08). They further explained he was being detained and he was actively obstructing their investigation by not providing his identifying information. (*See* Officer Thompson's BWC, **Exhibit 3** at 10:57:45-10:59:00; 11:00:33-11:01:00). Officers made other efforts to identify Plaintiff. Officer Moring spoke with a sixteen-year-old resident who confirmed Plaintiff had just told her his name was "Caleb", but she denied that she knew him or Chaplin (*Id.* at 11:02:22-11:03:08). He accurately explained to her that they were trying to get Plaintiff's information "because there's a sex offender that's not complying with their registration that's in the area…they look very similar…" (*Id.* at 11:02:41-11:02:48).

At 11:04 a.m., they told Plaintiff they were giving him one more chance and Plaintiff still refused to cooperate. He would not simply provide his date of birth (**Exhibits 2 and 3** at 11:04:40-11:05:26). The officers had a reason to believe Plaintiff was Curtis Chaplin and determined Plaintiff should be arrested for obstructing the investigation and for not registering as a sex offender. At 11:07 a.m., Plaintiff was placed under arrest. When Officer Thompson attempted to remove a pair of headphones from his hands, Plaintiff resisted. He tried to pull away and threw his right elbow back toward Officer Thompson. At that point, Officer Moring pulled Plaintiff to the ground. Plaintiff continued to resist and tried to kick officers. The officers then held Plaintiff on his side and pinned his legs down for their protection until he calmed down. (**Exhibits 2 and 3** at 11:07:15-11:07:50). At 11:08 a.m., the officers searched Plaintiff to make sure he did not have any weapons. (**Exhibit 2** at 11:08:47-11:10:12).

At 11:10 a.m., Plaintiff was acting as though he was being mistreated and yelled out to another resident for help. Officer Gooldy, who, at that time, reasonably believed Plaintiff to be the suspect they were looking for, advised the resident "we've got a registered sex offender here". (*Id.* at 11:10:12-11:10:15). At 11:11 a.m., the officers learned that the suspect they were looking for (Chaplin) had a "Blood" tattoo on his arm. They immediately inspected Plaintiff's arm and confirmed he did not have the tattoo. (*Id.* at 11:11:30-11:12:26). Although the officers determined then that Plaintiff was not likely the suspect they were looking for, they were not 100% certain. They still believed he looked like the suspect, and he was still refusing to identify himself (*Id.* at 11:11:50-11:14:00). Regardless, at that time, they clearly had grounds to arrest Plaintiff for his unlawful acts of improper crossing, obstructing their investigation, and resisting arrest.

Officer Kidd ran a search on his computer to determine the criminal history of "Caleb Walker" and find other information and photos to compare with "Curtis Chaplin". There are two individuals in Tulsa with a criminal history by the name of "Caleb Walker" with birth dates that are only four years apart. One of them had a prior charge for falsely personating another to create liability. (*See* Docket sheet for CF-2014-1606, **Exhibit 4**). Also, Officer Thompson discovered that "Curtis Chaplin" had previously provided a false name and date of birth. (See **Exhibit 3** at 11:19:37). Accordingly, the officers reasonably continued their efforts to definitively identify Plaintiff.

After Plaintiff calmed down, he continued to erroneously insist he knew his rights and did not need to answer the officers' questions. The officers attempted to place him in the back of a caged patrol vehicle that arrived so he could be transported to jail where he could be identified. Plaintiff again became combative and refused to put his legs in the patrol vehicle. The officers then were required to pick up Plaintiff and place him into the patrol vehicle. (**Exhibits 2 and 3** at

11:24:00-11:28:42). Plaintiff was then transported to the City of Tulsa jail where he was booked and his identity could be confirmed by use of a Live Scan digital fingerprinting process.

In his Petition, Plaintiff focuses on the fact that he was not the warranted suspect the officers were seeking. He fails to recognize he was obligated to comply with the officers' investigation and did not have a right to resist arrest. **Exhibits 2** and **3** demonstrate that Plaintiff's Petition omits numerous material facts. As shown below, the officers' investigation, detention, use of force, search, and arrest were objectively reasonable, and Plaintiff has no basis for a valid claim.

## II. LEGAL ARGUMENT AND AUTHORITY

### A. Plaintiff's Petition Fails to State a Claim Upon Which Relief Can Be Granted.

Under Oklahoma law, a claim for relief in a pleading may be dismissed on motion for "[f]ailure to state a claim upon which relief can be granted." 12 O.S. § 2012(B)(6). In ruling on a motion to dismiss, the Court may consider "only the well-pleaded facts and reasonable inferences emanating from them . . . and the pleader's conclusions are to be ignored." *Tanner v. Western Publishing Co.*, 1984 OK CIV APP 22, ¶ 11, 682 P.2d 239, 241. "[A] petition may be dismissed as a matter of law for two reasons: (1) lack of any cognizable legal theory, or (2) insufficient facts under a cognizable legal theory." *Indiana Nat'l Bank v. State Dept. of Human Services*, 1994 OK 98, ¶ 4, 880 P.2d 371, 375. The Court must take as true all of the Petition's allegations, but a plaintiff must identify a "set of facts which can be established and is consistent with the allegations." *May v. Mid-Century Ins. Co.*, 2006 OK 100, ¶ 10, 151 P.3d 132, 136. The purpose of the requirement that a plaintiff allege sufficient facts is to "give an opposing party fair notice of the claim and the grounds upon which it rests." *Gunn v. Consolidated Rural Water & Sewer District, No. 1, Jefferson County, Oklahoma*, 1992 OK 131, ¶ 13, 839 P.2d 1345, 1351.

Generally, the sufficiency of a Petition must rest on its contents alone. "The exceptions are: (1) incorporation by reference, codified in 12 O.S. § 2010(C), and (2) judicial notice of adjudicative facts, codified in 12 O.S. § 2202." *Spring v. Braum's Inc.*, 2022 OK CIV APP 11, ¶ 12, 510 P.3d 864, 869. As noted by the Oklahoma Supreme Court, "[t]he text of Rule 10(c) of the Federal Rules of Civil Procedure is incorporated verbatim in the Oklahoma pleading code in § 2010(C)," and "Federal Rule 10(c) jurisprudence is instructive" in this regard. *Gaylord Ent. Co. v. Thompson*, 1998 OK 30, ¶ 4 n.10, 958 P.2d 128, 136. Likewise, § 2202 is not significantly different from its federal counterpart found in Rule 201(b) of the Federal Rules of Civil Procedure. *Farley v. City of Claremore*, 2020 OK 30, ¶ 13, 465 P.3d 1213, 1222.

The Court may consider "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002). Under those circumstances, a defendant may submit an indisputably authentic copy which may be considered in ruling on a motion to dismiss. *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir.1997). Also, the Court may consider "matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322; *U.S. v. Mendoza*, 698 F.3d 1303, 1307 (10th Cir. 2012) ("dockets are generally public documents" which courts may take judicial notice of).

The two exceptions are at play here: incorporation by reference of body-worn camera video referred to in Plaintiff's Petition is central to his claims and judicial notice of a court docket. In his Petition, Plaintiff refers to the BWC video throughout as he provides quotes and a description of what occurred at the scene at specific times (*e.g.*, **Exhibit 1**, ¶¶ 4, 8, 11-19). As such, the Court may consider the body-worn camera videos attached as **Exhibits 2** and **3** and the court docket attached as **Exhibit 4** without converting this motion to a motion for summary judgment.

**1. Plaintiff Fails To State A Negligence Claim.**

In Count I of his Petition, Plaintiff alleges the City should be held liable for negligence. Specifically, Plaintiff alleges the officers breached their duty of care by failing to reasonably investigate and confirm a suspect's identity before effecting an arrest and breached their duty to refrain from using unreasonable force. (**Exhibit 1**, ¶25). Plaintiff further alleges the officers breached their duties by "failing to investigate or credit Mr. Walker's repeated identification of himself, the corroborating statement of a resident, the absence of the suspect's distinctive tattoo, and their own recognition that Mr. Walker was not the suspect; by detaining, arresting, and searching him without justification; and by using unreasonable force against him." (**Exhibit 1**, ¶26).

21 O.S. § 540 states: "Any person who willfully delays or obstructs any public officer in the discharge or attempt to discharge any duty of his or her office, is guilty of a misdemeanor." The City of Tulsa's Ordinances further state, in pertinent part:

> *Every pedestrian shall cross the street within the crosswalk or at an intersection... A pedestrian crossing a street in a residential area shall take the shortest possible route to the opposite side of the street and at a right angle to the side of the street.* (emphasis added) Title 37, Section 1102
> ...
> *It shall be unlawful and an offense for any person to willfully obstruct, resist, oppose, delay or interfere with any peace officer, member of the Police Department of the City of Tulsa...while in the discharge or attempted discharge of any duty of their respective offices, by means including but not limited to the following:*
>
> *A. Physically, by act or omission;*
> ...
> *F. Refusing or failing to provide a current, full, true and correct name, date of birth and residence address for the issuance of a citation or after being arrested;*
> Title 27, Section 300

Plaintiff improperly crossed 16th Street when he did not cross at a right angle to the opposite side of the street. Plaintiff clearly obstructed the officers in the discharge of their duty to investigate

the whereabouts of the warranted suspect (Chaplin) when he refused to answer questions about his identity. Plaintiff's obstructive behavior became physical when the officers attempted to arrest him. The officers used objectively reasonable force to take him into custody.

**FEDERAL ANALYSIS**

In determining the reasonableness of the officers' conduct, the case law interpreting the Fourth Amendment should be considered. It is well settled that, "where, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right "to be secure in their persons … against unreasonable … seizures." *Graham v. Connor*, 490 U.S. 386, 394 (1989). While considered a seizure, an investigative detention does not need to be supported by probable cause; instead, it must only be justified by reasonable and articulable suspicion that the person stopped has committed a crime or is about to do so. *United States v. Simpson*, 609 F.3d 1140, 1146 (10th Cir. 2010). The courts have also made it clear that the right to make an arrest or investigatory stop carries with it the ***right*** to use physical coercion to affect the arrest. *See Terry v. Ohio*, 392 U.S. 1, 22-27 (1968) (emphasis added).

"The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Bell v. Wolfish*, 441 U.S. 520, 559. Its proper application requires careful attention to the facts and circumstances of each particular case, including: the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *Tennessee v. Garner*, 471 U.S. 1, 8 (1985). Moreover, the "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Terry*, 392 U.S. at 20-22. "'Not every push or shove, even if it may

later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment." *Graham*, 490 U.S. at 396. Police officers are often required to make "split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

A warrantless arrest is reasonable if the officer has probable cause to believe the suspect committed a crime in the officer's presence. *District of Columbia v. Wesby*, 583 U.S. 48 (2018). To determine whether an officer had probable cause for an arrest, "we examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Id.* at 56-57.

The warrantless search rule is subject to several exceptions. One exception allows arresting officers to "search the person of the accused when legally arrested." *Weeks v. United States*, 232 U.S. 383 (1914). Case law has developed to allow not only the search of the arrestee's person, but also the area within the arrestee's "immediate control." *Chimel v. California*, 395 U.S. 752, 763 (1969). This authority is justified by the need to disarm the suspect and preserve evidence. *United States v. Robinson*, 414 U.S. 218, 234 (1973).

The initial detention of Plaintiff was reasonable and valid both because he had just committed the crime of improper crossing in the officers' presence and because there was probable cause to believe Plaintiff had committed the felony crime of failing to register as a sex offender. The officers were attempting to conduct an investigation to confirm Plaintiff's identity before making an arrest when they encountered Plaintiff. The officers soon had probable cause to believe Plaintiff was obstructing their investigation when he refused to answer questions and appeared he was about to flee.

The officers considered the fact that Plaintiff had a chipped tooth. They continued to look at other photos and information and reasonably concluded it was not dispositive as his tooth could have been chipped after the last photo of the suspect was taken. The officers spoke with the sixteen-year-old resident who confirmed Plaintiff had told her his name was "Caleb". However, she denied she knew him or Chaplin and this was not something they could reasonably rely upon to prove Plaintiff's identity.

It is common for suspects with warrants to give false names. If a suspect is not willing to give a birth date, it can be because they have provided a false name and do not want this to be verified by providing a birth date that does not match the name. When suspects refuse to provide information, it can lead an officer to believe they have a warrant or something else illegal to hide.

As the officers continued to investigate and work around Plaintiff's refusal to simply provide his birth date as he was legally required to do, they discovered Chaplin had a "Blood" tattoo. They immediately checked Plaintiff and found he did not have the tattoo. By this time, however, Plaintiff had already obstructed their investigation and resisted arrest. They had also found that a "Caleb Walker" had a prior charge of falsely impersonating another and that Curtis Chaplin had also previously given a false name and birth date. They still believed Plaintiff looked like the suspect and could only be definitively identified by using a Live Scan at the City jail. Plaintiff was ultimately determined not to be Curtis Chaplin and was never charged with failing to register as a sex offender.

However, the officers had probable cause to arrest Plaintiff for obstruction when he refused to provide identifying information (his birth date) despite repeated orders to do so. When Plaintiff tried to pull away, threw an elbow at Officer Thompson, and was kicking at officers in an aggressive manner, the officers had probable cause to arrest him for resisting and assault. 21 O.S.

§268 and 21 O.S. §649 A. It was objectively reasonable for Officer Moring to take Plaintiff to the ground and for the officers to secure Plaintiff's legs to protect themselves under the circumstances. It was also reasonable for the officers to search Plaintiff at the time of his lawful arrest to make sure he did not have any weapons or evidence to be preserved. Also, when Plaintiff chose to fight rather than comply with the officers' orders to place his feet in the patrol vehicle for transport to jail, the officers' use of force in picking him up and placing him in the vehicle was objectively reasonable. Reasonable officers in this situation would have responded with the same level of force used by Officers Gooldy, Kidd, Moring, and Thompson. The officers' actions were not unreasonable and did not violate Plaintiff's rights.

**OKLAHOMA ANALYSIS**

In Oklahoma, 76 O.S. § 6 provides that "[e]very person has, subject to the qualifications and restrictions provided by law, the right of protection from bodily restraint or harm." 22 O.S. § 196 provides, in relevant part: "a peace officer may, without a warrant, arrest a person 1) [f]or a public offense, committed or attempted in his presence or 2) [w]hen the person arrested has committed a felony, although not in the officer's presence." The Oklahoma Supreme Court recognized in *Morales v. City of Oklahoma City*, 2010 OK 9, 230 P.3d 186, that, given the nature of a police officer's duties, the duty of care is significantly different from that of an ordinary citizen.

> The basic formulation of the standard of care is not directly applicable to a police officer making an arrest where exposure of the suspect to injury is an inherent part of the activity. All arrests involve the use of some restraint, interference with the arrestee's liberty and the exercise of custodial control over another person. Each of these actions poses some risk of harm to the arrestee. Even when an arrest is accomplished with minimal force, an offensive contact takes place. If police officers were exposed to suit every time the risk of harm inherent in an arrest culminated in actual harm, law enforcement would grind to a halt.

*Id* at ¶ 25 (emphasis in original).

The Court stated:

> We therefore hold that a police officer has a special dispensation from the duty of ordinary care not to endanger others. A police officer's duty is very specific: it is to use only such force in making an arrest as a reasonably prudent police officer would use in light of the objective circumstances confronting the officer at the time of the arrest. In applying this standard, an officer's mistake of fact or law is irrelevant, including whether he (she) is acting in good or bad faith. The question in whether objective facts support the degree of force employed.

*Id* at ¶ 26. (emphasis in original). The Oklahoma Supreme Court then set forth seven factors that may be considered in evaluating the objective reasonableness of an officer's use of force in making an arrest:

> (1) the severity of the crime of which the arrestee is suspected; (2) whether the suspect poses an immediate threat to the safety of the officers or others; (3) whether the suspect is actively resisting arrest or attempting to evade arrest; (4) the known character of the arrestee; (5) the existence of alternative methods of accomplishing the arrest; (6) the physical size, strength and weaponry of the officers compared to those of the suspect; and (7) the exigency of the moment.

*Id* at ¶ 27.

As shown by the analysis above and applying these seven factors to the facts in this case, it is clear that the officers' conduct was objectively reasonable. Based on information provided to the officers, it was reasonable for them to believe Plaintiff was the suspect they were seeking. When Plaintiff failed to obey lawful commands to identify himself, he interfered with the ability of the officers to search for the sex offender suspect (Chaplin). This posed a risk of harm to the public. At this point, Plaintiff was suspected of failing to register and obstruction (and improper crossing) and these officers had a legal duty to take Plaintiff into custody. They also reasonably believed Plaintiff was pulling away and attempting to flee.

At the time of arrest, when he tried to pull away and throw an elbow at Officer Thompson and kick at other officers, Plaintiff was resisting and committing an assault on a police officer. He also, at this point, given his strength and anger, posed an immediate risk to the officers' safety.

Officer Moring's taking of Plaintiff to the ground and the officers' holding of his legs were objectively reasonable under the circumstances. It was reasonable for them to search Plaintiff for weapons and evidence at this point. Despite being given many chances to comply, Plaintiff chose not to cooperate. He was further actively resisting arrest when he would not place his feet in the patrol vehicle to be transported to jail. The officers' decisions were objectively reasonable as there did not appear to be any other way for them to get Plaintiff into custody. The officers' decisions to pick Plaintiff up and place him in the patrol vehicle was objectively reasonable.

As a matter of law, Plaintiff cannot prevail on a negligence claim against the City because under both a federal (*Graham* factors) and state analysis (*Morales* factors), the officers' detention, search, use of force, and arrest was objectively reasonable.

**2. Plaintiff's False Arrest and False Imprisonment Claims Fail.**

In Count III, Plaintiff asserts the claims of false arrest and false imprisonment. As shown above, the officers had probable cause and the arrest/imprisonment of Plaintiff was reasonable and lawful.[2] The Court in *Overall v. State ex rel. Dept. of Public Safety*, 1995 OK CIV APP 107, 910 P.2d 1087 examined the tort of false arrest and held:

> A good faith, warrantless arrest by an officer without due and legal process, *i.e.*, probable cause, is a false arrest. As such the arrest is tortious. The mental intent of the officer in making the arrest is irrelevant. There is *no inference of bad faith, ill will, or malice* to be drawn from the actions of the officer making the arrest." (Emphasis added.)

*Overall*, at ¶ 25, 910 P.2d at 1091.

---

[2] Although the terms false imprisonment and false arrest are often used interchangeably, the gist of either tort is unlawful detention. In Oklahoma there lies a distinction in how the causes of action arise: a tort claim arising from the wrongful detention of a person by an individual acting under the authority of law is called false arrest, but if a person is wrongfully detained by a private individual who does not act under color of law, then the appropriate tort claim is for false imprisonment. *See McGlone v. Landreth*, 1948 OK 85, 195 P.2d 268.

In the matter of *Shaw v. City of Oklahoma City*, 2016 OK CIV APP 55, 380 P.3d 894, the Oklahoma Court of Civil Appeals affirmed the dismissal of a false arrest claim (among others) against the City where police officers detained a man (Shaw) to conduct an investigation. Four Oklahoma City (OKCPD) police officers were called to a pub where an off-duty Village police officer overheard parts of a conversation between Shaw and his female friend. They were discussing shooting their weapons at a range and there was a mistaken concern the couple was discussing terroristic acts. *Id.* at ¶ 2, 380 P.3d at 895. While Shaw and his friend were actually off-duty McLoud police officers, the information reported to the responding officers concerned discussions about "shooting up somebody or maybe shooting somebody or something with an AK–47." *Id.* at ¶ 30, 380 P.3d at 901.

When the OKCPD officers arrived, one of them approached Shaw from behind and yanked him off the bar stool. Another officer grabbed Shaw and they dragged him outside while Shaw repeatedly told the officers he was a police officer. After they realized he was a police officer, the officers explained the call they received about someone discussing shooting an AK-47. Shaw was detained for over twenty-five minutes by the OKCPD officers and was ultimately not charged with any crimes. *Id.*

The plaintiff in *Shaw* made a claim against Oklahoma City for false arrest due to the actions of the officers. In response, Oklahoma City argued the officers had probable cause and cited to *Abraham v. State*, 1998 OK CR 29, ¶ 4, 962 P.2d 647, where the Court held "even when there is no probable cause to make an arrest, if an officer has 'reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then an investigative stop may be made to investigate that suspicion.'" *Shaw*

at ¶ 26, 380 P.3d at 900. The Court of Civil Appeals agreed and, in finding the false arrest claim had no merit, further stated:

> A felony arrest without a warrant is legal depending upon "... whether the arresting person has probable cause, or reasonable cause, to make the arrest." *Tomlin v. State*, 1994 OK CR 14, ¶ 19, 869 P.2d 334, 338. "If a police officer arrests a person without a warrant, the arrest is not unlawful if the officer, upon his own knowledge or *upon facts communicated to him by others*, has reasonable cause to believe the person has committed a felony." (Emphasis added) *Stout v State*, 1984 OK CR 94, ¶ 13, 693 P.2d 617, 622. "The State is not bound to prove that a felony was actually committed in order to justify such an arrest; *as long as reasonable cause existed to believe the person committed a felony*, the arrest, whether by peace officer or private citizen, is valid, *even though it may later turn out that no felony was committed*." *Tomlin*, ¶ 19.

*Id.* at ¶ 27, 380 P.3d at 900 (emphasis in original). The appellate court also cited to *Leaf v. State*, 1983 OK CR 167, ¶11, 673 P.2d 169, 171, and determined that "[a] crucial factor is whether the facts available to the officer at the moment of the seizure or search would warrant a man of reasonable caution in the belief that the action was appropriate." *Shaw* at ¶ 29, 380 P.3d at 901.

Here, Plaintiff claims the officers "lacked probable cause to believe that Mr. Walker had committed or was about to commit any crime." (**Exhibit 1** at ¶ 35). Plaintiff further claims the officers "unlawfully seized, detained, arrested, restrained, and searched Mr. Walker against his will and without legal justification, and continued to do so after they knew he was not the suspect they sought." (**Exhibit 1** at ¶ 36).

As explained above and as shown on the officer's BWC (**Exhibits 2 and 3**), the officers had a reasonable belief Plaintiff had committed the felony of failing to report as a sex offender. Additionally, in the officers' presence, Plaintiff committed the offenses of improper crossing, obstruction, resisting, and assault upon a police officer. Therefore, the officers had sufficient probable cause and were authorized to detain, arrest, and search Plaintiff. He was not ultimately

charged with assault or with failing to register as a sex offender once he was definitively identified with Live Scan. His claim against the City for unlawful arrest must be dismissed with prejudice.

**3. Plaintiff's Intentional Tort Claims Fail As A Matter of Law.**

The Governmental Tort Claims Act (GTCA) is the exclusive remedy by which an injured plaintiff may recover against an Oklahoma governmental entity in tort. *Fuller v. Odom*, 741 P.2d 449, 451 (Okla. 1987); *see also* 51 O.S. §§ 152(14) and 153. In the GTCA, 51 O.S. § 152.1(A), the legislature adopted and reaffirmed sovereign immunity for the State, its political subdivisions, and all employees acting within the scope of their employment. This immunity is subject to a limited waiver to the extent and the manner specifically provided for by the provisions of the other sections of the GTCA. 51 O.S. § 152.1(B); *see also Salazar v. City of Okla. City*, 976 P.2d 1056, 1066 (Okla. 1999).

"[A] political subdivision shall not be liable . . . for any act or omission of an employee acting outside the scope of the employee's employment." 51 O.S. § 153(A). "Scope of employment" is defined as "the performance by an employee acting in good faith . . . ." *Id.* § 152(13). Taken together, § 153(A) and § 152(13) "immunize a governmental entity falling under the GTCA when, in order to prevail on a particular tort claim sued upon, a plaintiff is required, as a matter of law, to show conduct on the part of a governmental employee that would mandate a determination the employee was not acting in good faith." *Fehring v. State Ins. Fund*, 2001 OK 11, ¶ 23, 19 P.3d 276, 283.

In Counts II, IV, and V of his Petition, Plaintiff claims the actions of the City's officers constituted an Assault and Battery, Malicious Prosecution, and Defamation and False Light. Such claims necessarily require Plaintiff to prove the individual City employees were acting in bad faith. As shown below, these claims must also be dismissed with prejudice for failure to state a claim.

**a. Assault And Battery**

In Count II. Plaintiff alleges the actions of the officers constituted assault and battery (excessive force). Plaintiff claims the City's officers "intentionally and without justification made harmful and offensive contact with Mr. Walker." (**Exhibit 1** at ¶¶ 30, 31). Malice is defined as "the intentional doing of a wrongful act without justification or excuse." *Yates v. Gannett Co., Inc.*, 2022 OK CIV APP 41, ¶ 22, 523 P.3d 69. If the allegations are taken as true, this conduct is outside the scope of employment and the City cannot be liable.

In *Shaw, supra*, the City argued that, almost identical to the allegations here, because Shaw alleged that "officers intentionally and purposefully assaulted him without justification", the acts were outside the scope of employment and the City could not be liable on such a claim. *Shaw* at ¶ 20, 380 P.3d at 899. The Court of Appeals found this argument to be supported by case law and agreed with the trial court's dismissal.

One such case cited was the matter of *Jackson v. Oklahoma City Public Schools*, 2014 OK CIV APP 61, 333 P.3d 975, where the parents of a student sued the school district and alleged its teacher assaulted and battered their child. The trial court found the assault and battery claim should be dismissed and the parents appealed. The Court of Civil Appeals affirmed and held, "[i]t is settled that intentional torts are outside the scope of employment and therefore District may not be liable for a teacher's assault and battery." *Id.* at ¶ 9, 333 P.3d at 978-979.

As shown above, pursuant to the standards for law enforcement officers set forth in *Morales*, the officers' actions were reasonable. Regardless, Plaintiff's claim for assault and battery necessarily requires him to prove that the individual City employees were acting in bad faith. Therefore, Plaintiff's claim for assault and battery must be dismissed.

**b. Malicious Prosecution**

In Count IV of his Petition, Plaintiff alleges the actions of the officers constituted malicious prosecution. To show malicious prosecution in a civil matter, a plaintiff must establish: (1) the bringing of the original action by Defendant against Plaintiff; (2) the successful termination of the original action in Plaintiff's favor; (3) the **want of probable cause** to join Plaintiff in the original action; (4) that the bringing of the original action was **malicious**; and (5) that as a result of the bringing of the original action Plaintiff sustained injury. OUJI-CIV No. 16.2 (emphasis added); *Young v. First State Bank*, 1981 OK 53, ¶ 5, 628 P.2d 707, 709; *Fletcher v. Burkhalter*, 605 F.3d 1091, 1095 (10th Cir. 2010). A claim for malicious prosecution requires the plaintiff to affirmatively prove, *inter alia*, malice and lack of probable cause. *See Parker v. City of Midwest City*, 1993 OK 29, 850 P.2d 1065. "These two elements necessarily include some degree of bad faith." *Id.* at 12, 850 P.2d at 1068 (internal citation omitted).

Plaintiff claims the actions of the City's officers and agents "caused criminal proceedings to be instituted and continued against Mr. Walker without probable cause and with malice, as evidenced by the officers' continuation of the arrest and prosecution after confirming that Mr. Walker was not the suspect." (Petition at ¶ 40). As shown above, the officers' actions were reasonable. Regardless, Plaintiff's claim for malicious prosecution necessarily requires him to prove that the individual City employees were acting in bad faith. Therefore, Plaintiff's claim against the City for malicious prosecution must be dismissed with prejudice for failure to state a claim.

**c. Defamation (Slander Per Se) And False Light Claims.**

In Count V of his Petition, Plaintiff alleges that "Officer Ray" (Gooldy) published false statements of fact to one or more third parties – that Mr. Walker was a "registered sex offender" –

when the officers knew or reasonably should have known that the statements were false and that this constituted defamation and placed Mr. Walker in a false light (**Exhibit 1**, ¶¶ 44-45). However, the GTCA provides immunity for negligent misrepresentations and statements made with reckless disregard cannot be made in good faith. Therefore, the City cannot be liable.

For a private figure to state a claim for defamation, he must prove (1) a false and defamatory statement, (2) an unprivileged publication to a third party, (3) fault amounting to at least negligence on the part of the publisher, and (4) either the actionability irrespective of special damages (per se) or the existence of special damages (per quod). *Nelson v. American Hometown Publishing, Inc.*, 2014 OK CIV APP 57, 333 P.3d 962. *See also Thornton v. Holdenville General Hospital*, 2001 OK CIV APP, 133, ¶ 16, 36 P.3d 456, 461 (a conditional qualified privilege attaches to statements which would ordinarily be defamatory, which are made in good faith on a subject in which the speaker has an interest or in reference to which he has or honestly believes he has a duty to perform); *Fawcett Publications, Inc. v. Morris*, 1962 OK 183, 377 P.2d 42 (as a general rule, some special private relationship has been involved, such as fraternal, fiduciary, business, or professional). *See also* OUJI-CIV No. 28.8.

Under Oklahoma law, the elements for a cause of action for false light invasion of privacy are based on the Restatement (Second) of Torts § 652E, which states:

> [o]ne who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability ... if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed."

*Sturgeon v. Retherford Publications, Inc.*, 1999 OK CIV APP 78, ¶ 26, 987 P.2d 1218, 1226 (citation omitted). Additionally, "[t]he disclosure must be a public disclosure, and *the facts*

*must be private and of no legitimate public concern.*" *Id.* (emphasis added). See also *Yates v. Gannett Co., Inc.*, 2022 OK CIV APP 41, 523 P.3d 69.

At the time of Officer Gooldy's statement, he had reason to believe Plaintiff was the suspect they were seeking and the information was of legitimate public concern. Regardless, 51 O.S. § 155(17) of the GTCA provides complete tort immunity for "[m]isrepresentation, if unintentional." This means the GTCA expressly excludes claims based on negligent misrepresentations and a party must prove at least reckless disregard in order to have a viable defamation claim. *White v. City of Del City*, 2012 OK CIV APP 5, 270 P.3d 205, 214, *abrogated on other grounds by City of Jenks v. Stone*, 2014 OK 11, 321 P.3d 179. Applying both 51 O.S. §§ 153(A) and 155(17), Oklahoma Courts have recognized that a political subdivision is necessarily immune from suit for claims of defamation under the terms of the GTCA. *See White*, 2012 OK CIV APP at ¶ 22, 270 P.3d at 214 ("we find that a party cannot act with 'reckless disregard' and also be acting within the 'scope of employment' pursuant to the GTCA."); *see also Tanique, Inc. v. State ex rel. Okla. Bureau of Narcotics & Dangerous Drugs*, 2004 OK CIV APP 73, 99 P.3d 1209, 1217 (holding that the State could not be held liable for the plaintiff's claims of libel, slander, and false light invasion of privacy under the GTCA).

There are no facts supportive of Plaintiff's allegation that the City is liable for defamation or false light and this claim should be dismissed with prejudice.

## III. CONCLUSION

Based upon the facts, arguments, and authorities set forth, Defendant City of Tulsa is entitled to the dismissal with prejudice of all claims asserted against it.

Respectfully submitted,

CITY OF TULSA, OKLAHOMA
a municipal corporation

JACK C. BLAIR,
City Attorney

By: [signature]

R. Lawson Vaughn, OBA #21557
Senior Assistant City Attorney
Rachel A. Fields, OBA #31096
Assistant City Attorney
City Hall @ One Technology Center
175 E. Second Street, Suite 685
Tulsa, Oklahoma 74103
Telephone (918) 596-7717
Facsimile (918) 596-9700

## CERTIFICATE OF SERVICE

I, R. Lawson Vaughn, hereby certify that on the 27th day of July 2026, I mailed a true and correct copy of the above and foregoing document with proper postage thereon applied, to:

Steven J. Terrill
J. Spencer Bryan
Bryan & Terrill Law, PLLC
2500 S. Broadway, #122
Edmond, OK 74013
sjterrill@bryanterrill.com
jsbryan@bryanterrill.com

And

D. Mitchell Garrett, Jr.
Garrett Law
320 S. Boston Ave., STE 825
Tulsa, OK 74103
mitchell@garrettlawcenter.com

*Counsel for Plaintiff Caleb Walker*

[signature]
R. Lawson Vaughn

DISTRICT COURT
FILED
JUN 16 2026
DON NEWBERRY, Court Clerk
STATE OF OKLA. TULSA COUNTY

DISTRICT COURT FOR TULSA COUNTY
STATE OF OKLAHOMA

(1) CALEB WALKER,

Plaintiff,

v.

(2) CITY OF TULSA,

Defendant.

CJ-2026-026

JURY TRIAL DEMANDED

ATTORNEY LIEN CLAIMED

Rebecca Brett Nightingale

# PETITION

Caleb Walker, for his cause of action against the above-named Defendant, states as follows:

## I.

## PARTIES, JURISDICTION, AND VENUE

1. Caleb Walker is a resident and citizen of Oklahoma.

2. The City of Tulsa (the "City") is a municipal corporation and a political subdivision of the State of Oklahoma within the meaning of the Oklahoma Governmental Tort Claims Act, 51 O.S. § 151 et seq., located primarily in Tulsa County.

3. The events complained of occurred in Tulsa County, Oklahoma

4. The officers who engaged Mr. Walker relative to the allegations herein were at all times as depicted in the body-worn camera ("BWC") footage of the encounter, (a) employed by and working for the City in their capacity as peace officers, (b) acting under color and authority of state law, (c) within the scope of their employment, and (d) consistent with the policies and practices of the City's police department.

FILED
OFFICE OF THE CITY CLERK
CITY OF TULSA, OKLAHOMA
2026 JUL 07 PM03:24

5. Pursuant to 51 O.S. § 153, the City is liable for the torts of its employees committed within the scope of their employment, and this action is brought against the City as the exclusive remedy provided by the Governmental Tort Claims Act.

6. Plaintiff presented a written notice of tort claim to the City of Tulsa on September 19, 2025, in compliance with 51 O.S. § 156. The City did not approve the claim within ninety (90) days, and the claim was therefore deemed denied by operation of law on December 18, 2025, pursuant to 51 O.S. § 157(A). This Petition is filed within one hundred eighty (180) days of that denial, on or before the resulting deadline of June 16, 2026, and is therefore timely under 51 O.S. § 157(B).

7. This Court has subject matter jurisdiction over this action, and venue is proper in Tulsa County.

## II.

## STATEMENT OF FACTS

8. On September 24, 2024, at approximately 10:55:53 a.m., Tulsa Police officers initiated a stop of Caleb Walker at his apartment complex, immediately addressing him as "Curtis Chaplin," a wanted sex offender.

9. Mr. Walker immediately and repeatedly identified himself as "Caleb Walker" and informed the officers that he lived at the complex.

10. Within seconds of contact, and despite Mr. Walker's verbal cooperation, Officer Ray and other officers physically seized Mr. Walker and grabbed his arms.

11. At approximately 10:58:32 a.m., Mr. Walker informed the officers that he had a chipped tooth that the actual suspect did not have. The officers disregarded this physical evidence

12. At approximately 11:02:26 a.m., Officer Ray interviewed a sixteen-year-old resident who confirmed that Mr. Walker had identified himself as "Caleb" before the police arrived. Despite this independent corroboration, the officers continued to detain Mr. Walker.

13. On at least two occasions, at approximately 11:02:40 a.m. and 11:10:05 a.m., Officer Ray stated to a private citizen that Mr. Walker was a "registered sex offender," even as Mr. Walker continued to protest his identity.

14. At approximately 11:06:06 a.m., Officer Ray informed Mr. Walker that he was under arrest for failure to register as a sex offender and for obstruction.

15. At approximately 11:07:22 a.m., Officers Gooldy, Thompson, and Kerr forced Mr. Walker to the ground and knelt on him while he was handcuffed.

16. At approximately 11:15:35 a.m., while Mr. Walker was handcuffed on the ground Officer Ray inspected Mr. Walker's arm and confirmed that he did not have the "blood" tattoo that the actual suspect had. Officer Ray told Mr. Walker, "The guy that we're looking for has 'blood' tattooed on his arm, which you do not have."

17. At approximately 11:16:51 a.m., Officer Ray admitted to Officer Doolin that Mr. Walker "looks like a guy we're looking for but it's not going to be him." The officers nevertheless proceeded with the arrest and transport.

18. After confirming that Mr. Walker was not the suspect, Officer Thompson stated that the officers were "past that point" and would proceed with "obstruction" and "jaywalking" charges.

19. At approximately 11:28:13 a.m., three officers used significant force to shove a handcuffed and seated Mr. Walker into the back of a patrol car. Mr. Walker screamed in pain and repeatedly insisted that he was the wrong person.

20. The City prosecuted Mr. Walker knowing the conduct of these officers.

21. The City continued to prosecute Mr. Walker until the day of trial.

22. Tellingly, when the matter was called for trial, not one of the officers involved in Mr. Walker's arrest appeared to testify or to answer questions about the encounter, and the City dismissed all charges against Mr. Walker that same day.

23. As a direct and proximate result of the officers' conduct, Mr. Walker suffered injuries and damages, including physical injury, pain and suffering, the loss of his liberty, humiliation, injury to his reputation, and emotional distress.

## III.

## CAUSES OF ACTION

### COUNT I

### NEGLIGENCE

24. Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

25. The officers who engaged Mr. Walker were employees of the City acting within the scope of their employment, and owed Mr. Walker a duty to perform their law enforcement functions with reasonable care, including a duty to reasonably investigate and confirm a suspect's identity before effecting an arrest and a duty to refrain from using unreasonable force.

26. The officers breached these duties by, among other things, failing to investigate or credit Mr. Walker's repeated identification of himself, the corroborating statement of a resident, the absence of the suspect's distinctive tattoo, and their own recognition that Mr. Walker was not the suspect; by detaining, arresting, and searching him without justification; and by using unreasonable force against him.

27. Pursuant to the Oklahoma Governmental Tort Claims Act, 51 O.S. § 153, the City is liable for the negligent acts and omissions of its employees committed within the scope of their employment.

28. As a direct and proximate result of this negligence, Mr. Walker suffered the injuries and damages described above.

## COUNT II

### ASSAULT AND BATTERY (EXCESSIVE FORCE)

29. Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

30. The officers intentionally and without justification made harmful and offensive contact with Mr. Walker, including by forcing a cooperative man to the ground, kneeling on him while he was handcuffed, and shoving a handcuffed and seated man into a patrol car with significant force.

31. The force used was objectively unreasonable and excessive under the circumstances, particularly after the officers had confirmed that Mr. Walker was not the suspect they sought.

32. The officers committed these acts within the scope of their employment, and the City is liable under 51 O.S. § 153.

33. As a direct and proximate result, Mr. Walker suffered the injuries and damages described above.

## COUNT III

### False Arrest and False Imprisonment

34. Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

35. The officers lacked probable cause to believe that Mr. Walker had committed or was about to commit any crime.

36. The officers unlawfully seized, detained, arrested, restrained, and searched Mr. Walker against his will and without legal justification, and continued to do so after they knew he was not the suspect they sought.

37. The officers acted within the scope of their employment, making the City liable under 51 O.S. § 153.

38. As a direct and proximate result, Mr. Walker suffered the injuries and damages described above, including the loss of his liberty.

## COUNT IV

### Malicious Prosecution

39. Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

40. The City, through its officers and agents, caused criminal proceedings to be instituted and continued against Mr. Walker without probable cause and with malice, as evidenced by the officers' continuation of the arrest and prosecution after confirming that Mr. Walker was not the suspect.

41. The criminal proceedings terminated in Mr. Walker's favor when the City dismissed all charges against him on the day [illegible] because Mr. Walker did not violate any law

42. As a direct and proximate result, Mr. Walker suffered the injuries and damages described above.

## COUNT V

### Defamation (Slander Per Se) and False Light

43. Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

44. Officer Ray published false statements of fact to one or more third parties — namely, that Mr. Walker was a "registered sex offender" — when the officers knew or reasonably should have known that the statements were false.

45. The statements falsely imputed to Mr. Walker the commission of a crime and were defamatory on their face, constituting slander per se, and placed Mr. Walker in a false light that would be highly offensive to a reasonable person.

46. The officers made these statements within the scope of their employment, and the City is liable under 51 O.S. § 153.

47. As a direct and proximate result, Mr. Walker suffered the injuries and damages described above, including injury to his reputation.

**WHEREFORE**, all premises considered, and pursuant to 12 O.S. § 1776, Plaintiff Caleb Walker respectfully requests that the Court enter judgment in his favor and against the City of Tulsa and award:

a. Compensatory damages in an amount in less than Two Hundred and Fifty Thousand dollars ($250,000.00);

b. All costs of this action;

c. Pre and post-judgment interest; and

d. such other and further relief as the Court deems just and equitable.

Respectfully submitted,

BRYAN & TERRILL

By: /s/ Spencer Bryan
Steven J. Terrill, OBA # 20869
J. Spencer Bryan, OBA # 19419
Bryan & Terrill Law, PLLC
2500 S. Broadway, #122
Edmond, OK 74013
Tele/Fax: (918) 935-2777
[illegible]
[illegible]

-and-

GARRETT LAW

By: ______________________
D. Mitchell Garrett Jr., OBA # 20704
320 S. Boston Ave, STE 825
Tulsa, Oklahoma 74103
Telephone: (918) 221-6190
Facsimile: (918) 340-6799
[illegible]

*Counsel for Plaintiff Caleb Walker*

**IN THE DISTRICT COURT OF TULSA COUNTY**
**STATE OF OKLAHOMA**

| | | |
|---|---|---|
| CALEB WALKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. CJ-2026-2691 |
| | ) | Judge Rebecca Nightingale |
| CITY OF TULSA, | ) | |
| | ) | |
| Defendant. | ) | |

# EXHIBIT 2 – MORING BWC

**IN THE DISTRICT COURT OF TULSA COUNTY**
**STATE OF OKLAHOMA**

| | | |
|---|---|---|
| CALEB WALKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. CJ-2026-2691 |
| | ) | Judge Rebecca Nightingale |
| CITY OF TULSA, | ) | |
| | ) | |
| Defendant. | ) | |

# EXHIBIT 3 – THOMPSON BWC

OKLAHOMA STATE COURTS NETWORK

The information on this page is NOT an official record. Do not rely on the correctness or completeness of this information. Verify all information with the official record keeper. The information contained in this report is provided in compliance with the Oklahoma Open Records Act, 51 O.S. 24A.1. Use of this information is governed by this act, as well as other applicable state and federal laws.

+ Track Case

**IN THE DISTRICT COURT IN AND FOR TULSA COUNTY, OKLAHOMA**

STATE OF OKLAHOMA,
Plaintiff,
v.
CALEB WALKER,
A/K/A CALEB HILL,
Defendant.

**No. CF-2014-1606**
**(Criminal Felony)**

Filed: 04/11/2014
Closed: 06/13/2014

Judge: CF Docket B

# PARTIES

STATE OF OKLAHOMA, Plaintiff
Tulsa Police Department, ARRESTING AGENCY
WALKER, CALEB, Defendant

# ATTORNEYS

| Attorney | Represented Parties |
|---|---|
| LINGER, JAMES C (Bar #5441)<br>1710 SOUTH BOSTON AVENUE<br>TULSA, OK 74119 | WALKER, CALEB |

# EVENTS

Get Text Reminders

| Event | Party | Docket | Reporter |
|---|---|---|---|
| Wednesday, May 14, 2014 at 9:00 AM<br>ARRAIGNMENT | WALKER, CALEB | Arraignment Docket | |
| Friday, June 13, 2014 at 9:00 AM<br>PRELIMINARY HEARING ISSUE (PRIVATE ATTORNEY) | WALKER, CALEB | Preliminary Hearing Docket | |
| Monday, June 30, 2014 at 0:00 AM<br>FAILED TO REPORT TO COST ADMININISTRATION {COST ADMINISTRATION LETTER SENT} | WALKER, CALEB | Cost Admin. Judge (General) | |

EXHIBIT 4 COT MTD

| Event | Party | Docket | Reporter |
|---|---|---|---|
| Friday, December 12, 2014 at 0:00 AM<br>COST ADMINISTRATION REVIEW | WALKER, CALEB | Cost Admin. Judge (General) | |
| Friday, December 11, 2015 at 9:00 AM<br>DEFERRED | WALKER, CALEB | Preliminary Hearing Docket | |
| Monday, August 26, 2019 at 0:00 AM<br>NOTICE OF AVAILABLE FUNDS REPORT RECEIVED FROM OKLAHOMA TAX COMMISSION | WALKER, CALEB | Cost Admin. Judge (General) | |
| Friday, October 25, 2019 at 0:00 AM<br>OTC Intercept Review | WALKER, CALEB | Cost Admin. Judge (General) | |
| Friday, January 31, 2020 at 0:00 AM<br>COST ADMINISTRATION CASE | WALKER, CALEB | Cost Admin. Judge (General) | |
| Tuesday, February 11, 2020 at 2:00 PM<br>COURT COSTS HEARING | WALKER, CALEB | Cost Admin. Judge (General) | |
| Tuesday, March 24, 2020 at 2:00 PM<br>COURT COSTS HEARING | WALKER, CALEB | Cost Admin. Judge (General) | |
| Friday, June 19, 2020 at 2:00 PM<br>COURT COSTS HEARING | WALKER, CALEB | Cost Admin. Judge (General) | |
| Friday, October 16, 2020 at 2:00 PM<br>COURT COSTS HEARING | WALKER, CALEB | Cost Admin. Judge (General) | |
| Friday, February 19, 2021 at 10:30 AM<br>COURT COSTS HEARING | WALKER, CALEB | Cost Admin. Judge (General) | |
| Monday, May 3, 2021 at 0:00 AM<br>NOTICE OF AVAILABLE FUNDS REPORT RECEIVED FROM OKLAHOMA TAX COMMISSION | WALKER, CALEB | Cost Admin. Judge (General) | |
| Wednesday, June 30, 2021 at 0:00 AM<br>OTC Intercept Review | WALKER, CALEB | Cost Admin. Judge (General) | |
| Friday, August 13, 2021 at 0:00 AM<br>COST ADMINISTRATION REVIEW | WALKER, CALEB | Cost Admin. Judge (General) | |
| Friday, August 13, 2021 at 10:30 AM<br>COURT COSTS HEARING | WALKER, CALEB | Cost Admin. Judge (General) | |
| Friday, February 25, 2022 at 0:00 AM<br>COST ADMINISTRATION REVIEW | WALKER, CALEB | Cost Admin. Judge (General) | |
| Friday, February 25, 2022 at 2:30 PM<br>COURT COSTS HEARING | WALKER, CALEB | Cost Admin. Judge (General) | |

# COUNTS

Parties appear only under the counts with which they were charged. For complete sentence information, see the court minute on the docket.

**Count # 1.** Count as Filed: FFP, FALSELY PERSONATE ANOTHER TO CREATE LIABILITY, in violation of 21 O.S. 1531.4
Date of Offense: 04/09/2014

| Party Name | Disposition Information |
| --- | --- |
| WALKER, CALEB | **Disposed: DEFERRED, 06/13/2014. Guilty Plea**<br>Count as Disposed: OBSTRUCTION OF JUSTICE(OBS)<br>Violation of 21 O.S. 540 |

## DOCKET

**Date** **Code** **Description**

**04-11-2014** [ **TEXT** ] WALKER, CALEB #1

CRIMINAL FELONY INITIAL FILING.
Document Available at Court Clerk's Office

**04-11-2014** [ **INFORMATION** ] WALKER, CALEB #1

DEFENDANT CALEB WALKER WAS CHARGED WITH COUNT #1, FALSELY PERSONATE ANOTHER TO CREATE LIABILITY IN VIOLATION OF 21 O.S. 1531.4

**04-11-2014** [ **TEXT** ]

OCIS HAS AUTOMATICALLY ASSIGNED JUDGE CF B DOCKET TO THIS CASE.

**04-16-2014** [ **CTARRPA** ] WALKER, CALEB

LUDI LEITCH, DEBORRAH: DEFENDANT PRESENT, NOT IN CUSTODY AND NOT REPRESENTED BY COUNSEL. ARRAIGNMENT PASSED TO 5-14-14 AT 9:00AM IN ROOM 173. DEFENDANT RECOGNIZED BACK, WITH BOND TO REMAIN.

**05-14-2014** [ **CTARRPL** ] WALKER, CALEB

HIDDLE, WILLIAM: DEFENDANT PRESENT, NOT IN CUSTODY AND REPRESENTED BY JIM LINGER. ARRAIGNMENT HELD. DEFENDANT WAIVES READING OF THE INFORMATION AND FURTHER TIME TO PLEAD. DEFENDANT ENTERS A PLEA OF NOT GUILTY. PRELIMINARY HEARING SET FOR 6-13-14 AT 9:00AM IN ROOM 347. DEFENDANT RECOGNIZED BACK WITH BOND TO REMAIN.

**05-14-2014** [ **DAINS** ] WALKER, CALEB

DISTRICT ATTORNEY INSPECTION NOTIFICATION
Document Available (#1025461693) TIFF PDF

**05-16-2014** [ **AFPCA** ] WALKER, CALEB

AFFIDAVIT & FINDING OF PROBABLE CAUSE T.R.A.C.I.S. (ARRESTED)
Document Available at Court Clerk's Office

**06-13-2014** [ **DEFERRED** ] WALKER, CALEB #1

JUDGE STEPHEN CLARK: DEFENDANT PRESENT, NOT IN CUSTODY, REPRESENTED BY JAMES LINGER. STATE REPRESENTED BY KENNY ELMORE. DEFENDANT SWORN IN OPEN COURT, COURT REPORTER NONE. DEFENDANT ENTERS A PLEA OF GUILTY AND WAIVES PRELIMINARY HEARING, WAIVES RIGHTS TO JURY, NON JURY TRIAL. COURT ACCEPTS PLEA. DEFENDANT SENTENCED TO:
COUNT 1) COURT WITHHOLDS A FINDING OF GUILTY AND DEFERS FOR EIGHTEEN (18) MONTHS UNTIL 12-11-2015 @ 9 AM IN ROOM 347 WITH THE SUPERVISION FROM TULSA COUNTY DISTRICT ATTORNEYS OFFICE, DEFENDANT TO PAY $300.00 COURT FUND, $75.00 VCA PLUS COSTS. DEFENDANT TO COMPLETE 56 TCMWP HOURS WITHIN 120 DAYS. CHARGE AMENDED TO MISDEMEANOR OBSTRUCTION OF JUSTICE. DEFENDANT ADVISED OF APPEAL RIGHTS, RULE 8 ISSUED, JUDGEMENT AND SENTENCE ISSUED. BOND EXONERATED.

**06-13-2014** [ **COSTM** ] WALKER, CALEB #1 $ 83.00

COURT COSTS ON MISDEMEANOR

EXHIBIT 4 COT MTD

| | | | |
|---|---|---|---|
| **06-13-2014** [ **OCISR** ] | WALKER, CALEB | #1 | $ 25.00 |
| OKLAHOMA COURT INFORMATION SYSTEM REVOLVING FUND | | | |
| **06-13-2014** [ **DACPAM** ] | WALKER, CALEB | #1 | $ 15.00 |
| DA COUNCIL PROSECUTION ASSESSMENT FOR MISDEMEANOR | | | |
| **06-13-2014** [ **TCARF** ] | WALKER, CALEB | #1 | $ 10.00 |
| TRAUMA CARE ASSISTANCE REVOLVING FUND | | | |
| **06-13-2014** [ **MELRF** ] | WALKER, CALEB | #1 | $ 10.00 |
| MEDICAL EXPENSE LIABILITY REVOLVING FUND | | | |
| **06-13-2014** [ **SSFCHS** ] | WALKER, CALEB | #1 | $ 10.00 |
| SHERIFF'S SERVICE FEE FOR COURT HOUSE SECURITY | | | |
| **06-13-2014** [ **CLEET** ] | WALKER, CALEB | #1 | $ 9.00 |
| CLEET PENALTY ASSESSMENT | | | |
| **06-13-2014** [ **PFE7** ] | WALKER, CALEB | #1 | $ 6.00 |
| LAW LIBRARY FEE | | | |
| **06-13-2014** [ **FOREN** ] | WALKER, CALEB | #1 | $ 5.00 |
| FORENSIC SCIENCE IMPROVEMENT ASSESSMENT | | | |
| **06-13-2014** [ **SSF** ] | WALKER, CALEB | #1 | $ 5.00 |
| SHERIFF'S SERVICE FEE ON ARRESTS | | | |
| **06-13-2014** [ **AFIS** ] | WALKER, CALEB | #1 | $ 5.00 |
| AFIS FEE | | | |
| **06-13-2014** [ **CHAB** ] | WALKER, CALEB | #1 | $ 3.00 |
| C.H.A.B. STATUTORY FEE | | | |
| **06-13-2014** [ **AGVSU** ] | WALKER, CALEB | #1 | $ 3.00 |
| ATTORNEY GENERAL VICTIM SERVICES UNIT | | | |
| **06-13-2014** [ **CTFD** ] | WALKER, CALEB | #1 | $ 300.00 |
| COURT FUND ASSESSMENT <..ENTER AMOUNT..> | | | |
| **06-13-2014** [ **VCA** ] | WALKER, CALEB | #1 | $ 75.00 |
| VICTIMS COMPENSATION ASSESSMENT (AC12) | | | |
| **06-13-2014** [ **CCADMIN** ] | WALKER, CALEB | #1 | $ 7.00 |
| COURT CLERK ADMINISTRATIVE FEE ON COLLECTIONS | | | |
| **06-16-2014** [ **CNOTE** ] | WALKER, CALEB | | |
| DEFENDANT NEEDS TO REPORT TO COST ADMINISTRATION FOR A PAYMENT PLAN | | | |
| **06-16-2014** [ **CTPPA** ] | WALKER, CALEB | | |

$ 50.00 IS TO BE PAID ON OR BEFORE 07/11/14 AND A PAYMENT DUE ON THE 11TH DAY OF EACH MONTH CONTINUING UNTIL THE CASE(S) IS PAID IN FULL.

COST ADMINISTRATION REVIEW: 12/12/14

AUTHORIZATION DATE: 6/13/14
Document Available (#1024490110) TIFF PDF

**06-16-2014** [ **ODEF** ] WALKER, CALEB #1

ORDER OF DEFERRED SENTENCE
Document Available (#1026214724) TIFF PDF

**06-16-2014** [ **RULE8** ] WALKER, CALEB

ORDER OF THE COURT - RULE 8 HEARING
Document Available (#1024487581) TIFF PDF

**06-16-2014** [ **RPLEA** ] WALKER, CALEB

RECORD OF PLEA
Document Available (#1026037681) TIFF PDF

**06-19-2014** [ **BOTRF** ] WALKER, CALEB #1 $ 10.00

A BOND FROM CASE # NF-2014-2484 DATED 04/11/2014 HAS BEEN TRANSFERRED TO THIS CASE. THE INFORMATION ON THIS BOND IS AS FOLLOWS:
PRE-TRIAL BOND FOR WALKER, CALEB, COUNT NUMBER 1, POSTED 04/11/2014 JUDGMENT AMOUNT $2,000.00
Document Available (#1026271488) TIFF PDF

**06-19-2014** [ **BOJ** ] WALKER, CALEB #1 $ 25.00

BOND INITIAL FILING JAIL FUND FEE

**06-19-2014** [ **CCADMIN25** ] WALKER, CALEB #1 $ 2.50

COURT CLERK ADMINISTRATIVE FEE ON $25 COLLECTIONS

**09-12-2014** [ **RETRL** ] WALKER, CALEB

RETURN RELEASE
Document Available (#1027040143) TIFF PDF

**12-10-2014** [ **MWPC** ] WALKER, CALEB

T.C.M.W.P. NOTICE OF COMPLETION - PART OF SENTENCE
Document Available (#1027981135) TIFF PDF

**09-25-2015** [ **CTFREE** ] WALKER, CALEB

HIDDLE, WILLIAM: BENCH WARRANT ISSUED FOR FAILURE TO PAY A CASH PAYMENT OF $688.50

**09-28-2015** [ **BWIFP** ] WALKER, CALEB $ 50.00

BENCH WARRANT ISSUED FAILED TO PAY, JUDGE: COST ADMIN. JUDGE (GENERAL) - BOND AMOUNT: $688.50

COUNT 1 - FALSELY PERSONATE ANOTHER TO CREATE LIABILITY

**09-28-2015** [ **CBWF1** ] WALKER, CALEB $ 5.00

CLERK'S BENCH WARRANT FEE {TITLE 22 O.S.966A}

**09-28-2015** [ **OCISR** ] WALKER, CALEB $ 25.00

OKLAHOMA COURT INFORMATION SYSTEM REVOLVING FUND

**10-02-2015** [ **CTRS** ] WALKER, CALEB

CLAIM FOR INTERCEPT OF TAX REFUND

**10-21-2015** [ **RPT** ] WALKER, CALEB

VIOLATION REPORT
Document Available (#1031390626) TIFF PDF

**11-30-2015** [ **ACCOUNT** ] WALKER, CALEB

RECEIPT # 2015-3219210 ON 11/30/2015.
PAYOR:WALKER, CALEB-LV TOTAL AMOUNT PAID: $50.00.
LINE ITEMS:
CF-2014-1606: $50.00 ON AC01 CLERK FEES FOR WALKER, CALEB.

**11-30-2015** [ **ACCOUNT** ]

RECEIPT # 3219210 VOIDED ON 11/30/2015 BY OSCN\JOYCEJACKSON.
WRITTEN INTO WRONG CASE NUMBER. RECEIPT VOIDED AND REWRITTEN.

**12-11-2015** [ **CTFREE** ] WALKER, CALEB

JUDGE MARTHA RUPP CARTER: DEFENDANT NOT PRESENT, NOT IN CUSTODY AND REPRESENTED BY JAMES LINGER. STATE REPRESENTED BY BRETT MIZE. EXPUNGEMENT DENIED. DEFENDANT TO PAY OFF BALANCE; EXPUNGING DEFENDANT'S CASE SUBJECT TO APPLICATION WITHIN 30 DAYS.

**12-11-2015** [ **SFC** ] WALKER, CALEB $ 206.55

CASE SENT FOR COLLECTION. BATCH ID: 20151212-6149 - COLLECTION ID: 96603

**12-11-2015** [ **SFCSF** ] WALKER, CALEB $ -5.00

REDUCTION IN BENCH WARRANT FEE TO SHERIFF (10%)

**12-11-2015** [ **SFCCC** ] WALKER, CALEB $ 5.00

ADDITION OF 10% FOR WARRANT COLLECTION

**01-27-2016** [ **RLSI** ] WALKER, CALEB

RELEASE ISSUED: ALL DEFENDANT'S CASES TURNED OVER TO ABERDEEN COLLECTION AGENCY. DEFENDANT NEEDS TO CONTACT ABERDEEN UPON RELEASE TO MAKE PAYMENT ARRANGEMENTS.

**02-01-2016** [ **RETRL** ] WALKER, CALEB

RETURN RELEASE
Document Available (#1032199894) TIFF PDF

**02-12-2016** [ **RETBW** ] WALKER, CALEB

WARRANT RETURNED 2/12/2016, WARRANT ISSUED ON 9/28/2015
Document Available at Court Clerk's Office

**10-18-2016** [ **CTRS** ] WALKER, CALEB

CLAIM FOR INTERCEPT OF TAX REFUND

**10-10-2017** [ **CTRS** ] WALKER, CALEB

CLAIM FOR INTERCEPT OF TAX REFUND

**03-28-2018** [ **SFCX** ] WALKER, CALEB $ -206.55

ADJUSTING ENTRY OF ADMINISTRATIVE COST FOR SHERIFF'S WARRANT COLLECTIONS VENDOR

**06-27-2019** [ **WINC** ] WALKER, CALEB

NOTICE OF CLAIM OKLAHOMA TAX COMMISSION WARRANT INTERCEPT
Document Available (#1043906918) TIFF PDF

**06-27-2019** [ **WICF** ] WALKER, CALEB

WARRANT INTERCEPT 3% COLLECTION FEE

**06-27-2019 [ ACCOUNT ]** WALKER, CALEB

RECEIPT # 2019-3961156 ON 06/27/2019. TRANSFERRED OTCEFT #62719
PAYOR: TOTAL AMOUNT PAID: $ 0.00.
LINE ITEMS:
CF-2014-1606: $64.68 ON TRANSFER TO AC96 OTC INTERCEPTS FOR WALKER, CALEB.
MRC-2019-105: $-64.68 ON TRANSFER FROM AC99 HOLDING FOR OKLAHOMA TAX COMMISION.

**08-29-2019 [ ACCOUNT ]** WALKER, CALEB

RECEIPT # 2019-3987544 ON 08/29/2019.
PAYOR: TOTAL AMOUNT PAID: $ 0.00.
LINE ITEMS:
CF-2014-1606: $64.68 ON TRANSFER TO AC01 CLERK FEES FOR WALKER, CALEB.
CF-2014-1606: $-64.68 ON TRANSFER FROM AC96 OTC INTERCEPTS FOR WALKER, CALEB.

**01-17-2020 [ CTFREE ]** WALKER, CALEB

DEFT PAID $250.00 CASH PAYMENT TO SECURE RELEASE FROM CUSTODY FOR FAILURE TO PAY AND OR APPEAR WARRANTS ONLY - LETTER SIGNED BY DEFENDANT.

* DEFENDANT MUST REPORT THE NEXT BUSINESS DAY TO COST ADMINISTRATION FOR INFORMATION FOR COURT COST HEARING.
SEE ALSO: CM-16-4715, CM-16-809, TR-16-6915, CF-14-1606
Document Available (#1045987342) TIFF PDF

**01-17-2020 [ CTFREE ]** WALKER, CALEB

JUDGE GUTEN: COURT COST HEARING SET FOR 2/11/2020 AT 2PM IN ROOM 173.

SEE ALL: CM-16-4715, CM-166-809, TR-16-6915, CF-14-1606
Document Available (#1046065044) TIFF PDF

**02-12-2020 [ CTFREE ]** WALKER, CALEB

JUDGE GUTEN; COURT COST HEARING 2/11/2020, DEFT PRESENT, SUSPEND PAYMENTS UNTIL REVIEW.

DEFENDANT HAS SATISFIED THE OBLIGATION OF A PORTION OF FINES AND COSTS BY COMPLETING OTHER COURT MANDATED REQUIREMENTS AND THEREFORE THE COURT WAIVES $100.00 IN CM-16-809.

DEFT IS RECOGNIZED BACK FOR REVIEW ON 3/24/2020 @ 2PM ROOM 173.
ALSO SEE: CF-14-1606, CM-16-809, TR-16-6915, CM-16-4715
Document Available (#1046217799) TIFF PDF

**03-18-2020 [ CTFREE ]** WALKER, CALEB

JUDGE GUTEN; STRIKE COURT COST HEARING SET FOR 3/24/20, RESET FOR 6/19/20 @ 2PM ROOM 173. PER JUDGE GUTEN REQUEST.

**05-28-2020 [ CTFREE ]** WALKER, CALEB

JUDGE GUTEN: COURT DATE FOR 6/19/20 IS STRICKEN BY THE COURT AND RESET TO 10/16/20 AT 2PM IN ROOM 173

**09-29-2020 [ CNOTE ]** WALKER, CALEB

JUDGE GUTEN: COURT DATE FOR 10/16/20 AT 2PM HAS BEEN CHANGED TO 9AM IN ROOM 124 WITH JUDGE DOSS.

**10-05-2020 [ CTRS ]** WALKER, CALEB

CLAIM FOR INTERCEPT OF TAX REFUND

EXHIBIT 4 COT MTD

**10-19-2020** [ **CTFREE** ] WALKER, CALEB

JUDGE MILLER: COST COURT HEARING 10/16/20. DEFT PRESENT, NOT IN CUSTODY. COURT FINDS THE DEFT IS ABLE TO PAY $50 PER MONTH.

THE DEFT HAS SATISFIED THE OBLIGATION OF A PORTION OF FINES AND COST BY COMPLETING OTHER COURT MANDATED REQUIREMENTS AND THEREFORE THE COURT SUSPENDS THE FOLLOWING FINES AND COST IN $375 IN CM-16-809.

DEFT RECOGNIZED BACK ON 2/19/21 AT 9AM IN ROOM 124.
SEE ALL:CM-16-809, CF-14-1606,TR-16-6915, CM-16-4715
Document Available (#1047726960) TIFF PDF

**01-13-2021** [ **CTFREE** ] WALKER, CALEB

JUDGE GODSBY: COURT COST HEARING SET FOR 2/19/21 IS STRICKEN BY THE COURT AND RESET TO 2/19/21 AT 9AM IN ROOM 413

**01-28-2021** [ **CTFREE** ] WALKER, CALEB

JUDGE GODSBY; COST COURT HEARING SET FOR 02/19/21 AT 9 AM, TIME HAS BEEN PASSED UNTIL 10:30AM IN RM 413.

**02-22-2021** [ **CTFREE** ] WALKER, CALEB

JUDGE GODSBY; COURT COST HEARING 02/19/21, DEFT PRESENT, COURT ORDERS 80 WORK HOURS IN LIEU OF THE BALANCE IN CF-14-1606, CM-16-809, AND TR-16-6915.

DEFT IS RECOGNIZED BACK FOR REVIEW ON 08/13/21 @ 10:30AM ROOM 413..
ALSO SEE: CF-14-1606, CM-16-809, TR-16-6915, CM-16-4715
Document Available (#1048703190) TIFF PDF

**02-22-2021** [ **RULE8** ] WALKER, CALEB

COURT ORDERS DEFT TO COMPLETE 80 WORK HOURS IN LIEU OF CF-14-1606 ($623.82) CM-16-809 ($157.50) AND TR-16-6915 ($211.50) COMPLETE BY 08/13/21.
Document Available (#1048703054) TIFF PDF

**03-18-2021** [ **WINC** ] WALKER, CALEB $ 10.00

NOTICE OF CLAIM OKLAHOMA TAX COMMISSION WARRANT INTERCEPT
Document Available (#1049052187) TIFF PDF

**03-18-2021** [ **WICF** ] WALKER, CALEB $ 5.16

WARRANT INTERCEPT 3% COLLECTION FEE

**03-22-2021** [ **ACCOUNT** ] WALKER, CALEB

RECEIPT # 2021-4201200 ON 03/22/2021. TRANSFERRED FROM OTCEFT #030221
PAYOR: TOTAL AMOUNT PAID: $ 0.00.
LINE ITEMS:
CF-2014-1606: $168.56 ON TRANSFER TO AC96 OTC INTERCEPTS FOR WALKER, CALEB.
MRC-2021-25: $-168.56 ON TRANSFER FROM AC99 HOLDING FOR OKLAHOMA TAX COMMISION.

**05-26-2021** [ **ACCOUNT** ] WALKER, CALEB

RECEIPT # 2021-4229252 ON 05/26/2021.
PAYOR: TOTAL AMOUNT PAID: $ 0.00.
LINE ITEMS:
CF-2014-1606: $168.56 ON TRANSFER TO AC01 CLERK FEES FOR WALKER, CALEB.
CF-2014-1606: $-168.56 ON TRANSFER FROM AC96 OTC INTERCEPTS FOR WALKER, CALEB.

**08-16-2021** [ **CTPPA** ] WALKER, CALEB

$35 IS TO BE PAID ON OR BEFORE 9/17/21 AND A PAYMENT DUE ON THE 17TH DAY OF EACH MONTH CONTINUING UNTIL THE CASE(S) IS PAID IN FULL.
YOU ARE TO RETURN TO COST ADMINISTRATION FOR REVIEW ON 2/25/22
AUTHORIZED 8/13/21
SEE ALSO CF-14-1606/CM-16-809/TR-2016-6915/CM-16-4715
Document Available (#1050181139) TIFF PDF

**08-17-2021** [ **CTFREE** ] WALKER, CALEB

JUDGE GODSBY: COST COURT 8/13/21. DEFT PRESENT, NOT IN CUSTODY, AND PUBLIC DEFENDER APPOINTED FOR THE PURPOSE OF COST COURT HEARING ONLY.

COURT FINDS DEFT ABLE TO PAY $35 PER MONTH AND IS TO SET UP NEW PAYMENT PLAN FOR REMAINING BALANCE OWED.
DEFENDANT HAS SATISFIED THE OBLIGATION OF A PORTION OF FINES AND COSTS BY COMPLETING OTHER COURT MANDATED REQUIREMENTS AND THEREFORE THE COURT WAIVES BALANCE IN CM-16-809.
COURT WANTS TO SEE EFFORT ON DEFT'S PART AT NEXT REVIEW. DEFT RECOGNIZED BACK FOR REVIEW ON 2/25/22 @ 10:30 AM IN 413.

SEE ALSO CF-14-1606/CM-16-809/TR-2016-6915/CM-16-4715

Document Available (#1050112992) TIFF PDF

**08-18-2021** [ **CTFREE** ] WALKER, CALEB

T.C.M.W.P. NOTICE OF NON-COMPLETION (COURT COST) 4/80 IN LIEU OF FINES AND COSTS FOR A TOTAL OF 0.00
Document Available (#1049850390) TIFF PDF

**10-12-2021** [ **CTRS** ] WALKER, CALEB

CLAIM FOR INTERCEPT OF TAX REFUND

**01-06-2022** [ **CTFREE** ] WALKER, CALEB

JUDGE GODSBY: COURT COST HEARING SET FOR 2/25/22 AT 10:30AM IS PASSED BY THE COURT TO 2:30PM IN ROOM 413

**02-22-2022** [ **ADJUST** ] WALKER, CALEB $ 1.00

ADJUSTING ENTRY: MONIES DUE TO AC09-CARD ALLOCATION

**02-22-2022** [ **ACCOUNT** ] WALKER, CALEB $ -1.00

ADJUSTING ENTRY: MONIES DUE TO THE FOLLOWING AGENCIES REDUCED BY THE FOLLOWING AMOUNTS:
CF-2014-1606: AC01 CLERK FEES -$1.00

**02-22-2022** [ **ACCOUNT** ] WALKER, CALEB

RECEIPT # 2022-4323663 ON 02/22/2022.
PAYOR: KENDRA HENDERSON TOTAL AMOUNT PAID: $ 40.00.
LINE ITEMS:
CF-2014-1606: $39.00 ON AC01 CLERK FEES FOR WALKER, CALEB.
CF-2014-1606: $1.00 ON AC09 CARD ALLOCATIONS FOR WALKER, CALEB.

EXHIBIT 4 COT MTD

**03-02-2022** [ **CTFREE** ] WALKER, CALEB

JUDGE WILSON; COURT COST HEARING 2/25/22; DEFENDANT PRESENT, NOT IN CUSTODY. COURT FINDS THE DEFENDANT IS UNABLE TO PAY THE COST AND FINES ASSESSED, COURT WAIVES BALANCE ON ALL FINES AND COST IN CF-14-1606/TR-16-6915

Document Available (#1051600796) TIFF PDF

**03-02-2022** [ **CTS** ] WALKER, CALEB $ -134.92

CREDIT TIME SERVED FOR IN THE AMOUNT OF $ 134.92 TO AC01 CLERK FEES

**03-02-2022** [ **CTS** ] WALKER, CALEB $ -3.00

CREDIT TIME SERVED FOR IN THE AMOUNT OF $ 3.00 TO AC07 ATTORNEY GENERAL VICTIM SERVICES UNIT

**03-02-2022** [ **CTS** ] WALKER, CALEB $ -45.00

CREDIT TIME SERVED FOR IN THE AMOUNT OF $ 45.00 TO AC08 SHERIFF FEES

**03-02-2022** [ **CTS** ] WALKER, CALEB $ -9.00

CREDIT TIME SERVED FOR IN THE AMOUNT OF $ 9.00 TO AC11 CLEET PENALTY ASSESSMENT

**03-02-2022** [ **CTS** ] WALKER, CALEB $ -75.00

CREDIT TIME SERVED FOR IN THE AMOUNT OF $ 75.00 TO AC12 VICTIM'S COMPENSATION ASSESSMENT (VCA)

**03-02-2022** [ **CTS** ] WALKER, CALEB $ -5.00

CREDIT TIME SERVED FOR IN THE AMOUNT OF $ 5.00 TO AC21 AFIS FUND

**03-02-2022** [ **CTS** ] WALKER, CALEB $ -5.00

CREDIT TIME SERVED FOR IN THE AMOUNT OF $ 5.00 TO AC22 SHERIFF'S SERVICE & INCARCERATION FEE

**03-02-2022** [ **CTS** ] WALKER, CALEB $ -6.00

CREDIT TIME SERVED FOR IN THE AMOUNT OF $ 6.00 TO AC23 LAW LIBRARY FEE CIVIL AND CRIMINAL

**03-02-2022** [ **CTS** ] WALKER, CALEB $ -19.50

CREDIT TIME SERVED FOR IN THE AMOUNT OF $ 19.50 TO AC31 COURT CLERK REVOLVING FUND

**03-02-2022** [ **CTS** ] WALKER, CALEB $ -3.00

CREDIT TIME SERVED FOR IN THE AMOUNT OF $ 3.00 TO AC69 CHILD ABUSE MULTIDISCIPLINARY FEE

**03-02-2022** [ **CTS** ] WALKER, CALEB $ -5.00

CREDIT TIME SERVED FOR IN THE AMOUNT OF $ 5.00 TO AC75 FORENSIC SCIENCE IMPROVEMENT ASSESSMENTS

**03-02-2022** [ **CTS** ] WALKER, CALEB $ -10.00

CREDIT TIME SERVED FOR IN THE AMOUNT OF $ 10.00 TO AC76 MEDICAL EXPENSE LIABILITY REVOLVING FUND

**03-02-2022** [ **CTS** ] WALKER, CALEB $ -15.00

CREDIT TIME SERVED FOR IN THE AMOUNT OF $ 15.00 TO AC77 DA COUNCIL PROSECUTION ASSESSMENT FEE

**03-02-2022** [ **CTS** ] WALKER, CALEB $ -10.00

CREDIT TIME SERVED FOR IN THE AMOUNT OF $ 10.00 TO AC78 OKLAHOMA DEPARTMENT OF HEALTH/TRAUMA CARE FUND

**03-02-2022** [ **CTS** ] WALKER, CALEB $ -50.00

CREDIT TIME SERVED FOR IN THE AMOUNT OF $ 50.00 TO AC79 OCIS REVOLVING FUND

**03-02-2022** [ **CTS** ] WALKER, CALEB $ -25.00

CREDIT TIME SERVED FOR IN THE AMOUNT OF $ 25.00 TO AC80 JAIL FUND (BOND FEE) SHERIFF OR PRIVATE JAIL

**03-02-2022** [ **CTS** ] WALKER, CALEB $ -10.00

CREDIT TIME SERVED FOR IN THE AMOUNT OF $ 10.00 TO AC88 SHERIFF'S SERVICE FEE FOR COURT HOUSE SECURITY

**03-07-2022** [ **OTCR** ] WALKER, CALEB

REFUND OF OKLAHOMA TAX COMMISSION COLLECTION FEE REQUESTED

**03-07-2022** [ **ACCOUNT** ] WALKER, CALEB

RECEIPT # 2022-4329284 ON 03/07/2022. TRANSFERRED FROM OTC EFT 3-3-22
PAYOR: TOTAL AMOUNT PAID: $ 0.00.
LINE ITEMS:
CF-2014-1606: $242.06 ON TRANSFER TO AC98 OVERPAYMENTS FOR WALKER, CALEB.
MRC-2022-31: $-242.06 ON TRANSFER FROM AC99 HOLDING FOR OKLAHOMA TAX COMMISION.

**03-07-2022** [ **OTCP** ] WALKER, CALEB

REFUND OF OKLAHOMA TAX COMMISSION COLLECTION FEE PROCESSED BY AOC

**03-11-2022** [ **ACCOUNT** ] WALKER, CALEB

RECEIPT # 2022-4331589 ON 03/11/2022. TRANSFERRED FROM OTC EFT 3-8-22
PAYOR: TOTAL AMOUNT PAID: $ 0.00.
LINE ITEMS:
CF-2014-1606: $4.94 ON TRANSFER TO AC98 OVERPAYMENTS FOR WALKER, CALEB.
MRC-2022-34: $-4.94 ON TRANSFER FROM AC99 HOLDING FOR OKLAHOMA TAX COMMISION.

**03-11-2022** [ **ACCOUNT** ] WALKER, CALEB

REQUESTED VOUCHER IN AMOUNT OF 247.00 TO WALKER, CALEB FROM ACCOUNT AC98. DISBURSEMENT NUMBER 15744116.

**03-14-2022** [ **DISBURSED** ] WALKER, CALEB

VOUCHER# 508095 PRINTED TO WALKER, CALEB, WHICH INCLUDES $ 247.00 FROM THIS CASE FOR AC98 - OVERPAYMENTS. TOTAL AMOUNT OF VOUCHER: $ 247.00.

**03-15-2022** [ **CNOTE** ] WALKER, CALEB

OTC EFT IN THE AMOUNT OF $247.00 MAILED TO CALEB WALKER TO THE ADDRESS ON THE OTC REPORT.

FILED
DISTRICT COURT
TULSA COUNTY, OKLAHOMA
August 17, 2026 5:27 PM
DON NEWBERRY, COURT CLERK
Case Number CJ-2026-2691

**IN THE DISTRICT COURT OF TULSA COUNTY**
**STATE OF OKLAHOMA**

CALEB WALKER,

Plaintiff,

v.

CITY OF TULSA, a municipal corporation; RAY GOOLDY, individually; ZACHARY MORING, individually; JAMES KIDD, individually; and RYAN THOMPSON, individually,

Defendants.

Case No. CJ-2026-2691

Judge Rebecca B. Nightingale

**JURY TRIAL DEMANDED**

**ATTORNEY LIEN CLAIMED**

---

**FIRST AMENDED PETITION**

Plaintiff Caleb Walker, by and through his counsel of record, brings this First Amended Petition as a matter of course pursuant to 12 O.S. § 2015(A), and for his causes of action against the above-named Defendants states and alleges as follows:

**I.**

**PARTIES, JURISDICTION, AND VENUE**

1. Plaintiff Caleb Walker is a resident and citizen of Tulsa County, Oklahoma.

2. Defendant City of Tulsa (the "City") is a municipal corporation and a political subdivision of the State of Oklahoma within the meaning of the Oklahoma Governmental Tort Claims Act ("GTCA"), 51 O.S. § 151 et seq., located primarily in Tulsa County.

3. Defendant Ray Gooldy was at all relevant times a police officer employed by the City of Tulsa. He is sued in his individual capacity. As to the state-law claims asserted against him individually, he acted willfully, wantonly, and in bad faith, and therefore outside the scope of his

RECEIVED
CITY OF TULSA
LEGAL DEPARTMENT
2026 AUG 26 PM01:45

employment as that term is defined by 51 O.S. § 152(13). As to the federal claims asserted against him, he acted under color of state law.

4. Defendant Zachary Moring was at all relevant times a police officer employed by the City of Tulsa. He is sued in his individual capacity, and acted as described in the preceding paragraph.

5. Defendant James Kidd was at all relevant times a police officer employed by the City of Tulsa. He is sued in his individual capacity, and acted as described above.

6. Defendant Ryan Thompson was at all relevant times a police officer employed by the City of Tulsa. He is sued in his individual capacity, and acted as described above. Defendants Gooldy, Moring, Kidd, and Thompson are referred to collectively as the "Individual Defendants" or the "Officers."

7. The events complained of occurred in Tulsa County, Oklahoma. Venue is proper in this Court, and this Court has subject-matter jurisdiction over Plaintiff's state-law claims and concurrent jurisdiction over Plaintiff's claims arising under 42 U.S.C. § 1983.

8. With respect to the negligence claim against the City only, Plaintiff has complied with the GTCA. Plaintiff presented a written notice of tort claim to the City of Tulsa on September 19, 2025, in compliance with 51 O.S. § 156. The City did not approve the claim within ninety (90) days, and the claim was deemed denied by operation of law on December 18, 2025, pursuant to 51 O.S. § 157(A). Plaintiff's original Petition was filed within one hundred eighty (180) days of that denial, on June 16, 2026, and this action is therefore timely under 51 O.S. § 157(B). GTCA notice is not a prerequisite to the claims asserted against the Individual Defendants for conduct outside the scope of their employment, or to the claims arising under federal law.

## II.

## STATEMENT OF FACTS

This case is not one of mistaken identity alone. The Officers came to doubt, and then confirmed, and then stated aloud, that Mr. Walker was not the man named in their warrant. They seized him, forced him to the ground, arrested and jailed him, and caused his prosecution anyway.

9. On September 24, 2024, at approximately 10:55 a.m., Tulsa Police officers, including the Individual Defendants, approached and stopped Caleb Walker outside his apartment complex as he was walking back across the road from the trash bin. All four Individual Defendants—Gooldy, Moring, Kidd, and Thompson, were present and participated in the stop, seizure, detention, and arrest of Mr. Walker, acting together as an integrated police unit and in concert with one another throughout the encounter.

10. When Mr. Walker crossed the road, he did so at a right angle to the curb, taking the shortest route directly across, the manner of crossing prescribed by law. The roadway he crossed is an interior drive that bisects the apartment complex in which Mr. Walker lived, and no vehicle was approaching as he crossed. Mr. Walker's crossing violated no law. In any event, "jaywalking" is, at most, a fine-only pedestrian infraction under Oklahoma law and the Tulsa Revised Traffic Code, not a criminal offense and not an arrestable one, and it furnished no lawful basis to seize, handcuff, arrest, jail, or prosecute Mr. Walker. The Officers did not stop Mr. Walker for jaywalking; they seized him as a suspected sex offender and raised "jaywalking" only later, after they had confirmed he was not the man they sought, as a charge manufactured to justify an arrest they knew was unlawful.

11. Officer Moring, who initiated the contact and appeared to be the senior officer directing the encounter, immediately took hold of Mr. Walker while still asking whether he was

"Curtis Chaplin," the person the officers were seeking on a warrant for failure to register as a sex offender. Officer Moring seized Mr. Walker before any officer had verified his identity or observed him commit any offense.

12. Mr. Walker immediately and repeatedly identified himself as "Caleb Walker" and informed the officers that he lived at the complex. Mr. Walker also protested aloud that he was being stopped because he is a Black man, asking words to the effect of, "What are y'all doing? … Just because I'm a Black man?"

13. Within seconds of contact, and although Mr. Walker had done nothing but walk his dog and take out his trash and had repeatedly identified himself by name, Officer Moring physically seized Mr. Walker, ordering him to put his hands behind his back and taking hold of his arms, and continued to restrain him while Officer Gooldy placed him in handcuffs. Officer Moring threatened to arrest Mr. Walker for "obstruction" if he pulled away.

14. At approximately 10:58 a.m., Mr. Walker informed the officers that he had a chipped tooth that the actual suspect did not have. The officers disregarded this physical evidence.

15. At approximately 11:02 a.m., Officer Moring interviewed a sixteen-year-old resident, who confirmed that Mr. Walker had identified himself as "Caleb" before the police arrived. Despite this independent corroboration, the Officers continued to detain Mr. Walker.

16. On at least two occasions, at approximately 11:02 a.m. and 11:10 a.m., Officer Gooldy stated to private citizens that Mr. Walker was a "registered sex offender," even as Mr. Walker continued to protest his identity.

17. At approximately 11:06 a.m., Officer Gooldy informed Mr. Walker that he was under arrest for failure to register as a sex offender and for obstruction.

18. While Mr. Walker remained handcuffed, Officer Moring attempted to pull a pair of headphones from Mr. Walker's restrained hands. When Mr. Walker held onto his own property, Officer Moring took him to the ground, and the Officers, Moring, Gooldy, Kidd, and Thompson, piled onto him and drove their knees into his back. Each of the Individual Defendants participated in, and none prevented, the unlawful seizure, arrest, and use of force against Mr. Walker, though each had the opportunity and the duty to intervene. The Officers later characterized Mr. Walker's grip on his own headphones as an attempt to "elbow" an officer.

19. At approximately 11:15 a.m., while Mr. Walker was handcuffed on the ground, Officer Gooldy inspected Mr. Walker's arm and confirmed that he did not have the "blood" tattoo that the actual suspect had, telling Mr. Walker, "The guy that we're looking for has 'blood' tattooed on his arm, which you do not have." The officers also compared Mr. Walker to photographs of Chaplin, observed that Chaplin bore tattoos that Mr. Walker did not, and, rather than treat that difference as exculpatory, accused Mr. Walker of having had his tattoos surgically removed.

20. Before arresting Mr. Walker, the Officers confirmed his identity. Officer Moring retrieved photographs of both Mr. Walker and Curtis Chaplin, photographed the differing mugshots, and showed them to Officer Kidd; comparing the images, the Officers confirmed, "This is Kaleb Walker," and recognized that one of the officers present had personally arrested Mr. Walker under that same name the prior year. The Officers acknowledged that Mr. Walker "looks like a guy we're looking for, but it's not going to be him." Having thus confirmed that Mr. Walker was not Curtis Chaplin, the Officers nevertheless proceeded with the arrest and transport.

21. After confirming that Mr. Walker was not the suspect, the Officers did not release him. Instead, one officer stated that they were "past that point" and that they had "got instruction" to proceed, and the Officers settled on substitute charges of "obstruction" and "jaywalking",

charges they used to paper over an arrest they knew lacked any lawful basis. The Officers further elected to transport and book Mr. Walker before confirming his identity, discussing on camera that they would take him to "get him live scan confirmed and then either change locations or book him", thereby jailing him before verifying who he was.

22. At approximately 11:28 a.m., the Officers used significant force to shove a handcuffed and seated Mr. Walker into the back of a patrol car. Mr. Walker cried out in pain and repeatedly insisted that he was the wrong person. While Mr. Walker remained handcuffed and detained, continuing to insist that he was not the man they sought, the Officers engaged in unrelated, casual conversation among themselves, displaying indifference to his protests and to the wrongfulness of his continued detention.

23. The Officers caused criminal charges to be initiated against Mr. Walker, and the City prosecuted those charges, with knowledge of the Officers' conduct described above.

24. The City continued to prosecute Mr. Walker until the day of trial, June 10, 2025, in the Municipal Court of the City of Tulsa (Division II). The City subpoenaed all four Individual Defendants, Gooldy, Moring, Kidd, and Thompson, to appear and testify. When the matter was called for trial, not one of them appeared, in defiance of the City's own subpoenas, and the City thereupon dismissed every charge against Mr. Walker. No officer was willing to take the stand and defend, under oath, the arrest and prosecution he had set in motion.

25. Mr. Walker's prosecution terminated in his favor when all charges were dismissed without a conviction.

26. As a direct and proximate result of Defendants' conduct, Mr. Walker suffered injuries and damages, including physical injury, pain and suffering, the loss of his liberty,

humiliation, injury to his reputation, emotional distress, and the costs of defending the criminal charges.

## III.
## CAUSES OF ACTION

### COUNT I — NEGLIGENCE
***(Against Defendant City of Tulsa)***

Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

27. The Officers who engaged Mr. Walker were employees of the City acting within the scope of their employment for purposes of this negligence claim, and owed Mr. Walker a duty to exercise reasonable care in the performance of their law-enforcement functions, including a duty to reasonably investigate and confirm a suspect's identity before effecting an arrest and a duty to refrain from using unreasonable force.

28. The Officers breached these duties by, among other things, failing to investigate or credit Mr. Walker's repeated identification of himself, the corroborating statement of a resident, the absence of the suspect's distinctive tattoo, and their own recognition that Mr. Walker was not the suspect; and by using unreasonable force against him.

29. Pursuant to 51 O.S. § 153, the City is liable for the negligent acts and omissions of its employees committed within the scope of their employment.

30. As a direct and proximate result of this negligence, Mr. Walker suffered the injuries and damages described above, in an amount to be proven at trial and subject to the applicable limits of the GTCA, 51 O.S. § 154.

## COUNT II — 42 U.S.C. § 1983: UNREASONABLE SEIZURE AND FALSE ARREST
***(Fourth Amendment — Against the Individual Defendants)***

Plaintiff re-alleges and incorporates by rcfcrencc cach of the foregoing paragraphs as though fully set forth herein.

31. At all relevant times, the Individual Defendants acted under color of the statutes, ordinances, customs, and usages of the State of Oklahoma and the City of Tulsa.

32. The Fourth Amendment to the United States Constitution, applied to the States through the Fourteenth Amendment, guarantees the right to be free from unreasonable searches and seizures, including seizure and arrest without probable cause.

33. The Individual Defendants seized, detained, and arrested Mr. Walker without probable cause and without reasonable suspicion. Even assuming some justification existed at the initial moment of contact, that justification evaporated once the Officers obtained multiple independent facts establishing that Mr. Walker was not Curtis Chaplin, including his immediate and repeated self-identification, the corroborating statement of a resident, the absence of the suspect's distinctive "blood" tattoo, and the Officers' own stated recognition that "it's not going to be him." The Officers nonetheless continued to detain, arrest, transport, and jail Mr. Walker after they knew, or in the exercise of reasonable diligence should have known, that he was not the person they sought and had committed no crime warranting arrest. Nor did the substitute charges the Officers later invented supply any lawful basis for the seizure: Mr. Walker committed no obstruction, and his crossing of an interior drive within his own apartment complex, at a right angle to the curb and with no traffic present, violated no law; "jaywalking" is, at most, a fine-only pedestrian infraction that authorizes no custodial arrest, and the Officers invoked it only as a pretext after confirming that Mr. Walker was not the man they sought.

34. No reasonable officer in the Individual Defendants' position could have believed that the continued seizure, arrest, and detention of Mr. Walker was lawful under clearly established law.

35. As a direct and proximate result of the Individual Defendants' violation of Mr. Walker's Fourth Amendment rights, Mr. Walker suffered the injuries and damages described above, entitling him to compensatory damages, punitive damages, and attorney's fees and costs under 42 U.S.C. §§ 1983 and 1988.

**COUNT III — 42 U.S.C. § 1983: EXCESSIVE FORCE**
***(Fourth Amendment — Against the Individual Defendants)***

Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

36. The Individual Defendants used force against Mr. Walker, including seizing and grabbing him, forcing him to the ground and kneeling on him while he was handcuffed, and shoving him into a patrol car, that was objectively unreasonable under the totality of the circumstances, in violation of the Fourth Amendment.

37. The force used was excessive and unnecessary in light of the absence of any serious crime, the absence of any immediate threat posed by Mr. Walker, and Mr. Walker's status as a handcuffed and restrained arrestee whom the Officers had already recognized was not their suspect.

38. No reasonable officer could have believed that the degree of force used against Mr. Walker was lawful under clearly established law. It is clearly established in this Circuit that officers may not use significant force against a subdued, restrained, or non-resisting person. *See Wilkins v. City of Tulsa*, 33 F.4th 1265 (10th Cir. 2022) (reversing qualified immunity and recognizing it

clearly established that officers may not use significant force against a subdued, restrained, and non-resisting person).

39. As a direct and proximate result of this violation of Mr. Walker's constitutional rights, Mr. Walker suffered the injuries and damages described above, entitling him to compensatory damages, punitive damages, and attorney's fees and costs under 42 U.S.C. §§ 1983 and 1988.

**COUNT IV — 42 U.S.C. § 1983: MALICIOUS PROSECUTION**
***(Fourth Amendment — Against the Individual Defendants)***

Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

40. The Individual Defendants caused criminal proceedings to be instituted and continued against Mr. Walker without probable cause and with malice. Having confirmed that Mr. Walker was not Curtis Chaplin and that he had committed no offense warranting arrest, the Officers had no probable cause to continue his detention or to institute the substitute obstruction and jaywalking charges, and their decision to arrest, jail, and charge him anyway effected a seizure of Mr. Walker without probable cause.

41. The criminal proceedings terminated in Mr. Walker's favor when all charges were dismissed without a conviction. *See Thompson v. Clark*, 596 U.S. 36 (2022).

42. As a direct and proximate result of the Individual Defendants' conduct, Mr. Walker was deprived of liberty consistent with the concept of a Fourth Amendment seizure and suffered the injuries and damages described above, entitling him to compensatory damages, punitive damages, and attorney's fees and costs under 42 U.S.C. §§ 1983 and 1988.

## COUNT V — 42 U.S.C. § 1983: DEPRIVATION OF LIBERTY WITHOUT DUE PROCESS ("STIGMA-PLUS")

***(Fourteenth Amendment — Against the Individual Defendants)***

Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

43. On at least two occasions, Officer Gooldy publicly stated to private citizens that Mr. Walker was a "registered sex offender," even as Mr. Walker protested his identity, and even after the officers had reason to know he was not the person they sought. Mr. Walker is not, and has never been, a sex offender.

44. These false statements imposed on Mr. Walker a badge of infamy and a grave moral stigma of the most serious kind.

45. That stigma was imposed contemporaneously with, and in direct connection with, a tangible and coercive alteration of Mr. Walker's legal status and rights: his warrantless seizure, his arrest and jailing, and the institution of criminal charges against him, each of which deprived him of his liberty. The constitutional injury alleged here is not the seizure standing alone, and it is not merely reputational harm; it is the State's public branding of Mr. Walker as a registered sex offender in direct connection with that deprivation of liberty, an official stigmatization that altered his legal status and his standing in the community, that carried concrete and continuing consequences, and for which Mr. Walker was afforded no process by which to clear his name.

46. The Individual Defendants inflicted this stigma and deprivation of liberty without any notice or meaningful opportunity to be heard, in violation of Mr. Walker's right to due process of law under the Fourteenth Amendment

47. As a direct and proximate result, Mr. Walker suffered the injuries and damages described above, entitling him to compensatory damages, punitive damages, and attorney's fees and costs under 42 U.S.C. §§ 1983 and 1988.

## COUNT VI — 42 U.S.C. § 1983: EQUAL PROTECTION (RACE-BASED SELECTIVE ENFORCEMENT)

***(Fourteenth Amendment — Against the Individual Defendants and Defendant City of Tulsa)***

Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

48. Mr. Walker is a Black man. Curtis Chaplin, the person named in the warrant the officers were purporting to execute, is also a Black man.

49. The Individual Defendants seized, arrested, used force against, and caused the prosecution of Mr. Walker because of his race. Relying on little more than Mr. Walker's race and a generic physical description, the Officers could say only that Mr. Walker shared the suspect's height, weight, facial structure, and eye shape, the officers treated Mr. Walker as interchangeable with Curtis Chaplin, another Black man, and disregarded cvery individuating fact establishing that Mr. Walker was not the person sought: his immediate and repeated identification of himself as Caleb Walker, the corroborating statement of a resident, the chipped tooth the suspect did not have, the absence of the suspect's distinctive "blood" tattoo, and the officers' own recognition that "it's not going to be him." When the officers saw that Chaplin bore tattoos that Mr. Walker plainly did not, they did not treat that difference as exculpatory; instead, determined to hold onto their identification of this Black man as their suspect, they accused Mr. Walker of having surgically removed his tattoos. Their readiness to invent an explanation rather than credit obvious exculpatory evidence reflects a purpose to treat Mr. Walker as a fungible Black suspect rather than as the individual he plainly was.

50. A similarly situated person who was not Black, and who had presented the same exculpatory identification and individuating facts, would not have been seized, subjected to force, arrested, and prosecuted as Mr. Walker was. The Individual Defendants acted with discriminatory

purpose and treated Mr. Walker differently on account of his race, in violation of the Equal Protection Clause of the Fourteenth Amendment.

51. The right to be free from racially selective law enforcement is clearly established, and no reasonable officer could have believed the race-based treatment of Mr. Walker was lawful.

52. The Individual Defendants' conduct conformed to, and was caused by, a custom of the Tulsa Police Department of enforcing the law against Black residents in a racially disparate manner, as further described in Count VII below. The City's deliberate indifference to that custom was a moving force behind the deprivation of Mr. Walker's right to the equal protection of the laws.

53. As a direct and proximate result of these violations, Mr. Walker suffered the injuries and damages described above, entitling him to compensatory damages, punitive damages against the Individual Defendants, and attorney's fees and costs under 42 U.S.C. §§ 1983 and 1988.

## COUNT VII — 42 U.S.C. § 1983: MUNICIPAL LIABILITY (*MONELL*)
***(Against Defendant City of Tulsa)***

Plaintiff re-alleges and incorporates by referencc each of the foregoing paragraphs as though fully set forth herein.

54. Final policymaking authority over the law-enforcement operations and practices of the Tulsa Police Department, including the decisions to effect, to maintain, and to approve the seizure, arrest, and detention at issue, rests with the City of Tulsa, acting through its Chief of Police and those officials to whom the City has delegated final authority over arrests and detentions.

55. Final policymaking authority over the institution and the continuation of prosecutions on municipal charges rests with the City of Tulsa, acting through its municipal prosecuting authority. The decision to charge Mr. Walker, and each successive decision to

continue prosecuting him over the ensuing nine months, was a decision of the City itself and not merely of the Individual Defendants.

56. Ratification. The City's liability on this theory does not depend upon proof of any prior incident or pattern. The City is liable because its own final policymakers adopted this seizure and this prosecution, with actual knowledge of the basis for them, and thereby made the officers' conduct the City's own.

57. Before Mr. Walker was transported, the Individual Defendants confirmed, and stated aloud on recordings the City itself owns, that Mr. Walker was not the person named in the warrant. Officer Gooldy told Mr. Walker: "The guy that we're looking for has 'blood' tattooed on his arm, which you do not have." The Officers compared Mr. Walker's photograph to Curtis Chaplin's, confirmed "This is Kaleb Walker," recognized that an officer present had arrested Mr. Walker under that name the prior year, and acknowledged that he "looks like a guy we're looking for, but it's not going to be him." One officer then stated that they were "past that point" and that they had "got instruction" to proceed.

58. With knowledge of that recorded basis, the City accepted Mr. Walker into custody, jailed him, and caused charges of "obstruction" and "jaywalking" to be instituted against him. The City did not release him upon learning that he was not Curtis Chaplin; it adopted the arrest and supplied it with substitute charges.

59. The City then prosecuted Mr. Walker on those substitute charges for approximately nine months, from September 2024 through June 10, 2025, in the Municipal Court of the City of Tulsa (Division II). Throughout that period the body-worn camera recordings described above were in the City's own possession, custody, and control. Every decision to continue the prosecution, at each setting, and finally on the day of trial, was an affirmative act of the City taken

with actual knowledge of what its own recordings showed. A municipality that prosecutes a man for nine months on charges its own recordings refute has not merely failed to correct its officers; it has embraced their conduct and the stated reasons for it.

60. The City subpoenaed all four Individual Defendants, Gooldy, Moring, Kidd, and Thompson, to appear and testify at trial. Not one appeared, in defiance of the City's own subpoenas, and the City thereupon dismissed every charge against Mr. Walker. The City sought no enforcement of its own subpoenas. It sought no continuance, requested no bench warrant or contempt citation, and took no action of any kind against the four officers who had disregarded its process. A municipality that prosecutes a man for nine months, subpoenas its officers to prove the case, and then does nothing when every one of them refuses to appear has confirmed what the recordings already showed, that there was no case to defend, and that the City knew it.

61. The City imposed no discipline on any officer in connection with the wrongful arrest, detention, or prosecution of Mr. Walker, and upon information and belief conducted no investigation of it. This allegation is pleaded as further evidence that the City adopted the officers' conduct as its own, and not as an independent basis of liability.

62. The allegations in this Count concerning instruction, direction, and supervision within the Tulsa Police Department are pleaded as evidence of the City's policies, customs, and practices, and in support of the City's liability under *Monell*. Plaintiff asserts no claim of supervisory liability against any individual, and no individual supervisor is named as a Defendant in this Count.

63. Custom of pretextual arrest and substitute charges. Independently, and in the alternative, the seizure and prosecution of Mr. Walker were caused by a persistent and widespread custom of the Tulsa Police Department of seizing and arresting persons without probable cause

and then papering those unlawful arrests with substitute charges such as "obstruction," "resisting," and "jaywalking." The custom operates by direction: officers who have detained a person without lawful basis are instructed to proceed and to supply a charge. Consistent with that custom, the Officers here stated on their body-worn cameras that, after confirming that Mr. Walker was not the man named in the warrant, they had "got instruction" to proceed, and they then settled on "obstruction" and "jaywalking." That an officer on scene understood himself to be acting on instruction, rather than on his own assessment of probable cause, evidences a practice operating at the supervisory level within the Department.

64. That custom is reflected in, among others, the following incidents involving the same type of constitutional violation:

a. *Buck v. City of Tulsa*, No. 4:21-cv-00295 (N.D. Okla.). In June 2020, Tulsa police officers arrested Sheila Buck, initially for "trespassing," and then, on a supervisor's instruction, on a substituted charge of "obstruction", despite her being lawfully present and compliant. A Tulsa County jury acquitted Ms. Buck of obstruction in September 2024, and the City paid $700,000 to resolve her civil-rights claims. The mechanism was the same one used against Mr. Walker: a supervisor directed the substitution of a cover charge for an arrest that lacked lawful basis.

b. *Adkins v. City of Tulsa*, No. CJ-2022-00331 (Dist. Ct. Tulsa County). In June 2020, Tulsa police officers handcuffed, forced to the ground, and used force against two Black minor children during a purported jaywalking stop, although the children posed no threat; the City resolved the resulting civil-rights claims for approximately $20,000.

c. *State of Oklahoma v. Hampton*, No. CM-2025-1536 (Dist. Ct. Tulsa County). On April 15, 2025, while Mr. Walker's own prosecution was still pending, Tulsa police

officers stopped Kemonte Hampton, a Black man, for alleged "jaywalking" near East 11th Street and South Garnett Road; during the stop an officer's patrol cruiser rolled over Mr. Hampton, and the City charged him with "obstructing an officer" and "jaywalking", the identical pair of substitute charges used against Mr. Walker.

d. On May 28, 2016, Tulsa police officers conducting a warrants sweep confronted Ollie Lee Brooks, a sixty-four-year-old Black man, to execute a municipal arrest warrant issued on a 2015 "jaywalking" citation. The officers pepper-sprayed Mr. Brooks and twice deployed a Taser on him, and Mr. Brooks died. The Department did not notify the public or the media that a man had died in its custody until Mr. Brooks's family raised questions, and it returned the officers to duty and deemed the force proper. Mr. Brooks's death illustrates where the custom pleaded here leads: a fine-only pedestrian citation becomes an arrest warrant, and the arrest warrant becomes a death.

65. The custom of using pedestrian and obstruction charges as instruments of discretionary arrest is long-standing and has been documented in litigation against this same Defendant. In an expert report prepared in *Johnson v. City of Tulsa*, No. 94-CV-00039-TCK-FHM (N.D. Okla.), Professor Ian Ayres analyzed Tulsa Police Department citations, arrests, and field interview reports for the period June 1, 1995 through May 31, 2000, and found that where officers possessed discretion whether to arrest, racial disparities widened sharply: twenty-nine (29) of fifty (50) jaywalking arrests were of African-Americans; African-Americans were seventeen (17) times more likely to be arrested for trespassing; and seventy-four (74) of one hundred twenty-eight (128) persons booked on disorderly-conduct complaints were African-American. African-Americans then comprised approximately fifteen percent (15%) of Tulsa's population.

66. Racially disparate enforcement. The Tulsa Police Department enforces the foregoing customs against Black residents, such as Mr. Walker, in a racially disparate manner. That disparity has been documented continuously for more than two decades and has never been remediated:

a. 2001 — the Ayres report described above, prepared in litigation against this Defendant.

b. 2005 — City-compiled data reflecting that African-Americans comprised approximately 32% of arrests while comprising approximately 16% of the population, and nearly 50% of all uses of force. [CONFIRM.]

c. 2010 — analysis of Department records reflecting that African-Americans were the subject of 45% of approximately 15,000 "pedestrian checks" and 50% of field interviews, while comprising approximately 15% of the population.

d. 2016 — analysis of Department use-of-force data for 2010 through 2015 reflecting that Black Tulsans were approximately two to four times more likely to be subjected to force than white Tulsans. [CONFIRM.]

e. 2018 and 2019 — the City's own Tulsa Equality Indicators Annual Reports, finding that Black residents are arrested more than twice as often as white residents and are five times as likely as all other racial and ethnic groups to be victims of officer use of force, and that racial inequality in youth arrests worsened between the two reports.

f. 2019 — Human Rights Watch, "Get on the Ground!": Policing, Poverty, and Racial Inequality in Tulsa, Oklahoma, documenting that the

Department subjects Black people to physical force at approximately 2.7 times the rate it uses such force against white people, arrests Black people at approximately 2.3 times the rate it arrests white people, and stops residents of predominantly Black neighborhoods at more than ten times the rate of predominantly white neighborhoods.

67. The City has had actual, particularized, and repeated notice of these disparities and of the arrest practices that produce them, delivered to its final policymakers by name:

a. On May 31, 2018, the NAACP Legal Defense and Educational Fund, together with approximately fifty Tulsa civil-rights attorneys, religious leaders, elected officials, law-enforcement officials, and community leaders, including a former Chief of the Tulsa Police Department, a sitting member of the Tulsa City Council, a former United States Attorney, and sitting members of the Oklahoma Legislature, wrote to then-Mayor G.T. Bynum and City Council Chair David Patrick regarding the findings of the City's own Equality Indicators report. The letter demanded, among other measures, that the City adopt a departmental policy on "least harm" resolutions, warnings and citations in lieu of arrest for minor infractions, observing that the City's own Commission had recommended such resolutions but had never specified which infractions were eligible.

b. On June 20, 2019, the Legal Defense Fund submitted written comments to all nine members of the Tulsa City Council, by name, renewing that demand and again urging the City to adopt and implement a policy governing alternatives to arrest for minor infractions.

c. Following the death of Terence Crutcher, the City convened the Tulsa Commission on Community Policing, which issued seventy-seven (77) recommendations.

According to the Commission's own appendix, the commissioners considered but did not approve any of the measurable action steps that would have produced greater police accountability, including in the areas of use of force and arrests.

d. On May 18, 2017, Mayor Bynum publicly acknowledged reporting that African-Americans in Tulsa were arrested at twice the rate of other races, stating that this was "precisely the type of issue that drove me to run for mayor" and that these were "the great moral issue of our time in this city."

68. The City thus knew, from its own reports, from its own Mayor, from its own Commission, and from written demands addressed to its Mayor and to every member of its City Council, that the Tulsa Police Department arrested Black residents at grossly disproportionate rates and that its officers made custodial arrests for minor infractions where a citation or warning would serve. The City was asked, specifically and repeatedly, to adopt a policy limiting custodial arrest for minor infractions but did nothing. On September 24, 2024, Tulsa police officers arrested Caleb Walker, a Black man, on a fine-only pedestrian infraction that authorizes no custodial arrest, the precise harm of which the City had been warned. The City's failure to act in the face of that knowledge was deliberate indifference.

69. Additionally and in the alternative, the violation of Mr. Walker's rights was caused by the City's failure to train its officers on the limits of their custodial arrest authority for fine-only municipal infractions, and on their obligation to terminate a seizure once the basis for it has been disproved. Plaintiff pleads inadequate training only; no claim of failure to supervise or failure to discipline is asserted, and no claim is asserted against any individual.

70. To recover for a failure to train under 42 U.S.C. § 1983, a plaintiff must establish (1) the existence of a municipal policy or custom involving deficient training; (2) that the policy

or custom caused the injury; and (3) that the municipality adopted the policy or custom with deliberate indifference. *Lance v. Morris*, 985 F.3d 787, 800 (10th Cir. 2021). Each element is satisfied here.

71. First, the City provides its officers no meaningful training on the constitutional limits of custodial arrest for fine-only pedestrian and municipal infractions, or on what an officer must do when the identification supporting a detention is disproved during the encounter. That the City's own Commission recommended "least harm" resolutions but never identified which infractions were eligible, and that the City was twice told in writing that no such policy existed, reflects the absence of any training program on the subject.

72. Second, had the Individual Defendants been trained that a fine-only pedestrian infraction furnishes no basis for custodial arrest, and that a seizure must end when its justification is disproved, Mr. Walker would have been released at the scene when the Officers confirmed that he was not Curtis Chaplin. The injury would have been avoided had the officers been trained under a program not deficient in the identified respect. *City of Canton v. Harris*, 489 U.S. 378, 391 (1989).

73. Third, the City adopted that deficient training with deliberate indifference. Deliberate indifference exists where a municipality fails to train officers on how to handle recurring situations presenting an obvious potential to violate the Constitution. *Allen v. Muskogee*, 119 F.3d 837, 842 (10th Cir. 1997). Whether a situation recurs often enough to require training is measured by a three-part test: whether the policymakers know "to a moral certainty" that their employees will confront the situation; whether the situation "presents the employee with a difficult choice of the sort that training or supervision will make less difficult"; and whether "the wrong choice . . . will frequently cause the deprivation of a citizen's constitutional rights." *Lance*, 985

F.3d at 801–02 (quoting *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992), quoting *Canton*, 489 U.S. at 390 n.10).

a. Tulsa police officers execute arrest warrants and encounter pedestrians as an ordinary and recurring part of their duties. The City's policymakers know to a moral certainty that its officers will detain a person on suspicion that he is the subject of a warrant and will then learn, mid-encounter, that they have the wrong man, and that its officers will encounter pedestrians whose manner of crossing a street might be characterized as an infraction. Four officers confronted both situations in this case.

b. What an officer must do when he has seized a person, the identification collapses, and he must decide whether any lawful basis for continued detention remains is precisely the kind of judgment that training makes easier. The City's own position throughout Mr. Walker's municipal prosecution, that "obstruction" and "jaywalking" supplied a basis for a custodial arrest, demonstrates the difficulty: if the City itself maintained for nine months that those charges justified the arrest, its officers could hardly be expected to know otherwise without being taught.

c. The wrong choice is a warrantless custodial arrest unsupported by probable cause, a violation of the Fourth Amendment in every instance. That the wrong choice is made frequently is shown by the incidents described above, in which Tulsa officers arrested persons without lawful basis and supplied substitute "obstruction" and "jaywalking" charges, and by the documented disparities described above.

74. The City has moreover had actual notice that this training was absent. In the May 31, 2018 letter to Mayor Bynum and Council Chair Patrick, and again in the June 20, 2019 comments submitted to all nine members of the Tulsa City Council, the City was told that the

Tulsa Police Department had adopted no policy identifying which minor infractions were eligible for citation or warning in lieu of arrest, that it had no de-escalation policy, and that its implicit-bias training had not been entrusted to a trainer with a proven record. The City was given the specific remedy and declined to adopt it. On September 24, 2024, four of its officers made exactly the wrong choice, and Caleb Walker was arrested, jailed, and prosecuted for nine months as a result.

75. The City's ratification of the officers' conduct, and independently the customs, the deliberate indifference, and the inadequate training described above, were each and together the moving force behind, and the direct and proximate cause of, the unlawful seizure of Mr. Walker, his continued detention after the Officers knew he was not the man they sought, the force used against him, and his nine-month prosecution, and the resulting injuries and damages, entitling Mr. Walker to compensatory damages and attorney's fees and costs under 42 U.S.C. §§ 1983 and 1988.

## IV.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Caleb Walker respectfully requests that the Court enter judgment in his favor and against Defendants and award:

a. On Count I, compensatory damages against the City of Tulsa in an amount to be proven at trial, subject to the applicable limits of the Governmental Tort Claims Act, 51 O.S. § 154;

b. On Counts II, III, IV, V, and VI, compensatory damages against the Individual Defendants in an amount to be proven at trial;

c. On Counts II, III, IV, V, and VI, punitive damages against the Individual Defendants in an amount sufficient to punish and deter;

d. On Counts VI and VII, compensatory damages against the City of Tulsa in an amount to be proven at trial;

e. Reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988 on the federal claims;

f. All costs of this action and pre- and post-judgment interest as allowed by law; and

g. Such other and further relief as the Court deems just and equitable.

Plaintiff demands a trial by jury on all issues so triable.

*Respectfully submitted,*

**GARRETT LAW CENTER, PLLC**

D. Mitchell Garrett, Jr., OBA #20704
320 S. Boston Ave., Suite 825
Tulsa, Oklahoma 74103
Telephone: (918) 221-6190
Facsimile: (918) 340-6799
mitchell@garrettlawcenter.com

-and-

**BRYAN & TERRILL LAW, PLLC**

J. Spencer Bryan, OBA #19419
Steven J. Terrill, OBA #20869
2500 S. Broadway, #122
Edmond, Oklahoma 73013
Telephone/Facsimile: (918) 935-2777
jsbryan@bryanterrill.com
sjterrill@bryanterrill.com

*Counsel for Plaintiff Caleb Walker*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 17th day of August, 2026, a true and correct copy of the foregoing First Amended Petition was filed and served upon all counsel of record via the Court's electronic filing system, and that the newly added Individual Defendants will be served with summons and a copy of this First Amended Petition as provided by law.

D. Mitchell Garrett, Jr.

*1066514707*

IN THE DISTRICT COURT IN AND FOR TULSA COUNTY, OKLAHOMA

| | |
|---|---|
| CALEB WALKER,<br>Plaintiff,<br>v.<br>CITY OF TULSA,<br>Defendant. | No. CJ-2026-2691<br>(Civil relief more than $10,000<br>NEGLIGENCE (GENERAL))<br><br>Filed: 06/16/2026<br><br>Judge: Civil Docket A |

DISTRICT COURT
F I L E D
AUG 28 2026
DON NEWBERRY, Court Clerk
STATE OF OKLA. TULSA COUNTY

**Order on Defendant's Motion to Dismiss**

On this 28th day of August 2026, the following matter in the designated case comes on for decision on Defendant's Motion to Dismiss filed July 27, 2026, pursuant to the rules of the District Court for Tulsa County.

Defendant's Motion to Dismiss is **GRANTED.** Plaintiff is granted 10 days to file a Second Amended Petition. The First Amended Petition is **STRICKEN** for failure to gain leave of the court before filing •

IT IS SO ORDERED this 28th day of August 2026.

Rebecca Brett Nightingale, District Judge

**AFFIDAVIT OF MAILING**

I, Don Newberry, Court Clerk of Tulsa County, hereby certify that on the 28th day of August 2026, a true and correct copy of the foregoing Order was served upon all parties by mailing to each of the attorneys/parties listed below, and a true and correct copy of the foregoing Order was filed in the above case. **ORDER WAS MAILED TO:**

- Garrett Mitchell 320 S BOSTON AVE, STE 825
  TULSA, OK 74103
- Lawson Vaughn 175 E. Second Street, Suite 685
  Tulsa, OK 74103
- Steven Terill 2500 S. Broadway, 122
  Edmond, OK 74013

Don Newberry, Court Clerk
Mary Green, Deputy Court Clerk

**IN THE DISTRICT COURT OF TULSA COUNTY**
**STATE OF OKLAHOMA**

FILED
DISTRICT COURT
TULSA COUNTY, OKLAHOMA
September 8, 2026 3:13 PM
DON NEWBERRY, COURT CLERK
Case Number CJ-2026-2691

CALEB WALKER,

Plaintiff,

v.

CITY OF TULSA, a municipal corporation; RAY GOOLDY, individually; ZACHARY MORING, individually; JAMES KIDD, individually; and RYAN THOMPSON, individually,

Defendants.

Case No. CJ-2026-2691

Judge Rebecca B. Nightingale

**JURY TRIAL DEMANDED**

**ATTORNEY LIEN CLAIMED**

---

## SECOND AMENDED PETITION

Plaintiff Caleb Walker, by and through his counsel of record, brings this Second Amended Petition as a matter of course pursuant to 12 O.S. § 2015(A) and this Court's Order of August 28, 2026,[1] and for his causes of action against the above-named Defendants states and alleges as follows:

## I.

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiff Caleb Walker is a resident and citizen of Tulsa County, Oklahoma.

2. Defendant City of Tulsa (the "City") is a municipal corporation and a political subdivision of the State of Oklahoma within the meaning of the Oklahoma Governmental Tort Claims Act ("GTCA"), 51 O.S. § 151 et seq., located primarily in Tulsa County.

---

[1] Plaintiff filed his First Amended Petition following the Defendant's Motion to Dismiss. On September 8, 2026, the undersigned received the Court's Order of August 28, 2026 which provided ten (10) days to file a Second Amended Petition. Accordingly, Plaintiff is filing his Second Amended Petition the same day as receiving notice of the Court's Order dated August 28, 2026.

3. Defendant Ray Gooldy was at all relevant times a police officer employed by the City of Tulsa. He is sued in his individual capacity. As to the state-law claims asserted against him individually, he acted willfully, wantonly, and in bad faith, and therefore outside the scope of his employment as that term is defined by 51 O.S. § 152(13). As to the federal claims asserted against him, he acted under color of state law.

4. Defendant Zachary Moring was at all relevant times a police officer employed by the City of Tulsa. He is sued in his individual capacity, and acted as described in the preceding paragraph.

5. Defendant James Kidd was at all relevant times a police officer employed by the City of Tulsa. He is sued in his individual capacity, and acted as described above.

6. Defendant Ryan Thompson was at all relevant times a police officer employed by the City of Tulsa. He is sued in his individual capacity, and acted as described above. Defendants Gooldy, Moring, Kidd, and Thompson are referred to collectively as the "Individual Defendants" or the "Officers."

7. The events complained of occurred in Tulsa County, Oklahoma. Venue is proper in this Court, and this Court has subject-matter jurisdiction over Plaintiff's state-law claims and concurrent jurisdiction over Plaintiff's claims arising under 42 U.S.C. § 1983.

8. With respect to the negligence claim against the City only, Plaintiff has complied with the GTCA. Plaintiff presented a written notice of tort claim to the City of Tulsa on September 19, 2025, in compliance with 51 O.S. § 156. The City did not approve the claim within ninety (90) days, and the claim was deemed denied by operation of law on December 18, 2025, pursuant to 51 O.S. § 157(A). Plaintiff's original Petition was filed within one hundred eighty (180) days of that denial, on June 16, 2026, and this action is therefore timely under 51 O.S. § 157(B). GTCA notice

is not a prerequisite to the claims asserted against the Individual Defendants for conduct outside the scope of their employment, or to the claims arising under federal law.

## II.

## STATEMENT OF FACTS

This case is not one of mistaken identity alone. The Officers came to doubt, and then confirmed, and then stated aloud, that Mr. Walker was not the man named in their warrant. They seized him, forced him to the ground, arrested and jailed him, and caused his prosecution anyway.

9. On September 24, 2024, at approximately 10:55 a.m., Tulsa Police officers, including the Individual Defendants, approached and stopped Caleb Walker outside his apartment complex as he was walking back across the road from the trash bin. All four Individual Defendants—Gooldy, Moring, Kidd, and Thompson, were present and participated in the stop, seizure, detention, and arrest of Mr. Walker, acting together as an integrated police unit and in concert with one another throughout the encounter.

10. When Mr. Walker crossed the road, he did so at a right angle to the curb, taking the shortest route directly across, the manner of crossing prescribed by law. The roadway he crossed is an interior drive that bisects the apartment complex in which Mr. Walker lived, and no vehicle was approaching as he crossed. Mr. Walker's crossing violated no law. In any event, "jaywalking" is, at most, a fine-only pedestrian infraction under Oklahoma law and the Tulsa Revised Traffic Code, not a criminal offense and not an arrestable one, and it furnished no lawful basis to seize, handcuff, arrest, jail, or prosecute Mr. Walker. The Officers did not stop Mr. Walker for jaywalking; they seized him as a suspected sex offender and raised "jaywalking" only later, after

they had confirmed he was not the man they sought, as a charge manufactured to justify an arrest they knew was unlawful.

11. Officer Moring, who initiated the contact and appeared to be the senior officer directing the encounter, immediately took hold of Mr. Walker while still asking whether he was "Curtis Chaplin," the person the officers were seeking on a warrant for failure to register as a sex offender. Officer Moring seized Mr. Walker before any officer had verified his identity or observed him commit any offense.

12. Mr. Walker immediately and repeatedly identified himself as "Caleb Walker" and informed the officers that he lived at the complex. Mr. Walker also protested aloud that he was being stopped because he is a Black man, asking words to the effect of, "What are y'all doing? … Just because I'm a Black man?"

13. Within seconds of contact, and although Mr. Walker had done nothing but walk his dog and take out his trash and had repeatedly identified himself by name, Officer Moring physically seized Mr. Walker, ordering him to put his hands behind his back and taking hold of his arms, and continued to restrain him while Officer Gooldy placed him in handcuffs. Officer Moring threatened to arrest Mr. Walker for "obstruction" if he pulled away.

14. At approximately 10:58 a.m., Mr. Walker informed the officers that he had a chipped tooth that the actual suspect did not have. The officers disregarded this physical evidence.

15. At approximately 11:02 a.m., Officer Moring interviewed a sixteen-year-old resident, who confirmed that Mr. Walker had identified himself as "Caleb" before the police arrived. Despite this independent corroboration, the Officers continued to detain Mr. Walker.

16. On at least two occasions, at approximately 11:02 a.m. and 11:10 a.m., Officer Gooldy stated to private citizens that Mr. Walker was a "registered sex offender," even as Mr. Walker continued to protest his identity.

17. At approximately 11:06 a.m., Officer Gooldy informed Mr. Walker that he was under arrest for failure to register as a sex offender and for obstruction.

18. While Mr. Walker remained handcuffed, Officer Moring attempted to pull a pair of headphones from Mr. Walker's restrained hands. When Mr. Walker held onto his own property, Officer Moring took him to the ground, and the Officers, Moring, Gooldy, Kidd, and Thompson, piled onto him and drove their knees into his back. Each of the Individual Defendants participated in, and none prevented, the unlawful seizure, arrest, and use of force against Mr. Walker, though each had the opportunity and the duty to intervene. The Officers later characterized Mr. Walker's grip on his own headphones as an attempt to "elbow" an officer.

19. At approximately 11:15 a.m., while Mr. Walker was handcuffed on the ground, Officer Gooldy inspected Mr. Walker's arm and confirmed that he did not have the "blood" tattoo that the actual suspect had, telling Mr. Walker, "The guy that we're looking for has 'blood' tattooed on his arm, which you do not have." The officers also compared Mr. Walker to photographs of Chaplin, observed that Chaplin bore tattoos that Mr. Walker did not, and, rather than treat that difference as exculpatory, accused Mr. Walker of having had his tattoos surgically removed.

20. Before arresting Mr. Walker, the Officers confirmed his identity. Officer Moring retrieved photographs of both Mr. Walker and Curtis Chaplin, photographed the differing mugshots, and showed them to Officer Kidd; comparing the images, the Officers confirmed, "This is Kaleb Walker," and recognized that one of the officers present had personally arrested Mr. Walker under that same name the prior year. The Officers acknowledged that Mr. Walker "looks

like a guy we're looking for, but it's not going to be him." Having thus confirmed that Mr. Walker was not Curtis Chaplin, the Officers nevertheless proceeded with the arrest and transport.

21. After confirming that Mr. Walker was not the suspect, the Officers did not release him. Instead, one officer stated that they were "past that point" and that they had "got instruction" to proceed, and the Officers settled on substitute charges of "obstruction" and "jaywalking", charges they used to paper over an arrest they knew lacked any lawful basis. The Officers further elected to transport and book Mr. Walker before confirming his identity, discussing on camera that they would take him to "get him live scan confirmed and then either change locations or book him", thereby jailing him before verifying who he was.

22. At approximately 11:28 a.m., the Officers used significant force to shove a handcuffed and seated Mr. Walker into the back of a patrol car. Mr. Walker cried out in pain and repeatedly insisted that he was the wrong person. While Mr. Walker remained handcuffed and detained, continuing to insist that he was not the man they sought, the Officers engaged in unrelated, casual conversation among themselves, displaying indifference to his protests and to the wrongfulness of his continued detention.

23. The Officers caused criminal charges to be initiated against Mr. Walker, and the City prosecuted those charges, with knowledge of the Officers' conduct described above.

24. The City continued to prosecute Mr. Walker until the day of trial, June 10, 2025, in the Municipal Court of the City of Tulsa (Division II). The City subpoenaed all four Individual Defendants, Gooldy, Moring, Kidd, and Thompson, to appear and testify. When the matter was called for trial, not one of them appeared, in defiance of the City's own subpoenas, and the City thereupon dismissed every charge against Mr. Walker. No officer was willing to take the stand and defend, under oath, the arrest and prosecution he had set in motion.

25. Mr. Walker's prosecution terminated in his favor when all charges were dismissed without a conviction.

26. As a direct and proximate result of Defendants' conduct, Mr. Walker suffered injuries and damages, including physical injury, pain and suffering, the loss of his liberty, humiliation, injury to his reputation, emotional distress, and the costs of defending the criminal charges.

## III.
## CAUSES OF ACTION

### COUNT I — NEGLIGENCE
***(Against Defendant City of Tulsa)***

Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

27. The Officers who engaged Mr. Walker were employees of the City acting within the scope of their employment for purposes of this negligence claim, and owed Mr. Walker a duty to exercise reasonable care in the performance of their law-enforcement functions, including a duty to reasonably investigate and confirm a suspect's identity before effecting an arrest and a duty to refrain from using unreasonable force.

28. The Officers breached these duties by, among other things, failing to investigate or credit Mr. Walker's repeated identification of himself, the corroborating statement of a resident, the absence of the suspect's distinctive tattoo, and their own recognition that Mr. Walker was not the suspect; and by using unreasonable force against him.

29. Pursuant to 51 O.S. § 153, the City is liable for the negligent acts and omissions of its employees committed within the scope of their employment.

30. As a direct and proximate result of this negligence, Mr. Walker suffered the injuries and damages described above, in an amount to be proven at trial and subject to the applicable limits of the GTCA, 51 O.S. § 154.

**COUNT II — 42 U.S.C. § 1983: UNREASONABLE SEIZURE AND FALSE ARREST**
***(Fourth Amendment — Against the Individual Defendants)***

Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

31. At all relevant times, the Individual Defendants acted under color of the statutes, ordinances, customs, and usages of the State of Oklahoma and the City of Tulsa.

32. The Fourth Amendment to the United States Constitution, applied to the States through the Fourteenth Amendment, guarantees the right to be free from unreasonable searches and seizures, including seizure and arrest without probable cause.

33. The Individual Defendants seized, detained, and arrested Mr. Walker without probable cause and without reasonable suspicion. Even assuming some justification existed at the initial moment of contact, that justification evaporated once the Officers obtained multiple independent facts establishing that Mr. Walker was not Curtis Chaplin, including his immediate and repeated self-identification, the corroborating statement of a resident, the absence of the suspect's distinctive "blood" tattoo, and the Officers' own stated recognition that "it's not going to be him." The Officers nonetheless continued to detain, arrest, transport, and jail Mr. Walker after they knew, or in the exercise of reasonable diligence should have known, that he was not the person they sought and had committed no crime warranting arrest. Nor did the substitute charges the Officers later invented supply any lawful basis for the seizure: Mr. Walker committed no

obstruction, and his crossing of an interior drive within his own apartment complex, at a right angle to the curb and with no traffic present, violated no law; "jaywalking" is, at most, a fine-only pedestrian infraction that authorizes no custodial arrest, and the Officers invoked it only as a pretext after confirming that Mr. Walker was not the man they sought.

34. No reasonable officer in the Individual Defendants' position could have believed that the continued seizure, arrest, and detention of Mr. Walker was lawful under clearly established law.

35. As a direct and proximate result of the Individual Defendants' violation of Mr. Walker's Fourth Amendment rights, Mr. Walker suffered the injuries and damages described above, entitling him to compensatory damages, punitive damages, and attorney's fees and costs under 42 U.S.C. §§ 1983 and 1988.

**COUNT III — 42 U.S.C. § 1983: EXCESSIVE FORCE**
***(Fourth Amendment — Against the Individual Defendants)***

Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

36. The Individual Defendants used force against Mr. Walker, including seizing and grabbing him, forcing him to the ground and kneeling on him while he was handcuffed, and shoving him into a patrol car, that was objectively unreasonable under the totality of the circumstances, in violation of the Fourth Amendment.

37. The force used was excessive and unnecessary in light of the absence of any serious crime, the absence of any immediate threat posed by Mr. Walker, and Mr. Walker's status as a handcuffed and restrained arrestee whom the Officers had already recognized was not their suspect.

38. No reasonable officer could have believed that the degree of force used against Mr. Walker was lawful under clearly established law. It is clearly established in this Circuit that officers may not use significant force against a subdued, restrained, or non-resisting person. *See Wilkins v. City of Tulsa*, 33 F.4th 1265 (10th Cir. 2022) (reversing qualified immunity and recognizing it clearly established that officers may not use significant force against a subdued, restrained, and non-resisting person).

39. As a direct and proximate result of this violation of Mr. Walker's constitutional rights, Mr. Walker suffered the injuries and damages described above, entitling him to compensatory damages, punitive damages, and attorney's fees and costs under 42 U.S.C. §§ 1983 and 1988.

**COUNT IV — 42 U.S.C. § 1983: MALICIOUS PROSECUTION**
***(Fourth Amendment — Against the Individual Defendants)***

Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

40. The Individual Defendants caused criminal proceedings to be instituted and continued against Mr. Walker without probable cause and with malice. Having confirmed that Mr. Walker was not Curtis Chaplin and that he had committed no offense warranting arrest, the Officers had no probable cause to continue his detention or to institute the substitute obstruction and jaywalking charges, and their decision to arrest, jail, and charge him anyway effected a seizure of Mr. Walker without probable cause.

41. The criminal proceedings terminated in Mr. Walker's favor when all charges were dismissed without a conviction. *See Thompson v. Clark*, 596 U.S. 36 (2022).

42. As a direct and proximate result of the Individual Defendants' conduct, Mr. Walker was deprived of liberty consistent with the concept of a Fourth Amendment seizure and suffered

the injuries and damages described above, entitling him to compensatory damages, punitive damages, and attorney's fees and costs under 42 U.S.C. §§ 1983 and 1988.

**COUNT V — 42 U.S.C. § 1983: DEPRIVATION OF LIBERTY WITHOUT DUE PROCESS ("STIGMA-PLUS")**
***(Fourteenth Amendment — Against the Individual Defendants)***

Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

43. On at least two occasions, Officer Gooldy publicly stated to private citizens that Mr. Walker was a "registered sex offender," even as Mr. Walker protested his identity, and even after the officers had reason to know he was not the person they sought. Mr. Walker is not, and has never been, a sex offender.

44. These false statements imposed on Mr. Walker a badge of infamy and a grave moral stigma of the most serious kind.

45. That stigma was imposed contemporaneously with, and in direct connection with, a tangible and coercive alteration of Mr. Walker's legal status and rights: his warrantless seizure, his arrest and jailing, and the institution of criminal charges against him, each of which deprived him of his liberty. The constitutional injury alleged here is not the seizure standing alone, and it is not merely reputational harm; it is the State's public branding of Mr. Walker as a registered sex offender in direct connection with that deprivation of liberty, an official stigmatization that altered his legal status and his standing in the community, that carried concrete and continuing consequences, and for which Mr. Walker was afforded no process by which to clear his name.

46. The Individual Defendants inflicted this stigma and deprivation of liberty without any notice or meaningful opportunity to be heard, in violation of Mr. Walker's right to due process of law under the Fourteenth Amendment.

47. As a direct and proximate result, Mr. Walker suffered the injuries and damages described above, entitling him to compensatory damages, punitive damages, and attorney's fees and costs under 42 U.S.C. §§ 1983 and 1988.

## COUNT VI — 42 U.S.C. § 1983: EQUAL PROTECTION (RACE-BASED SELECTIVE ENFORCEMENT)

***(Fourteenth Amendment — Against the Individual Defendants and Defendant City of Tulsa)***

Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

48. Mr. Walker is a Black man. Curtis Chaplin, the person named in the warrant the officers were purporting to execute, is also a Black man.

49. The Individual Defendants seized, arrested, used force against, and caused the prosecution of Mr. Walker because of his race. Relying on little more than Mr. Walker's race and a generic physical description, the Officers could say only that Mr. Walker shared the suspect's height, weight, facial structure, and eye shape, the officers treated Mr. Walker as interchangeable with Curtis Chaplin, another Black man, and disregarded every individuating fact establishing that Mr. Walker was not the person sought: his immediate and repeated identification of himself as Caleb Walker, the corroborating statement of a resident, the chipped tooth the suspect did not have, the absence of the suspect's distinctive "blood" tattoo, and the officers' own recognition that "it's not going to be him." When the officers saw that Chaplin bore tattoos that Mr. Walker plainly did not, they did not treat that difference as exculpatory; instead, determined to hold onto their identification of this Black man as their suspect, they accused Mr. Walker of having surgically

removed his tattoos. Their readiness to invent an explanation rather than credit obvious exculpatory evidence reflects a purpose to treat Mr. Walker as a fungible Black suspect rather than as the individual he plainly was.

50. A similarly situated person who was not Black, and who had presented the same exculpatory identification and individuating facts, would not have been seized, subjected to force, arrested, and prosecuted as Mr. Walker was. The Individual Defendants acted with discriminatory purpose and treated Mr. Walker differently on account of his race, in violation of the Equal Protection Clause of the Fourteenth Amendment.

51. The right to be free from racially selective law enforcement is clearly established, and no reasonable officer could have believed the race-based treatment of Mr. Walker was lawful.

52. The Individual Defendants' conduct conformed to, and was caused by, a custom of the Tulsa Police Department of enforcing the law against Black residents in a racially disparate manner, as further described in Count VII below. The City's deliberate indifference to that custom was a moving force behind the deprivation of Mr. Walker's right to the equal protection of the laws.

53. As a direct and proximate result of these violations, Mr. Walker suffered the injuries and damages described above, entitling him to compensatory damages, punitive damages against the Individual Defendants, and attorney's fees and costs under 42 U.S.C. §§ 1983 and 1988.

## COUNT VII — 42 U.S.C. § 1983: MUNICIPAL LIABILITY (*MONELL*)
***(Against Defendant City of Tulsa)***

Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

54. Final policymaking authority over the law-enforcement operations and practices of the Tulsa Police Department, including the decisions to effect, to maintain, and to approve the

seizure, arrest, and detention at issue, rests with the City of Tulsa, acting through its Chief of Police and those officials to whom the City has delegated final authority over arrests and detentions.

55. Final policymaking authority over the institution and the continuation of prosecutions on municipal charges rests with the City of Tulsa, acting through its municipal prosecuting authority. The decision to charge Mr. Walker, and each successive decision to continue prosecuting him over the ensuing nine months, was a decision of the City itself and not merely of the Individual Defendants.

56. Ratification. The City's liability on this theory does not depend upon proof of any prior incident or pattern. The City is liable because its own final policymakers adopted this seizure and this prosecution, with actual knowledge of the basis for them, and thereby made the officers' conduct the City's own.

57. Before Mr. Walker was transported, the Individual Defendants confirmed, and stated aloud on recordings the City itself owns, that Mr. Walker was not the person named in the warrant. Officer Gooldy told Mr. Walker: "The guy that we're looking for has 'blood' tattooed on his arm, which you do not have." The Officers compared Mr. Walker's photograph to Curtis Chaplin's, confirmed "This is Kaleb Walker," recognized that an officer present had arrested Mr. Walker under that name the prior year, and acknowledged that he "looks like a guy we're looking for, but it's not going to be him." One officer then stated that they were "past that point" and that they had "got instruction" to proceed.

58. With knowledge of that recorded basis, the City accepted Mr. Walker into custody, jailed him, and caused charges of "obstruction" and "jaywalking" to be instituted against him. The City did not release him upon learning that he was not Curtis Chaplin; it adopted the arrest and supplied it with substitute charges.

59. The City then prosecuted Mr. Walker on those substitute charges for approximately nine months, from September 2024 through June 10, 2025, in the Municipal Court of the City of Tulsa (Division II). Throughout that period the body-worn camera recordings described above were in the City's own possession, custody, and control. Every decision to continue the prosecution, at each setting, and finally on the day of trial, was an affirmative act of the City taken with actual knowledge of what its own recordings showed. A municipality that prosecutes a man for nine months on charges its own recordings refute has not merely failed to correct its officers; it has embraced their conduct and the stated reasons for it.

60. The City subpoenaed all four Individual Defendants, Gooldy, Moring, Kidd, and Thompson, to appear and testify at trial. Not one appeared, in defiance of the City's own subpoenas, and the City thereupon dismissed every charge against Mr. Walker. The City sought no enforcement of its own subpoenas. It sought no continuance, requested no bench warrant or contempt citation, and took no action of any kind against the four officers who had disregarded its process. A municipality that prosecutes a man for nine months, subpoenas its officers to prove the case, and then does nothing when every one of them refuses to appear has confirmed what the recordings already showed, that there was no case to defend, and that the City knew it.

61. The City imposed no discipline on any officer in connection with the wrongful arrest, detention, or prosecution of Mr. Walker, and upon information and belief conducted no investigation of it. This allegation is pleaded as further evidence that the City adopted the officers' conduct as its own, and not as an independent basis of liability.

62. The allegations in this Count concerning instruction, direction, and supervision within the Tulsa Police Department are pleaded as evidence of the City's policies, customs, and practices, and in support of the City's liability under *Monell*. Plaintiff asserts no claim of

supervisory liability against any individual, and no individual supervisor is named as a Defendant in this Count.

63. Custom of pretextual arrest and substitute charges. Independently, and in the alternative, the seizure and prosecution of Mr. Walker were caused by a persistent and widespread custom of the Tulsa Police Department of seizing and arresting persons without probable cause and then papering those unlawful arrests with substitute charges such as "obstruction," "resisting," and "jaywalking." The custom operates by direction: officers who have detained a person without lawful basis are instructed to proceed and to supply a charge. Consistent with that custom, the Officers here stated on their body-worn cameras that, after confirming that Mr. Walker was not the man named in the warrant, they had "got instruction" to proceed, and they then settled on "obstruction" and "jaywalking." That an officer on scene understood himself to be acting on instruction, rather than on his own assessment of probable cause, evidences a practice operating at the supervisory level within the Department.

64. That custom is reflected in, among others, the following incidents involving the same type of constitutional violation:

a. *Buck v. City of Tulsa*, No. 4:21-cv-00295 (N.D. Okla.). In June 2020, Tulsa police officers arrested Sheila Buck, initially for "trespassing," and then, on a supervisor's instruction, on a substituted charge of "obstruction", despite her being lawfully present and compliant. A Tulsa County jury acquitted Ms. Buck of obstruction in September 2024, and the City paid $700,000 to resolve her civil-rights claims. The mechanism was the same one used against Mr. Walker: a supervisor directed the substitution of a cover charge for an arrest that lacked lawful basis.

b. *Adkins v. City of Tulsa*, No. CJ-2022-00331 (Dist. Ct. Tulsa County). In June 2020, Tulsa police officers handcuffed, forced to the ground, and used force against two Black minor children during a purported jaywalking stop, although the children posed no threat; the City resolved the resulting civil-rights claims for approximately $20,000.

c. *State of Oklahoma v. Hampton*, No. CM-2025-1536 (Dist. Ct. Tulsa County). On April 15, 2025, while Mr. Walker's own prosecution was still pending, Tulsa police officers stopped Kemonte Hampton, a Black man, for alleged "jaywalking" near East 11th Street and South Garnett Road; during the stop an officer's patrol cruiser rolled over Mr. Hampton, and the City charged him with "obstructing an officer" and "jaywalking", the identical pair of substitute charges used against Mr. Walker.

d. On May 28, 2016, Tulsa police officers conducting a warrants sweep confronted Ollie Lee Brooks, a sixty-four-year-old Black man, to execute a municipal arrest warrant issued on a 2015 "jaywalking" citation. The officers pepper-sprayed Mr. Brooks and twice deployed a Taser on him, and Mr. Brooks died. The Department did not notify the public or the media that a man had died in its custody until Mr. Brooks's family raised questions, and it returned the officers to duty and deemed the force proper. Mr. Brooks's death illustrates where the custom pleaded here leads: a fine-only pedestrian citation becomes an arrest warrant, and the arrest warrant becomes a death.

65. The custom of using pedestrian and obstruction charges as instruments of discretionary arrest is long-standing and has been documented in litigation against this same Defendant. In an expert report prepared in *Johnson v. City of Tulsa*, No. 94-CV-00039-TCK-FHM (N.D. Okla.), Professor Ian Ayres analyzed Tulsa Police Department citations, arrests, and field interview reports for the period June 1, 1995 through May 31, 2000, and found that where officers

possessed discretion whether to arrest, racial disparities widened sharply: twenty-nine (29) of fifty (50) jaywalking arrests were of African-Americans; African-Americans were seventeen (17) times more likely to be arrested for trespassing; and seventy-four (74) of one hundred twenty-eight (128) persons booked on disorderly-conduct complaints were African-American. African-Americans then comprised approximately fifteen percent (15%) of Tulsa's population.

66. Racially disparate enforcement. The Tulsa Police Department enforces the foregoing customs against Black residents, such as Mr. Walker, in a racially disparate manner. That disparity has been documented continuously for more than two decades and has never been remediated:

a. 2001 — the Ayres report described above, prepared in litigation against this Defendant.

b. 2005 — City-compiled data reflecting that African-Americans comprised approximately 32% of arrests while comprising approximately 16% of the population, and nearly 50% of all uses of force. [CONFIRM.]

c. 2010 — analysis of Department records reflecting that African-Americans were the subject of 45% of approximately 15,000 "pedestrian checks" and 50% of field interviews, while comprising approximately 15% of the population.

d. 2016 — analysis of Department use-of-force data for 2010 through 2015 reflecting that Black Tulsans were approximately two to four times more likely to be subjected to force than white Tulsans. [CONFIRM.]

e. 2018 and 2019 — the City's own Tulsa Equality Indicators Annual Reports, finding that Black residents are arrested more than twice as often as white

residents and are five times as likely as all other racial and ethnic groups to be victims of officer use of force, and that racial inequality in youth arrests worsened between the two reports.

f. 2019 — Human Rights Watch, "Get on the Ground!": Policing, Poverty, and Racial Inequality in Tulsa, Oklahoma, documenting that the Department subjects Black people to physical force at approximately 2.7 times the rate it uses such force against white people, arrests Black people at approximately 2.3 times the rate it arrests white people, and stops residents of predominantly Black neighborhoods at more than ten times the rate of predominantly white neighborhoods.

67. The City has had actual, particularized, and repeated notice of these disparities and of the arrest practices that produce them, delivered to its final policymakers by name:

a. On May 31, 2018, the NAACP Legal Defense and Educational Fund, together with approximately fifty Tulsa civil-rights attorneys, religious leaders, elected officials, law-enforcement officials, and community leaders, including a former Chief of the Tulsa Police Department, a sitting member of the Tulsa City Council, a former United States Attorney, and sitting members of the Oklahoma Legislature, wrote to then-Mayor G.T. Bynum and City Council Chair David Patrick regarding the findings of the City's own Equality Indicators report. The letter demanded, among other measures, that the City adopt a departmental policy on "least harm" resolutions, warnings and citations in lieu of arrest for minor infractions, observing that the City's own Commission had recommended such resolutions but had never specified which infractions were eligible.

b. On June 20, 2019, the Legal Defense Fund submitted written comments to all nine members of the Tulsa City Council, by name, renewing that demand and again urging the City to adopt and implement a policy governing alternatives to arrest for minor infractions.

c. Following the death of Terence Crutcher, the City convened the Tulsa Commission on Community Policing, which issued seventy-seven (77) recommendations. According to the Commission's own appendix, the commissioners considered but did not approve any of the measurable action steps that would have produced greater police accountability, including in the areas of use of force and arrests.

d. On May 18, 2017, Mayor Bynum publicly acknowledged reporting that African-Americans in Tulsa were arrested at twice the rate of other races, stating that this was "precisely the type of issue that drove me to run for mayor" and that these were "the great moral issue of our time in this city."

68. The City thus knew, from its own reports, from its own Mayor, from its own Commission, and from written demands addressed to its Mayor and to every member of its City Council, that the Tulsa Police Department arrested Black residents at grossly disproportionate rates and that its officers made custodial arrests for minor infractions where a citation or warning would serve. The City was asked, specifically and repeatedly, to adopt a policy limiting custodial arrest for minor infractions but did nothing. On September 24, 2024, Tulsa police officers arrested Caleb Walker, a Black man, on a fine-only pedestrian infraction that authorizes no custodial arrest, the precise harm of which the City had been warned. The City's failure to act in the face of that knowledge was deliberate indifference.

69. Additionally and in the alternative, the violation of Mr. Walker's rights was caused by the City's failure to train its officers on the limits of their custodial arrest authority for fine-only municipal infractions, and on their obligation to terminate a seizure once the basis for it has been disproved. Plaintiff pleads inadequate training only; no claim of failure to supervise or failure to discipline is asserted, and no claim is asserted against any individual.

70. To recover for a failure to train under 42 U.S.C. § 1983, a plaintiff must establish (1) the existence of a municipal policy or custom involving deficient training; (2) that the policy or custom caused the injury; and (3) that the municipality adopted the policy or custom with deliberate indifference. *Lance v. Morris*, 985 F.3d 787, 800 (10th Cir. 2021). Each element is satisfied here.

71. First, the City provides its officers no meaningful training on the constitutional limits of custodial arrest for fine-only pedestrian and municipal infractions, or on what an officer must do when the identification supporting a detention is disproved during the encounter. That the City's own Commission recommended "least harm" resolutions but never identified which infractions were eligible, and that the City was twice told in writing that no such policy existed, reflects the absence of any training program on the subject.

72. Second, had the Individual Defendants been trained that a fine-only pedestrian infraction furnishes no basis for custodial arrest, and that a seizure must end when its justification is disproved, Mr. Walker would have been released at the scene when the Officers confirmed that he was not Curtis Chaplin. The injury would have been avoided had the officers been trained under a program not deficient in the identified respect. *City of Canton v. Harris*, 489 U.S. 378, 391 (1989).

73. Third, the City adopted that deficient training with deliberate indifference. Deliberate indifference exists where a municipality fails to train officers on how to handle recurring situations presenting an obvious potential to violate the Constitution. *Allen v. Muskogee*, 119 F.3d 837, 842 (10th Cir. 1997). Whether a situation recurs often enough to require training is measured by a three-part test: whether the policymakers know "to a moral certainty" that their employees will confront the situation; whether the situation "presents the employee with a difficult choice of the sort that training or supervision will make less difficult"; and whether "the wrong choice . . . will frequently cause the deprivation of a citizen's constitutional rights." *Lance*, 985 F.3d at 801–02 (quoting *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992), quoting *Canton*, 489 U.S. at 390 n.10).

a. Tulsa police officers execute arrest warrants and encounter pedestrians as an ordinary and recurring part of their duties. The City's policymakers know to a moral certainty that its officers will detain a person on suspicion that he is the subject of a warrant and will then learn, mid-encounter, that they have the wrong man, and that its officers will encounter pedestrians whose manner of crossing a street might be characterized as an infraction. Four officers confronted both situations in this case.

b. What an officer must do when he has seized a person, the identification collapses, and he must decide whether any lawful basis for continued detention remains is precisely the kind of judgment that training makes easier. The City's own position throughout Mr. Walker's municipal prosecution, that "obstruction" and "jaywalking" supplied a basis for a custodial arrest, demonstrates the difficulty: if the City itself maintained for nine months that those charges justified the arrest, its officers could hardly be expected to know otherwise without being taught.

c. The wrong choice is a warrantless custodial arrest unsupported by probable cause, a violation of the Fourth Amendment in every instance. That the wrong choice is made frequently is shown by the incidents described above, in which Tulsa officers arrested persons without lawful basis and supplied substitute "obstruction" and "jaywalking" charges, and by the documented disparities described above.

74. The City has moreover had actual notice that this training was absent. In the May 31, 2018 letter to Mayor Bynum and Council Chair Patrick, and again in the June 20, 2019 comments submitted to all nine members of the Tulsa City Council, the City was told that the Tulsa Police Department had adopted no policy identifying which minor infractions were eligible for citation or warning in lieu of arrest, that it had no de-escalation policy, and that its implicit-bias training had not been entrusted to a trainer with a proven record. The City was given the specific remedy and declined to adopt it. On September 24, 2024, four of its officers made exactly the wrong choice, and Caleb Walker was arrested, jailed, and prosecuted for nine months as a result.

75. The City's ratification of the officers' conduct, and independently the customs, the deliberate indifference, and the inadequate training described above, were each and together the moving force behind, and the direct and proximate cause of, the unlawful seizure of Mr. Walker, his continued detention after the Officers knew he was not the man they sought, the force used against him, and his nine-month prosecution, and the resulting injuries and damages, entitling Mr. Walker to compensatory damages and attorney's fees and costs under 42 U.S.C. §§ 1983 and 1988.

**IV.**

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff Caleb Walker respectfully requests that the Court enter judgment in his favor and against Defendants and award:

a. On Count I, compensatory damages against the City of Tulsa in an amount to be proven at trial, subject to the applicable limits of the Governmental Tort Claims Act, 51 O.S. § 154;

b. On Counts II, III, IV, V, and VI, compensatory damages against the Individual Defendants in an amount to be proven at trial;

c. On Counts II, III, IV, V, and VI, punitive damages against the Individual Defendants in an amount sufficient to punish and deter;

d. On Counts VI and VII, compensatory damages against the City of Tulsa in an amount to be proven at trial;

e. Reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988 on the federal claims;

f. All costs of this action and pre- and post-judgment interest as allowed by law; and

g. Such other and further relief as the Court deems just and equitable.

Plaintiff demands a trial by jury on all issues so triable.

*Respectfully submitted,*

***BRYAN & TERRILL LAW, PLLC***

*s/Steven J. Terrill*______________________

J. Spencer Bryan, OBA #19419
Steven J. Terrill, OBA #20869
2500 S. Broadway, #122

Edmond, Oklahoma 73013
Telephone/Facsimile: (918) 935-2777
jsbryan@bryanterrill.com
sjterrill@bryanterrill.com

-and-

**GARRETT LAW CENTER, PLLC**

D. Mitchell Garrett, Jr., OBA #20704
320 S. Boston Ave., Suite 825
Tulsa, Oklahoma 74103
Telephone: (918) 221-6190
Facsimile: (918) 340-6799
mitchell@garrettlawcenter.com

*Counsel for Plaintiff Caleb Walker*

## CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of September, 2026, a true and correct copy of the foregoing Second Amended Petition was filed and served upon all counsel of record via electronic mail and USPS, and that the newly added Individual Defendants will be served with summons and a copy of this Second Amended Petition as provided by law.

*s/Steven J. Terrill*________________________
Steven J. Terrill

**IN THE DISTRICT COURT IN AND FOR TULSA COUNTY**
**STATE OF OKLAHOMA**
500 S. Denver Ave., Tulsa, Oklahoma 74103

| | | |
|---|---|---|
| CALEB WALKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. CJ-2026-2691 |
| v. | ) | |
| | ) | Judge Rebecca B. Nightingale |
| CITY OF TULSA, a municipal corporation; | ) | |
| RAY GOOLDY, individually; ZACHARY | ) | **JURY TRIAL DEMANDED** |
| MORING, individually; JAMES KIDD, | ) | |
| individually; and RYAN THOMPSON, | ) | **ATTORNEY LIEN CLAIMED** |
| individually, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**SUMMONS**

**(Service by Certified Mail, Return Receipt Requested, Restricted Delivery)**

**To the above-named Defendant: RAY GOOLDY, individually**
**VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED, RESTRICTED DELIVERY**
Jeremy Ray Gooldy
3624 S. Braden Place
Tulsa, Oklahoma 74135-5508

You have been sued by the above-named Plaintiff, and you are directed to file a written answer to the attached Second Amended Petition in the court at the above address within twenty (20) days after service of this summons upon you exclusive of the day of service. Within the same time, a copy of your answer must be delivered or mailed to the attorney for the plaintiff. Unless you answer the petition within the time stated judgment will be rendered against you with the costs of the action.

If Interrogatories and Request for Production of Documents are served with this Petition, you are directed to answer the Interrogatories and produce the documents requested within forty-five (45) days after service of these Interrogatories and Request for Production of Documents.

Issued this _____ day of ______________, 2026.

**ISSUED**
DISTRICT COURT
TULSA COUNTY, OKLAHOMA
October 09, 2026 8:41 AM
DON NEWBERRY, COURT CLERK
Case Number CJ-2026-2691
By ______________________

DON NEWBERRY, Court Clerk

By: ______________________
Deputy Court Clerk
(Seal)

DISTRICT COURT CLERK TULSA COUNTY, OKLAHOMA

**Attorney(s) for Plaintiff:**

D. Mitchell Garrett, Jr., OBA #20704
GARRETT LAW
320 S. Boston Ave., Ste. 825
Tulsa, Oklahoma 74103
Telephone: (918) 221-6190
Facsimile: (918) 340-6799
mitchell@garrettlawcenter.com
-and-
Steven J. Terrill, OBA #20869
J. Spencer Bryan, OBA #19419
BRYAN & TERRILL LAW, PLLC
2500 S. Broadway, Suite 122
Edmond, OK 73013
T/F: (918) 935-2777
sjterrill@bryanterrill.com
jsbryan@bryanterrill.com

**RETURN OF SERVICE BY MAIL**

I certify that on the _____ day of ______________, 2026, I mailed a copy of this summons and the Second Amended Petition to the above-named Defendant by certified mail, return receipt requested, deliverable to addressee only, at the address stated above, as shown by the attached return receipt.

Certified Mail No.: ___________________________________

Date of delivery per return receipt: ____________________

___________________________________
Signature of person mailing summons

**IN THE DISTRICT COURT IN AND FOR TULSA COUNTY**
**STATE OF OKLAHOMA**
500 S. Denver Ave., Tulsa, Oklahoma 74103

| | | |
|---|---|---|
| CALEB WALKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. CJ-2026-2691 |
| v. | ) | |
| | ) | Judge Rebecca B. Nightingale |
| CITY OF TULSA, a municipal corporation; | ) | |
| RAY GOOLDY, individually; ZACHARY | ) | **JURY TRIAL DEMANDED** |
| MORING, individually; JAMES KIDD, | ) | |
| individually; and RYAN THOMPSON, | ) | **ATTORNEY LIEN CLAIMED** |
| individually, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**SUMMONS**

**(Service by Certified Mail, Return Receipt Requested, Restricted Delivery)**

**To the above-named Defendant: RYAN THOMPSON, individually**
**VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED, RESTRICTED DELIVERY**
Ryan Paul Thompson
7601 S. Oswego Pl.
Tulsa, Oklahoma 74136-812[?]

You have been sued by the above-named Plaintiff, and you are directed to file a written answer to the attached Second Amended Petition in the court at the above address within twenty (20) days after service of this summons upon you exclusive of the day of service. Within the same time, a copy of your answer must be delivered or mailed to the attorney for the plaintiff. Unless you answer the petition within the time stated judgment will be rendered against you with the costs of the action.

If Interrogatories and Request for Production of Documents are served with this Petition, you are directed to answer the Interrogatories and produce the documents requested within forty-five (45) days after service of these Interrogatories and Request for Production of Documents.

Issued this _____ day of ______________, 2026.

**ISSUED**
DISTRICT COURT
TULSA COUNTY, OKLAHOMA
October 09, 2026 8:45 AM
DON NEWBERRY, COURT CLERK
Case Number CJ-2026-2691

By ______________________

DON NEWBERRY, Court Clerk

By: ______________________
Deputy Court Clerk
(Seal)

DISTRICT COURT CLERK TULSA COUNTY, OKLAHOMA

**Attorney(s) for Plaintiff:**
D. Mitchell Garrett, Jr., OBA #20704
GARRETT LAW
320 S. Boston Ave., Ste. 825
Tulsa, Oklahoma 74103
Telephone: (918) 221-6190
Facsimile: (918) 340-6799
mitchell@garrettlawcenter.com
-and-
Steven J. Terrill, OBA #20869
J. Spencer Bryan, OBA #19419
BRYAN & TERRILL LAW, PLLC
2500 S. Broadway, Suite 122
Edmond, OK 73013
T/F: (918) 935-2777
sjterrill@bryanterrill.com
jsbryan@bryanterrill.com

## RETURN OF SERVICE BY MAIL

I certify that on the _____ day of ______________, 2026, I mailed a copy of this summons and the Second Amended Petition to the above-named Defendant by certified mail, return receipt requested, deliverable to addressee only, at the address stated above, as shown by the attached return receipt.

Certified Mail No.: ___________________________________

Date of delivery per return receipt: ____________________

_______________________________________
Signature of person mailing summons

**IN THE DISTRICT COURT OF TULSA COUNTY**
**STATE OF OKLAHOMA**

| | |
|---|---|
| CALEB WALKER,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF TULSA, a municipal corporation; RAY GOOLDY, individually; ZACHARY MORING, individually; JAMES KIDD, individually; and RYAN THOMPSON, individually,<br><br>Defendants. | Case No. CJ-2026-2691<br><br>Judge Rebecca B. Nightingale<br><br>**JURY TRIAL DEMANDED**<br><br>**ATTORNEY LIEN CLAIMED** |

## PLAINTIFF'S NOTICE REGARDING SERVICE

Plaintiff Caleb Walker, by and through his counsel of record, provides the following notice to the Court regarding service of the Second Amended Petition of the following:

1. Plaintiff mailed first class mail the Second Amended Petition to the City of Tulsa on October 12, 2026.
2. Plaintiff is awaiting the summons for Ray Gooldy, Zachary Moring, James Kidd, and Ryan Thompson from the Tulsa County District Court Clerk.
3. Upon receiving the summons signed by the Tulsa County Court Clerk, Plaintiff will have summons and the Second Amended Petition served upon the individual defendants.

*Respectfully submitted,*

***BRYAN & TERRILL LAW, PLLC***

RECEIVED
CITY OF TULSA
LEGAL DEPARTMENT
2026 OCT 19 AM09:59

*s/Steven J. Terrill*______________________
J. Spencer Bryan, OBA #19419
Steven J. Terrill, OBA #20869
2500 S. Broadway, #122
Edmond, Oklahoma 73013
Telephone/Facsimile: (918) 935-2777
jsbryan@bryanterrill.com
sjterrill@bryanterrill.com

-and-

**GARRETT LAW CENTER, PLLC**

D. Mitchell Garrett, Jr., OBA #20704
320 S. Boston Ave., Suite 825
Tulsa, Oklahoma 74103
Telephone: (918) 221-6190
Facsimile: (918) 340-6799
mitchell@garrettlawcenter.com

*Counsel for Plaintiff Caleb Walker*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 12th day of October, 2026, a true and correct copy of the foregoing was filed and served upon all counsel of record via USPS.

Steven J. Terrill

**IN THE DISTRICT COURT OF TULSA COUNTY**
**STATE OF OKLAHOMA**

FILED
DISTRICT COURT
TULSA COUNTY, OKLAHOMA
September 8, 2026 3:13 PM
DON NEWBERRY, COURT CLERK
Case Number CJ-2026-2691

CALEB WALKER,

Plaintiff,

v.

CITY OF TULSA, a municipal corporation; RAY GOOLDY, individually; ZACHARY MORING, individually; JAMES KIDD, individually; and RYAN THOMPSON, individually,

Defendants.

Case No. CJ-2026-2691

Judge Rebecca B. Nightingale

**JURY TRIAL DEMANDED**

**ATTORNEY LIEN CLAIMED**

**SECOND AMENDED PETITION**

Plaintiff Caleb Walker, by and through his counsel of record, brings this Second Amended Petition as a matter of course pursuant to 12 O.S. § 2015(A) and this Court's Order of August 28, 2026,[1] and for his causes of action against the above-named Defendants states and alleges as follows:

**I.**

**PARTIES, JURISDICTION, AND VENUE**

1. Plaintiff Caleb Walker is a resident and citizen of Tulsa County, Oklahoma.

2. Defendant City of Tulsa (the "City") is a municipal corporation and a political subdivision of the State of Oklahoma within the meaning of the Oklahoma Governmental Tort Claims Act ("GTCA"), 51 O.S. § 151 et seq., located primarily in Tulsa County.

[1] Plaintiff filed his First Amended Petition following the Defendant's Motion to Dismiss. On September 8, 2026, the undersigned received the Court's Order of August 28, 2026 which provided ten (10) days to file a Second Amended Petition. Accordingly, Plaintiff is filing his Second Amended Petition the same day as receiving notice of the Court's Order dated August 28, 2026.

3. Defendant Ray Gooldy was at all relevant times a police officer employed by the City of Tulsa. He is sued in his individual capacity. As to the state-law claims asserted against him individually, he acted willfully, wantonly, and in bad faith, and therefore outside the scope of his employment as that term is defined by 51 O.S. § 152(13). As to the federal claims asserted against him, he acted under color of state law.

4. Defendant Zachary Moring was at all relevant times a police officer employed by the City of Tulsa. He is sued in his individual capacity, and acted as described in the preceding paragraph.

5. Defendant James Kidd was at all relevant times a police officer employed by the City of Tulsa. He is sued in his individual capacity, and acted as described above.

6. Defendant Ryan Thompson was at all relevant times a police officer employed by the City of Tulsa. He is sued in his individual capacity, and acted as described above. Defendants Gooldy, Moring, Kidd, and Thompson are referred to collectively as the "Individual Defendants" or the "Officers."

7. The events complained of occurred in Tulsa County, Oklahoma. Venue is proper in this Court, and this Court has subject-matter jurisdiction over Plaintiff's state-law claims and concurrent jurisdiction over Plaintiff's claims arising under 42 U.S.C. § 1983.

8. With respect to the negligence claim against the City only, Plaintiff has complied with the GTCA. Plaintiff presented a written notice of tort claim to the City of Tulsa on September 19, 2025, in compliance with 51 O.S. § 156. The City did not approve the claim within ninety (90) days, and the claim was deemed denied by operation of law on December 18, 2025, pursuant to 51 O.S. § 157(A). Plaintiff's original Petition was filed within one hundred eighty (180) days of that denial, on June 16, 2026, and this action is therefore timely under 51 O.S. § 157(B). GTCA notice

is not a prerequisite to the claims asserted against the Individual Defendants for conduct outside the scope of their employment, or to the claims arising under federal law.

## II.

## STATEMENT OF FACTS

This case is not one of mistaken identity alone. The Officers came to doubt, and then confirmed, and then stated aloud, that Mr. Walker was not the man named in their warrant. They seized him, forced him to the ground, arrested and jailed him, and caused his prosecution anyway.

9. On September 24, 2024, at approximately 10:55 a.m., Tulsa Police officers, including the Individual Defendants, approached and stopped Caleb Walker outside his apartment complex as he was walking back across the road from the trash bin. All four Individual Defendants—Gooldy, Moring, Kidd, and Thompson, were present and participated in the stop, seizure, detention, and arrest of Mr. Walker, acting together as an integrated police unit and in concert with one another throughout the encounter.

10. When Mr. Walker crossed the road, he did so at a right angle to the curb, taking the shortest route directly across, the manner of crossing prescribed by law. The roadway he crossed is an interior drive that bisects the apartment complex in which Mr. Walker lived, and no vehicle was approaching as he crossed. Mr. Walker's crossing violated no law. In any event, "jaywalking" is, at most, a fine-only pedestrian infraction under Oklahoma law and the Tulsa Revised Traffic Code, not a criminal offense and not an arrestable one, and it furnished no lawful basis to seize, handcuff, arrest, jail, or prosecute Mr. Walker. The Officers did not stop Mr. Walker for jaywalking; they seized him as a suspected sex offender and raised "jaywalking" only later, after

they had confirmed he was not the man they sought, as a charge manufactured to justify an arrest they knew was unlawful.

11. Officer Moring, who initiated the contact and appeared to be the senior officer directing the encounter, immediately took hold of Mr. Walker while still asking whether he was "Curtis Chaplin," the person the officers were seeking on a warrant for failure to register as a sex offender. Officer Moring seized Mr. Walker before any officer had verified his identity or observed him commit any offense.

12. Mr. Walker immediately and repeatedly identified himself as "Caleb Walker" and informed the officers that he lived at the complex. Mr. Walker also protested aloud that he was being stopped because he is a Black man, asking words to the effect of, "What are y'all doing? … Just because I'm a Black man?"

13. Within seconds of contact, and although Mr. Walker had done nothing but walk his dog and take out his trash and had repeatedly identified himself by name, Officer Moring physically seized Mr. Walker, ordering him to put his hands behind his back and taking hold of his arms, and continued to restrain him while Officer Gooldy placed him in handcuffs. Officer Moring threatened to arrest Mr. Walker for "obstruction" if he pulled away.

14. At approximately 10:58 a.m., Mr. Walker informed the officers that he had a chipped tooth that the actual suspect did not have. The officers disregarded this physical evidence.

15. At approximately 11:02 a.m., Officer Moring interviewed a sixteen-year-old resident, who confirmed that Mr. Walker had identified himself as "Caleb" before the police arrived. Despite this independent corroboration, the Officers continued to detain Mr. Walker.

16. On at least two occasions, at approximately 11:02 a.m. and 11:10 a.m., Officer Gooldy stated to private citizens that Mr. Walker was a "registered sex offender," even as Mr. Walker continued to protest his identity.

17. At approximately 11:06 a.m., Officer Gooldy informed Mr. Walker that he was under arrest for failure to register as a sex offender and for obstruction.

18. While Mr. Walker remained handcuffed, Officer Moring attempted to pull a pair of headphones from Mr. Walker's restrained hands. When Mr. Walker held onto his own property, Officer Moring took him to the ground, and the Officers, Moring, Gooldy, Kidd, and Thompson, piled onto him and drove their knees into his back. Each of the Individual Defendants participated in, and none prevented, the unlawful seizure, arrest, and use of force against Mr. Walker, though each had the opportunity and the duty to intervene. The Officers later characterized Mr. Walker's grip on his own headphones as an attempt to "elbow" an officer.

19. At approximately 11:15 a.m., while Mr. Walker was handcuffed on the ground, Officer Gooldy inspected Mr. Walker's arm and confirmed that he did not have the "blood" tattoo that the actual suspect had, telling Mr. Walker, "The guy that we're looking for has 'blood' tattooed on his arm, which you do not have." The officers also compared Mr. Walker to photographs of Chaplin, observed that Chaplin bore tattoos that Mr. Walker did not, and, rather than treat that difference as exculpatory, accused Mr. Walker of having had his tattoos surgically removed.

20. Before arresting Mr. Walker, the Officers confirmed his identity. Officer Moring retrieved photographs of both Mr. Walker and Curtis Chaplin, photographed the differing mugshots, and showed them to Officer Kidd; comparing the images, the Officers confirmed, "This is Kaleb Walker," and recognized that one of the officers present had personally arrested Mr. Walker under that same name the prior year. The Officers acknowledged that Mr. Walker "looks

like a guy we're looking for, but it's not going to be him." Having thus confirmed that Mr. Walker was not Curtis Chaplin, the Officers nevertheless proceeded with the arrest and transport.

21. After confirming that Mr. Walker was not the suspect, the Officers did not release him. Instead, one officer stated that they were "past that point" and that they had "got instruction" to proceed, and the Officers settled on substitute charges of "obstruction" and "jaywalking", charges they used to paper over an arrest they knew lacked any lawful basis. The Officers further elected to transport and book Mr. Walker before confirming his identity, discussing on camera that they would take him to "get him live scan confirmed and then either change locations or book him", thereby jailing him before verifying who he was.

22. At approximately 11:28 a.m., the Officers used significant force to shove a handcuffed and seated Mr. Walker into the back of a patrol car. Mr. Walker cried out in pain and repeatedly insisted that he was the wrong person. While Mr. Walker remained handcuffed and detained, continuing to insist that he was not the man they sought, the Officers engaged in unrelated, casual conversation among themselves, displaying indifference to his protests and to the wrongfulness of his continued detention.

23. The Officers caused criminal charges to be initiated against Mr. Walker, and the City prosecuted those charges, with knowledge of the Officers' conduct described above.

24. The City continued to prosecute Mr. Walker until the day of trial, June 10, 2025, in the Municipal Court of the City of Tulsa (Division II). The City subpoenaed all four Individual Defendants, Gooldy, Moring, Kidd, and Thompson, to appear and testify. When the matter was called for trial, not one of them appeared, in defiance of the City's own subpoenas, and the City thereupon dismissed every charge against Mr. Walker. No officer was willing to take the stand and defend, under oath, the arrest and prosecution he had set in motion.

25. Mr. Walker's prosecution terminated in his favor when all charges were dismissed without a conviction.

26. As a direct and proximate result of Defendants' conduct, Mr. Walker suffered injuries and damages, including physical injury, pain and suffering, the loss of his liberty, humiliation, injury to his reputation, emotional distress, and the costs of defending the criminal charges.

## III.
## CAUSES OF ACTION

### COUNT I — NEGLIGENCE
***(Against Defendant City of Tulsa)***

Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

27. The Officers who engaged Mr. Walker were employees of the City acting within the scope of their employment for purposes of this negligence claim, and owed Mr. Walker a duty to exercise reasonable care in the performance of their law-enforcement functions, including a duty to reasonably investigate and confirm a suspect's identity before effecting an arrest and a duty to refrain from using unreasonable force.

28. The Officers breached these duties by, among other things, failing to investigate or credit Mr. Walker's repeated identification of himself, the corroborating statement of a resident, the absence of the suspect's distinctive tattoo, and their own recognition that Mr. Walker was not the suspect; and by using unreasonable force against him.

29. Pursuant to 51 O.S. § 153, the City is liable for the negligent acts and omissions of its employees committed within the scope of their employment.

30. As a direct and proximate result of this negligence, Mr. Walker suffered the injuries and damages described above, in an amount to be proven at trial and subject to the applicable limits of the GTCA, 51 O.S. § 154.

**COUNT II — 42 U.S.C. § 1983: UNREASONABLE SEIZURE AND FALSE ARREST**
***(Fourth Amendment — Against the Individual Defendants)***

Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

31. At all relevant times, the Individual Defendants acted under color of the statutes, ordinances, customs, and usages of the State of Oklahoma and the City of Tulsa.

32. The Fourth Amendment to the United States Constitution, applied to the States through the Fourteenth Amendment, guarantees the right to be free from unreasonable searches and seizures, including seizure and arrest without probable cause.

33. The Individual Defendants seized, detained, and arrested Mr. Walker without probable cause and without reasonable suspicion. Even assuming some justification existed at the initial moment of contact, that justification evaporated once the Officers obtained multiple independent facts establishing that Mr. Walker was not Curtis Chaplin, including his immediate and repeated self-identification, the corroborating statement of a resident, the absence of the suspect's distinctive "blood" tattoo, and the Officers' own stated recognition that "it's not going to be him." The Officers nonetheless continued to detain, arrest, transport, and jail Mr. Walker after they knew, or in the exercise of reasonable diligence should have known, that he was not the person they sought and had committed no crime warranting arrest. Nor did the substitute charges the Officers later invented supply any lawful basis for the seizure: Mr. Walker committed no

obstruction, and his crossing of an interior drive within his own apartment complex, at a right angle to the curb and with no traffic present, violated no law; "jaywalking" is, at most, a fine-only pedestrian infraction that authorizes no custodial arrest, and the Officers invoked it only as a pretext after confirming that Mr. Walker was not the man they sought.

34. No reasonable officer in the Individual Defendants' position could have believed that the continued seizure, arrest, and detention of Mr. Walker was lawful under clearly established law.

35. As a direct and proximate result of the Individual Defendants' violation of Mr. Walker's Fourth Amendmcnt rights, Mr. Walkcr suffcred thc injurics and damagcs describcd above, entitling him to compensatory damages, punitive damages, and attorney's fees and costs under 42 U.S.C. §§ 1983 and 1988.

**COUNT III — 42 U.S.C. § 1983: EXCESSIVE FORCE**
***(Fourth Amendment — Against the Individual Defendants)***

Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

36. The Individual Defendants used force against Mr. Walker, including seizing and grabbing him, forcing him to the ground and kneeling on him while he was handcuffed, and shoving him into a patrol car, that was objectively unrcasonable undcr the totality of the circumstances, in violation of the Fourth Amendment.

37. The force used was excessive and unnecessary in light of the absence of any serious crime, the absence of any immediate threat posed by Mr. Walker, and Mr. Walker's status as a handcuffed and restrained arrestee whom the Officers had already recognized was not their suspect.

38. No reasonable officer could have believed that the degree of force used against Mr. Walker was lawful under clearly established law. It is clearly established in this Circuit that officers may not use significant force against a subdued, restrained, or non-resisting person. *See Wilkins v. City of Tulsa*, 33 F.4th 1265 (10th Cir. 2022) (reversing qualified immunity and recognizing it clearly established that officers may not use significant force against a subdued, restrained, and non-resisting person).

39. As a direct and proximate result of this violation of Mr. Walker's constitutional rights, Mr. Walker suffered the injuries and damages described above, entitling him to compensatory damages, punitive damages, and attorney's fees and costs under 42 U.S.C. §§ 1983 and 1988.

**COUNT IV — 42 U.S.C. § 1983: MALICIOUS PROSECUTION**
***(Fourth Amendment — Against the Individual Defendants)***

Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

40. The Individual Defendants caused criminal proceedings to be instituted and continued against Mr. Walker without probable cause and with malice. Having confirmed that Mr. Walker was not Curtis Chaplin and that he had committed no offense warranting arrest, the Officers had no probable cause to continue his detention or to institute the substitute obstruction and jaywalking charges, and their decision to arrest, jail, and charge him anyway effected a seizure of Mr. Walker without probable cause.

41. The criminal proceedings terminated in Mr. Walker's favor when all charges were dismissed without a conviction. *See Thompson v. Clark*, 596 U.S. 36 (2022).

42. As a direct and proximate result of the Individual Defendants' conduct, Mr. Walker was deprived of liberty consistent with the concept of a Fourth Amendment seizure and suffered

the injuries and damages described above, entitling him to compensatory damages, punitive damages, and attorney's fees and costs under 42 U.S.C. §§ 1983 and 1988.

**COUNT V — 42 U.S.C. § 1983: DEPRIVATION OF LIBERTY WITHOUT DUE PROCESS ("STIGMA-PLUS")**
***(Fourteenth Amendment — Against the Individual Defendants)***

Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

43. On at least two occasions, Officer Gooldy publicly stated to private citizens that Mr. Walker was a "registered sex offender," even as Mr. Walker protested his identity, and even after the officers had reason to know he was not the person they sought. Mr. Walker is not, and has never been, a sex offender.

44. These false statements imposed on Mr. Walker a badge of infamy and a grave moral stigma of the most serious kind.

45. That stigma was imposed contemporaneously with, and in direct connection with, a tangible and coercive alteration of Mr. Walker's legal status and rights: his warrantless seizure, his arrest and jailing, and the institution of criminal charges against him, each of which deprived him of his liberty. The constitutional injury alleged here is not the seizure standing alone, and it is not merely reputational harm; it is the State's public branding of Mr. Walker as a registered sex offender in direct connection with that deprivation of liberty, an official stigmatization that altered his legal status and his standing in the community, that carried concrete and continuing consequences, and for which Mr. Walker was afforded no process by which to clear his name.

46. The Individual Defendants inflicted this stigma and deprivation of liberty without any notice or meaningful opportunity to be heard, in violation of Mr. Walker's right to due process of law under the Fourteenth Amendment.

47. As a direct and proximate result, Mr. Walker suffered the injuries and damages described above, entitling him to compensatory damages, punitive damages, and attorney's fees and costs under 42 U.S.C. §§ 1983 and 1988.

## COUNT VI — 42 U.S.C. § 1983: EQUAL PROTECTION (RACE-BASED SELECTIVE ENFORCEMENT)

***(Fourteenth Amendment — Against the Individual Defendants and Defendant City of Tulsa)***

Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

48. Mr. Walker is a Black man. Curtis Chaplin, the person named in the warrant the officers were purporting to execute, is also a Black man.

49. The Individual Defendants seized, arrested, used force against, and caused the prosecution of Mr. Walker because of his race. Relying on little more than Mr. Walker's race and a generic physical description, the Officers could say only that Mr. Walker shared the suspect's height, weight, facial structure, and eye shape, the officers treated Mr. Walker as interchangeable with Curtis Chaplin, another Black man, and disregarded every individuating fact establishing that Mr. Walker was not the person sought: his immediate and repeated identification of himself as Caleb Walker, the corroborating statement of a resident, the chipped tooth the suspect did not have, the absence of the suspect's distinctive "blood" tattoo, and the officers' own recognition that "it's not going to be him." When the officers saw that Chaplin bore tattoos that Mr. Walker plainly did not, they did not treat that difference as exculpatory; instead, determined to hold onto their identification of this Black man as their suspect, they accused Mr. Walker of having surgically

removed his tattoos. Their readiness to invent an explanation rather than credit obvious exculpatory evidence reflects a purpose to treat Mr. Walker as a fungible Black suspect rather than as the individual he plainly was.

50. A similarly situated person who was not Black, and who had presented the same exculpatory identification and individuating facts, would not have been seized, subjected to force, arrested, and prosecuted as Mr. Walker was. The Individual Defendants acted with discriminatory purpose and treated Mr. Walker differently on account of his race, in violation of the Equal Protection Clause of the Fourteenth Amendment.

51. The right to be free from racially selective law enforcement is clearly established, and no reasonable officer could have believed the race-based treatment of Mr. Walker was lawful.

52. The Individual Defendants' conduct conformed to, and was caused by, a custom of the Tulsa Police Department of enforcing the law against Black residents in a racially disparate manner, as further described in Count VII below. The City's deliberate indifference to that custom was a moving force behind the deprivation of Mr. Walker's right to the equal protection of the laws.

53. As a direct and proximate result of these violations, Mr. Walker suffered the injuries and damages described above, entitling him to compensatory damages, punitive damages against the Individual Defendants, and attorney's fees and costs under 42 U.S.C. §§ 1983 and 1988.

**COUNT VII — 42 U.S.C. § 1983: MUNICIPAL LIABILITY (*MONELL*)**
***(Against Defendant City of Tulsa)***

Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

54. Final policymaking authority over the law-enforcement operations and practices of the Tulsa Police Department, including the decisions to effect, to maintain, and to approve the

seizure, arrest, and detention at issue, rests with the City of Tulsa, acting through its Chief of Police and those officials to whom the City has delegated final authority over arrests and detentions.

55. Final policymaking authority over the institution and the continuation of prosecutions on municipal charges rests with the City of Tulsa, acting through its municipal prosecuting authority. The decision to charge Mr. Walker, and each successive decision to continue prosecuting him over the ensuing nine months, was a decision of the City itself and not merely of the Individual Defendants.

56. Ratification. The City's liability on this theory does not depend upon proof of any prior incident or pattern. The City is liable because its own final policymakers adopted this seizure and this prosecution, with actual knowledge of the basis for them, and thereby made the officers' conduct the City's own.

57. Before Mr. Walker was transported, the Individual Defendants confirmed, and stated aloud on recordings the City itself owns, that Mr. Walker was not the person named in the warrant. Officer Gooldy told Mr. Walker: "The guy that we're looking for has 'blood' tattooed on his arm, which you do not have." The Officers compared Mr. Walker's photograph to Curtis Chaplin's, confirmed "This is Kaleb Walker," recognized that an officer present had arrested Mr. Walker under that name the prior year, and acknowledged that he "looks like a guy we're looking for, but it's not going to be him." One officer then stated that they were "past that point" and that they had "got instruction" to proceed.

58. With knowledge of that recorded basis, the City accepted Mr. Walker into custody, jailed him, and caused charges of "obstruction" and "jaywalking" to be instituted against him. The City did not release him upon learning that he was not Curtis Chaplin; it adopted the arrest and supplied it with substitute charges.

59. The City then prosecuted Mr. Walker on those substitute charges for approximately nine months, from September 2024 through June 10, 2025, in the Municipal Court of the City of Tulsa (Division II). Throughout that period the body-worn camera recordings described above were in the City's own possession, custody, and control. Every decision to continue the prosecution, at each setting, and finally on the day of trial, was an affirmative act of the City taken with actual knowledge of what its own recordings showed. A municipality that prosecutes a man for nine months on charges its own recordings refute has not merely failed to correct its officers; it has embraced their conduct and the stated reasons for it.

60. The City subpoenaed all four Individual Defendants, Gooldy, Moring, Kidd, and Thompson, to appear and testify at trial. Not one appeared, in defiance of the City's own subpoenas, and the City thereupon dismissed every charge against Mr. Walker. The City sought no enforcement of its own subpoenas. It sought no continuance, requested no bench warrant or contempt citation, and took no action of any kind against the four officers who had disregarded its process. A municipality that prosecutes a man for nine months, subpoenas its officers to prove the case, and then does nothing when every one of them refuses to appear has confirmed what the recordings already showed, that there was no case to defend, and that the City knew it.

61. The City imposed no discipline on any officer in connection with the wrongful arrest, detention, or prosecution of Mr. Walker, and upon information and belief conducted no investigation of it. This allegation is pleaded as further evidence that the City adopted the officers' conduct as its own, and not as an independent basis of liability.

62. The allegations in this Count concerning instruction, direction, and supervision within the Tulsa Police Department are pleaded as evidence of the City's policies, customs, and practices, and in support of the City's liability under *Monell*. Plaintiff asserts no claim of

supervisory liability against any individual, and no individual supervisor is named as a Defendant in this Count.

63. Custom of pretextual arrest and substitute charges. Independently, and in the alternative, the seizure and prosecution of Mr. Walker were caused by a persistent and widespread custom of the Tulsa Police Department of seizing and arresting persons without probable cause and then papering those unlawful arrests with substitute charges such as "obstruction," "resisting," and "jaywalking." The custom operates by direction: officers who have detained a person without lawful basis are instructed to proceed and to supply a charge. Consistent with that custom, the Officers here stated on their body-worn cameras that, after confirming that Mr. Walker was not the man named in the warrant, they had "got instruction" to proceed, and they then settled on "obstruction" and "jaywalking." That an officer on scene understood himself to be acting on instruction, rather than on his own assessment of probable cause, evidences a practice operating at the supervisory level within the Department.

64. That custom is reflected in, among others, the following incidents involving the same type of constitutional violation:

a. *Buck v. City of Tulsa*, No. 4:21-cv-00295 (N.D. Okla.). In June 2020, Tulsa police officers arrested Sheila Buck, initially for "trespassing," and then, on a supervisor's instruction, on a substituted charge of "obstruction", despite her being lawfully present and compliant. A Tulsa County jury acquitted Ms. Buck of obstruction in September 2024, and the City paid $700,000 to resolve her civil-rights claims. The mechanism was the same one used against Mr. Walker: a supervisor directed the substitution of a cover charge for an arrest that lacked lawful basis.

b. *Adkins v. City of Tulsa*, No. CJ-2022-00331 (Dist. Ct. Tulsa County). In June 2020, Tulsa police officers handcuffed, forced to the ground, and used force against two Black minor children during a purported jaywalking stop, although the children posed no threat; the City resolved the resulting civil-rights claims for approximately $20,000.

c. *State of Oklahoma v. Hampton*, No. CM-2025-1536 (Dist. Ct. Tulsa County). On April 15, 2025, while Mr. Walker's own prosecution was still pending, Tulsa police officers stopped Kemonte Hampton, a Black man, for alleged "jaywalking" near East 11th Street and South Garnett Road; during the stop an officer's patrol cruiser rolled over Mr. Hampton, and the City charged him with "obstructing an officer" and "jaywalking", the identical pair of substitute charges used against Mr. Walker.

d. On May 28, 2016, Tulsa police officers conducting a warrants sweep confronted Ollie Lee Brooks, a sixty-four-year-old Black man, to execute a municipal arrest warrant issued on a 2015 "jaywalking" citation. The officers pepper-sprayed Mr. Brooks and twice deployed a Taser on him, and Mr. Brooks died. The Department did not notify the public or the media that a man had died in its custody until Mr. Brooks's family raised questions, and it returned the officers to duty and deemed the force proper. Mr. Brooks's death illustrates where the custom pleaded here leads: a fine-only pedestrian citation becomes an arrest warrant, and the arrest warrant becomes a death.

65. The custom of using pedestrian and obstruction charges as instruments of discretionary arrest is long-standing and has been documented in litigation against this same Defendant. In an expert report prepared in *Johnson v. City of Tulsa*, No. 94-CV-00039-TCK-FHM (N.D. Okla.), Professor Ian Ayres analyzed Tulsa Police Department citations, arrests, and field interview reports for the period June 1, 1995 through May 31, 2000, and found that where officers

possessed discretion whether to arrest, racial disparities widened sharply: twenty-nine (29) of fifty (50) jaywalking arrests were of African-Americans; African-Americans were seventeen (17) times more likely to be arrested for trespassing; and seventy-four (74) of one hundred twenty-eight (128) persons booked on disorderly-conduct complaints were African-American. African-Americans then comprised approximately fifteen percent (15%) of Tulsa's population.

66. Racially disparate enforcement. The Tulsa Police Department enforces the foregoing customs against Black residents, such as Mr. Walker, in a racially disparate manner. That disparity has been documented continuously for more than two decades and has never been remediated:

a. 2001 — the Ayres report described above, prepared in litigation against this Defendant.

b. 2005 — City-compiled data reflecting that African-Americans comprised approximately 32% of arrests while comprising approximately 16% of the population, and nearly 50% of all uses of force. [CONFIRM.]

c. 2010 — analysis of Department records reflecting that African-Americans were the subject of 45% of approximately 15,000 "pedestrian checks" and 50% of field interviews, while comprising approximately 15% of the population.

d. 2016 — analysis of Department use-of-force data for 2010 through 2015 reflecting that Black Tulsans were approximately two to four times more likely to be subjected to force than white Tulsans. [CONFIRM.]

e. 2018 and 2019 — the City's own Tulsa Equality Indicators Annual Reports, finding that Black residents are arrested more than twice as often as white

residents and are five times as likely as all other racial and ethnic groups to be victims of officer use of force, and that racial inequality in youth arrests worsened between the two reports.

f. 2019 — Human Rights Watch, "Get on the Ground!": Policing, Poverty, and Racial Inequality in Tulsa, Oklahoma, documenting that the Department subjects Black people to physical force at approximately 2.7 times the rate it uses such force against white people, arrests Black people at approximately 2.3 times the rate it arrests white people, and stops residents of predominantly Black neighborhoods at more than ten times the rate of predominantly white neighborhoods.

67. The City has had actual, particularized, and repeated notice of these disparities and of the arrest practices that produce them, delivered to its final policymakers by name:

a. On May 31, 2018, the NAACP Legal Defense and Educational Fund, together with approximately fifty Tulsa civil-rights attorneys, religious leaders, elected officials, law-enforcement officials, and community leaders, including a former Chief of the Tulsa Police Department, a sitting member of the Tulsa City Council, a former United States Attorney, and sitting members of the Oklahoma Legislature, wrote to then-Mayor G.T. Bynum and City Council Chair David Patrick regarding the findings of the City's own Equality Indicators report. The letter demanded, among other measures, that the City adopt a departmental policy on "least harm" resolutions, warnings and citations in lieu of arrest for minor infractions, observing that the City's own Commission had recommended such resolutions but had never specified which infractions were eligible.

b. On June 20, 2019, the Legal Defense Fund submitted written comments to all nine members of the Tulsa City Council, by name, renewing that demand and again urging the City to adopt and implement a policy governing alternatives to arrest for minor infractions.

c. Following the death of Terence Crutcher, the City convened the Tulsa Commission on Community Policing, which issued seventy-seven (77) recommendations. According to the Commission's own appendix, the commissioners considered but did not approve any of the measurable action steps that would have produced greater police accountability, including in the areas of use of force and arrests.

d. On May 18, 2017, Mayor Bynum publicly acknowledged reporting that African-Americans in Tulsa were arrested at twice the rate of other races, stating that this was "precisely the type of issue that drove me to run for mayor" and that these were "the great moral issue of our time in this city."

68. The City thus knew, from its own reports, from its own Mayor, from its own Commission, and from written demands addressed to its Mayor and to every member of its City Council, that the Tulsa Police Department arrested Black residents at grossly disproportionate rates and that its officers made custodial arrests for minor infractions where a citation or warning would serve. The City was asked, specifically and repeatedly, to adopt a policy limiting custodial arrest for minor infractions but did nothing. On September 24, 2024, Tulsa police officers arrested Caleb Walker, a Black man, on a fine-only pedestrian infraction that authorizes no custodial arrest, the precise harm of which the City had been warned. The City's failure to act in the face of that knowledge was deliberate indifference.

69. Additionally and in the alternative, the violation of Mr. Walker's rights was caused by the City's failure to train its officers on the limits of their custodial arrest authority for fine-only municipal infractions, and on their obligation to terminate a seizure once the basis for it has been disproved. Plaintiff pleads inadequate training only; no claim of failure to supervise or failure to discipline is asserted, and no claim is asserted against any individual.

70. To recover for a failure to train under 42 U.S.C. § 1983, a plaintiff must establish (1) the existence of a municipal policy or custom involving deficient training; (2) that the policy or custom caused the injury; and (3) that the municipality adopted the policy or custom with deliberate indifference. *Lance v. Morris*, 985 F.3d 787, 800 (10th Cir. 2021). Each element is satisfied here.

71. First, the City provides its officers no meaningful training on the constitutional limits of custodial arrest for fine-only pedestrian and municipal infractions, or on what an officer must do when the identification supporting a detention is disproved during the encounter. That the City's own Commission recommended "least harm" resolutions but never identified which infractions were eligible, and that the City was twice told in writing that no such policy existed, reflects the absence of any training program on the subject.

72. Second, had the Individual Defendants been trained that a fine-only pedestrian infraction furnishes no basis for custodial arrest, and that a seizure must end when its justification is disproved, Mr. Walker would have been released at the scene when the Officers confirmed that he was not Curtis Chaplin. The injury would have been avoided had the officers been trained under a program not deficient in the identified respect. *City of Canton v. Harris*, 489 U.S. 378, 391 (1989).

73. Third, the City adopted that deficient training with deliberate indifference. Deliberate indifference exists where a municipality fails to train officers on how to handle recurring situations presenting an obvious potential to violate the Constitution. *Allen v. Muskogee*, 119 F.3d 837, 842 (10th Cir. 1997). Whether a situation recurs often enough to require training is measured by a three-part test: whether the policymakers know "to a moral certainty" that their employees will confront the situation; whether the situation "presents the employee with a difficult choice of the sort that training or supervision will make less difficult"; and whether "the wrong choice . . . will frequently cause the deprivation of a citizen's constitutional rights." *Lance*, 985 F.3d at 801–02 (quoting *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992), quoting *Canton*, 489 U.S. at 390 n.10).

a. Tulsa police officers execute arrest warrants and encounter pedestrians as an ordinary and recurring part of their duties. The City's policymakers know to a moral certainty that its officers will detain a person on suspicion that he is the subject of a warrant and will then learn, mid-encounter, that they have the wrong man, and that its officers will encounter pedestrians whose manner of crossing a street might be characterized as an infraction. Four officers confronted both situations in this case.

b. What an officer must do when he has seized a person, the identification collapses, and he must decide whether any lawful basis for continued detention remains is precisely the kind of judgment that training makes easier. The City's own position throughout Mr. Walker's municipal prosecution, that "obstruction" and "jaywalking" supplied a basis for a custodial arrest, demonstrates the difficulty: if the City itself maintained for nine months that those charges justified the arrest, its officers could hardly be expected to know otherwise without being taught.

c. The wrong choice is a warrantless custodial arrest unsupported by probable cause, a violation of the Fourth Amendment in every instance. That the wrong choice is made frequently is shown by the incidents described above, in which Tulsa officers arrested persons without lawful basis and supplied substitute "obstruction" and "jaywalking" charges, and by the documented disparities described above.

74. The City has moreover had actual notice that this training was absent. In the May 31, 2018 letter to Mayor Bynum and Council Chair Patrick, and again in the June 20, 2019 comments submitted to all nine members of the Tulsa City Council, the City was told that the Tulsa Police Department had adopted no policy identifying which minor infractions were eligible for citation or warning in lieu of arrest, that it had no de-escalation policy, and that its implicit-bias training had not been entrusted to a trainer with a proven record. The City was given the specific remedy and declined to adopt it. On September 24, 2024, four of its officers made exactly the wrong choice, and Caleb Walker was arrested, jailed, and prosecuted for nine months as a result.

75. The City's ratification of the officers' conduct, and independently the customs, the deliberate indifference, and the inadequate training described above, were each and together the moving force behind, and the direct and proximate cause of, the unlawful seizure of Mr. Walker, his continued detention after the Officers knew he was not the man they sought, the force used against him, and his nine-month prosecution, and the resulting injuries and damages, entitling Mr. Walker to compensatory damages and attorney's fees and costs under 42 U.S.C. §§ 1983 and 1988.

IV.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff Caleb Walker respectfully requests that the Court enter judgment in his favor and against Defendants and award:

a. On Count I, compensatory damages against the City of Tulsa in an amount to be proven at trial, subject to the applicable limits of the Governmental Tort Claims Act, 51 O.S. § 154;

b. On Counts II, III, IV, V, and VI, compensatory damages against the Individual Defendants in an amount to be proven at trial;

c. On Counts II, III, IV, V, and VI, punitive damages against the Individual Defendants in an amount sufficient to punish and deter;

d. On Counts VI and VII, compensatory damages against the City of Tulsa in an amount to be proven at trial;

e. Reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988 on the federal claims;

f. All costs of this action and pre- and post-judgment interest as allowed by law; and

g. Such other and further relief as the Court deems just and equitable.

Plaintiff demands a trial by jury on all issues so triable.

*Respectfully submitted,*

***BRYAN & TERRILL LAW, PLLC***

*s/Steven J. Terrill*
J. Spencer Bryan, OBA #19419
Steven J. Terrill, OBA #20869
2500 S. Broadway, #122

Edmond, Oklahoma 73013
Telephone/Facsimile: (918) 935-2777
jsbryan@bryanterrill.com
sjterrill@bryanterrill.com

-and-

**GARRETT LAW CENTER, PLLC**

D. Mitchell Garrett, Jr., OBA #20704
320 S. Boston Ave., Suite 825
Tulsa, Oklahoma 74103
Telephone: (918) 221-6190
Facsimile: (918) 340-6799
mitchell@garrettlawcenter.com

*Counsel for Plaintiff Caleb Walker*

## CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of September, 2026, a true and correct copy of the foregoing Second Amended Petition was filed and served upon all counsel of record via electronic mail and USPS, and that the newly added Individual Defendants will be served with summons and a copy of this Second Amended Petition as provided by law.

*s/Steven J. Terrill*__________________
Steven J. Terrill